**122**

Michael B. Reynolds (CA Bar #174534)
Christopher H. Bayley (AZ Bar #010764)[1]
Steven D. Jerome (AZ Bar #018420)[2]
SNELL & WILMER L.L.P.
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689
Telephone: 714.427.7000
Facsimile: 714.427.7799
Email: mreynolds@swlaw.com
       cbayley@swlaw.com
       sjerome@swlaw.com
*Proposed Attorneys for Debtor*

Nanette D. Sanders (CA Bar #120169)
RINGSTAD & SANDERS LLP
4343 Von Karman Ave., Suite 300
Newport Beach, CA 92660
Telephone: (949) 851-7450
Email: Nanette@ringstadlaw.com
*Proposed Special Counsel for Debtor*

*Snell & Wilmer*
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| In Re: | Proceedings Under Chapter 11 |
|---|---|
| ECS REFINING, INC., | Case No. _____ |
| Debtor. | DC No. MBR-003 |
| | **EMERGENCY *EX PARTE* MOTION FOR ORDER (1) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. § 364; (2) GRANTING LIENS AND SUPERPRIORITY CLAIMS PURSUANT TO § 364; (3) AUTHORIZING THE USE OF POST-PETITION CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (4) SCHEDULING A FINAL HEARING; AND (5) GRANTING RELATED RELIEF** |
| | Date: <br> Time: <br> Place:     Department _ – Ctrm <br>            501 I Street, _ Floor |

---

[1] Application for admission *pro hac vice* is pending.
[2] Application for admission *pro hac vice* is pending.

1

2

Sacramento, CA 95814
Judge:    Hon.

3    ECS Refining, Inc. (the "Debtor"), debtor and debtor-in-possession in the above-

4    captioned chapter 11 case (the "Bankruptcy Case"), respectfully requests that the court (i)

5    enter an interim order, substantially in the form attached hereto as Exhibit "A" (the

6    "Interim Order"), and (ii) enter a final order (the "Final Order") substantially in the form

7    attached hereto as Exhibit "E" (the Interim Order and Final Order are collectively referred

8    to as the "Financing Orders") pursuant to Sections 105(a), 361, 362, 363, 364, 365, 507,

9    and 552 of Title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001,

10    6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

11    and Rules 4001(c) and 4001(d) of the Local Rules for the U.S. Bankruptcy Court, Eastern

12    District of California ("Local Rules"):

13    (1)    Authorizing the Debtor to obtain post-petition financing up to the principal

14    amount of $6.0 million (the "DIP Loan") from Butch & Sundance LLC ("Lender"),

15    pursuant to the terms of that certain "Loan Agreement" ("DIP Credit Agreement") and

16    related loan and collateral documents (collectively, the "DIP Loan Documents") (true and

17    correct copies of the DIP Credit Agreement, "Secured Promissory Note", and "Security

18    Agreement" are attached hereto as Exhibits "B-1, B-2, and B-3"). The Debtor will use the

19    DIP Loan to: pays its post-petition operating expenses, which include, but are not limited

20    to payroll, insurance, utilities, rent, ordinary and necessary repair and maintenance

21    obligations, and to fund the expenses of the Bankruptcy Case, including but not limited

22    the Debtor's professional fees, all as set forth in the 15-day and 13-week budgets attached

23    hereto as Exhibits "C" and "D", as may be amended from time to time (collectively, the

24    "Budget").

25    (2)    Authorizing and empowering the Debtor to enter into the DIP Loan

26    Documents and all other related documents and agreements and to perform such other and

27    further acts as may be required in connection with the DIP Loan Documents;

28    (3)    Providing, pursuant to Sections 364(c), that the obligations under the DIP

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

EMERGENCY MOTION FOR
POST-PETITION FINANCING

4819-4465-8272

Loan Documents, including, without limitation, principal, accrued interest, and all other obligations and amounts due from time to time under the DIP Loan Documents:

    a.     have priority over any and all administrative expenses, diminution claims, and all other claims against the Debtor, including all administrative expenses of the kind specified in, or ordered pursuant to Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, or 1114 or otherwise, which allowed superpriority claims of the Lender (the "DIP Superpriority Claims") shall be payable from, and have recourse to, any unencumbered pre-petition assets and all post-petition assets of the Debtor as will be provided in the DIP Loan Documents, provided, however, that the DIP Superpriority Claims shall be subject to: (i) the allowed, accrued, but unpaid administrative claims of professionals employed by the Debtor for capped fees and expenses not to exceed the aggregate amount of $750,000.00 as set forth in the Budget which may be paid from the DIP Loan or deposited into a segregated account as accrued; and (ii) payment of fees pursuant to 28 U.S.C. § 1930; and

    b.     are secured by a valid, binding, continuing, enforceable, fully perfected, and unavoidable first priority security interest and lien granted to the Lender (the "Post-Petition DIP Lien") in and on any unencumbered pre-petition assets and all post-petition assets of the Debtor, which shall be, and deemed to be, immediately secured (without any further filings);

    c.     are secured by a valid, binding, continuing, enforceable, fully perfected, and unavoidable security interest and lien granted to the Lender (the "Pre-Petition DIP Lien") in and on any and pre-petition assets of the Debtor, subject only to any existing, as of the Petition Date, valid, perfected and unavoidable liens, which shall be, and deemed to be, immediately secured (without any further filings) (the Post-Petition DIP Lien and the Pre-Petition DIP Lien are collectively referred to herein as the "DIP Lien"); and

    d.     are further secured by a valid, binding, continuing, enforceable, fully perfected, and unavoidable first priority security interest and lien to the Lender (the "DIP

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

3

Chapter 5 Lien") in and on any and all claims arising under Chapter 5 of the Bankruptcy Code, including without limitation Sections 502(d), 544, 547, 548, 549, 550, and 553, any other avoidance action under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, non-bankruptcy law, and the proceeds thereof, whether real or personal, tangible or intangible, and wherever located, and whether now existing or hereafter acquired, including proceeds, products, rents, and profits thereof.

(4)     Authorizing the Debtor, pursuant to Sections 105, 361, 363, 541, and 553, Bankruptcy Rules 2002, 4001, and 9014, and Local Rule 4001, to use post-petition Cash Collateral (as defined under Section 363) in accordance with the terms of the DIP Loan Documents and the Budget, subject to any variance provided by the DIP Loan Agreement and otherwise approved by Lender;

(5)     Vacating and modifying the automatic stay imposed by Section 362 solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and Financing Orders;

(6)     Finding that adequate notice of the Motion has been provided;

(7)     Finding that the Lender has acted in good faith in connection with the DIP Loan Documents and is entitled to the protections afforded under Section 364(e);

(8)     Scheduling, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") before this Court to consider entry of the Final Order approving the DIP Loan and authorizing the use of post-petition Cash Collateral on a final basis;

(9)     Waiving any applicable stay, including under Bankruptcy Rules 4001(b) and (c) and providing for the immediate effectiveness of the Interim Financing Order; and

(10)    Granting related relief.

In addition, in compliance with Bankruptcy Rules 4001(b)(1)(B) and 4001(d)(1)(B) and Local Rule 4001(c), the Debtor provides the following information:

**1.**     Name of each entity with an interest in cash collateral: The Lender has an interest in the Debtor's post-petition Cash Collateral and any unencumbered pre-petition Cash Collateral.  SummitBridge National Investments V LLC ("SummitBridge") may

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California  92626-7689

4

have an interest in the Debtor's pre-petition Cash Collateral. The Debtor does not propose using any pre-petition Cash Collateral that SummitBridge alleges to have a security interest in.[3]

**2.** Purposes for the Use of Cash Collateral: The Debtor proposes to use post-petition Cash Collateral, subject to the terms of the DIP Loan Documents, to pays its operating expenses, which include, but are not limited to payroll, insurance, utilities, rent, and ordinary and necessary repair and maintenance obligations, and to fund the expenses of the Bankruptcy Case, including but not limited to the Debtor's professional fees, as set forth in the Budget.

**3.** Duration for the Use of Cash Collateral: The Debtor seeks an immediate interim order permitting it to use post-petition Cash Collateral, subject to the terms of the DIP Loan Documents, until such time as the court may schedule and hold a final hearing.

**4.** Adequate Protection: As set forth herein, the Debtor will provide the Lender with the DIP Superpriority Claims, the DIP Lien, and the DIP Chapter 5 Lien. The Debtor does <u>not</u> propose to use any pre-petition Cash Collateral that SummitBridge asserts a security interest in.

**5.** In accordance with Local Rule 4001(c)(3)(J), the Debtor discloses that it proposes to grant the Lender the DIP Chapter 5 Lien, as defined above. Other than the DIP Chapter 5 Lien, the proposed Financing Orders do not and will not contain any other provision listed in Local Rule 4001(c)(3).

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## II.    <u>JURISDICTION & VENUE</u>

**1.** This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

**2.** This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b).

---

[3] The Debtor intends to deposit all pre-petition Cash Collateral against which SummitBridge asserts a security interest into a segregated account pending agreement of the parties or a determination by the Court.

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

EMERGENCY MOTION FOR
POST-PETITION FINANCING

4819-4465-8272

**3.**　　　Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.　BACKGROUND

On April 24, 2018 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11, Title 11 of the United States Code ("Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of California ("Court"). Pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code, the Debtor is managing its assets and properties as debtor-in-possession.

### A.　History and Purpose of the Debtor

The Debtor, an electronics recycling company, was founded in 1980 by Jim Taggart and Ken Taggart as a processor of post-manufacturing scrap and residues for original equipment manufacturers in Silicon Valley. As the electronics industry enjoyed rapid growth and manufacturing operations were outsourced to other parts of the world, the Debtor adapted by shifting its focus to processing post-consumer electronics. Through organic growth and strategic acquisitions, the Debtor developed new competences in end-of-life value recovery to become a vertically integrated electronics recycler. The recent widespread use of electronics in the private sector has created a demand for sophisticated services that go above and beyond traditional shred-and-separate commodity recovery. The Debtor has developed value-add and remarketing solutions that allow businesses to maximize the value of their electronics while protecting their brand and data.

Today, the Debtor provides recycling and asset disposition solutions ranging from e-waste shredding to information technology and industrial asset resale. The Debtor is a leader in innovative electronics recycling, offering both end-of-life and asset management services to a variety of markets, by utilizing state-of-the-art technology and over 37 years of experience to provide the most comprehensive, responsible solutions in the industry, maximizing value recovery and ensuring data security while safeguarding the future of the planet. The Debtor's three tenets are security, sustainability, and value recovery.

The Debtor's corporate headquarters are located in Santa Clara, California.

EMERGENCY MOTION FOR
POST-PETITION FINANCING

4819-4465-8272

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California  92626-7689

Additionally, the Debtor has facilities in Santa Fe Springs and Stockton, California; Medford and Portland, Oregon; Mesquite, Texas; Columbus, Ohio; and Rogers, Arkansas. The Debtor currently has approximately 341 employees ("Employees").  The Employees include approximately: (i) 325 full-time employees; (ii) 0 part-time employees; and (iii) 16 contract employees.

### B.   The Debtor's Business Lines

The Debtor primarily operates 3 business lines: the SB 20 program, the end of life program, and the AMS Program, all of which are described below.

### 1.   SB 20

In accordance with the California's Covered Electronic Waste ("CEW") recycling payment specifications under Titles 14 and 27 of the California Code of Regulations, the Debtor, as a certified recycler, recycles both cathode ray tube ("CRT") and non-CRT (flat panel) displays.  The Debtor can only claim with the California Department of Resources Recycling and Recovery ("CalRecycle") pounds of CRT and non-CRT which were cancelled during a reporting month.  For cancelled pounds to be claimable, supporting documentation including all of the following must be provided:  collection logs; source anonymous logs; proof of designation documentation; transfer receipts/weight tickets; cancellation records / processing log; bills of lading; and end-use destination.

The requirement of this documentation indicates that revenue is not earned (the Debtor does not qualify to be paid the legislated rate of $0.49/pound) until material has been processed or cancelled, logs have been collected, and a sufficient amount of correlating glass has been shipped to the Department of Toxic Substance Control's ("DTSC") approved glass outlets. Because of these requirements, the Debtor's CEW revenue matches the CEW claim on a monthly basis, with rare exception. Should any of the aforementioned supporting documentation not meet the state of California's standards, the claim relating to the pounds of cancelled CRT and non-CRT (flat panel) would be rejected by the state, and the Debtor would not receive revenue for those pounds from the state. This occurs in less than 1% of pounds claimed, and when it does, the Debtor bills

7

the collectors and handlers who provided those pounds back at the full lost claim rate of $0.49/pound to recover the lost revenue. CalRecycle pays the Debtor within 90 days of a claim being submitted and is bound by state legislation to pay $0.49/pound for approved cancelled pounds.

### 2. EOL

The end of life program is collection and recycling of electronic products that require processing and recycling because of age, security, or disposal reasons. The Debtor typically charges for these services.

### 3. AMS

**a. AMS Downstream Sales Revenue -** AMS generates downstream sales revenue by selling refurbished electronics to various customers. Sales representatives make inventory types and resale values available to interested parties and arrange a sale, which is documented with a sales order. When material is shipped, title transfers and a sales invoice are posted. AMS downstream sales are all completed cash in advance, so payment must occur prior to shipment.

**b. AMS Upstream Sales Revenue -** AMS generates upstream sales revenue by selling arranged items based on a contract or statement of work. Material prices and fees are agreed upon by both parties, and are set as either fair market value ("FMV") or revenue-share agreements. With FMV contracts, AMS is purchasing material at FMV and recognizing service and destruction revenue when the service is performed. With revenue share agreements, AMS earns no revenue until the material is refurbished and resold, at which time AMS recognizes fee and service revenue as well as cost of goods sold for the material. As AMS is charging fees but paying for material, many of these net transactions result in a payable, rather than a receivable. If a receivable is generated, AMS collects within sixty (60) days, or offsets the receivable against payables.

### C. The Debtor's Agreements

### 1. The Debtor's Leases

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

EMERGENCY MOTION FOR
POST-PETITION FINANCING

4819-4465-8272

a.     **Headquarters Lease** – The Debtor entered into that certain Air Commercial Real Estate Association Standard Industrial/Commercial Single-Tenant Lease-Net on or about October 31, 2016 with Forsyth-Bolin Property Management, LLC, a California limited liability company for 24,000 square feet of property located at 705 Reed Street, Santa Clara, California ("Headquarters Lease"). The Headquarters Lease term is for two (2) years, and is due to expire on October 31, 2018. The base rent is $22,000.00 per month. The Debtor also entered into that certain Air Commercial Real Estate Association Standard Industrial/Commercial Single-Tenant Lease-Gross on or about December 28, 2008 with David Fontana and Dorothy Smith, for 4,151 square feet of office space located at 735 Reed Street, Santa Clara, California (as amended, "Second Santa Clara Lease"). The Second Santa Clara Lease is due to expire on October 31, 2021. The rent is currently $9,785.00 per month, and is set to increase to $10,079.00 per month on November 1, 2018.

b.     **Warehouse Leases** – The Debtor has leased warehouse/industrial space in California, Oregon, Texas, Ohio, and Arkansas.

1)     2222 South Sinclair Avenue, Stockton, California. The Debtor entered into that certain Industrial/Commercial Single-Tenant Lease [Net Net Net] with Sinclair Partners, LLC, a California limited liability company, on or about March 1, 2011 for 262,000 square feet of warehouse space (as amended, "Stockton Lease"). The Stockton Lease term is twenty (20) years, and is due to expire on February 28, 2031. The Debtor has the option to terminate the lease as of March 1, 2021 by paying a $1,500,000 termination fee. The base rent is $90,000.00 per month, and is increased by no less than a 3.25% cost of living adjustment each year.

2)     12420 Bell Ranch Drive, Santa Fe Springs, California. The Debtor entered into that certain Lease Agreement with Prologis, L.P. on or about July 15, 2016, for 9,519 square feet of warehouse space ("Santa Fe Springs Lease"). The Santa Fe Springs Lease term is three (3) years.

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

4819-4465-8272

Base rent is currently $6,863.20 per month, and is set to increase on August 1, 2018 to $7,069.10 per month.

3) <u>6823/6829 N.E. 59th Place, Portland, Oregon</u>. The Debtor entered into that certain Sublease with Diamond Line Delivery Service, Inc., an Idaho corporation, on or about December 1, 2017, for a 46-door portion of a 61-door truck terminal situated on approximately 4.7 acres ("<u>Portland Sublease</u>"). The Portland Sublease term is 13 months. The rent is $3,500 per month.

4) <u>407 Boardman Street, Medford, Oregon</u>. The Debtor entered into a lease extension of that certain lease with Cliff Krause on or about January 1, 2018 ("<u>Medford Lease</u>"). The Medford Lease term is three (3) years. Rent is currently $2,890.00 per month.

5) <u>1515 Big Town Blvd., Mesquite, Texas</u>. The Debtor entered into that certain Industrial/Commercial Single-Tenant Lease with ECS Big Town, LLC, a Texas limited liability company, on or about January 12, 2012 for approximately 216,000 square feet of industrial space (as amended, "<u>Texas Lease</u>"). The Texas Lease term is ten (10) years and six (6) months, and is due to expire on July 1, 2022. The base rent is currently $51,322.83 per month, and is due to increase to $52,605.90 per month on August 1, 2018.

6) <u>711 Distribution Drive, Columbus, Ohio</u>. The Debtor entered into that certain Lease Agreement with Distribution Drive Partners LLC, an Ohio limited liability company, on or about January 31, 2018 for 26,000 square feet of industrial space ("<u>Ohio Lease</u>"). The Ohio Lease term is six (6) months, and is due to expire on July 31, 2018. The rent is $10,725.00 per month.

7) <u>1315 North 13th Street, Rogers, Arkansas.</u> The Debtor entered into that certain Sublease Agreement and Guaranty with Ozark Liquidation

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

10

4819-4465-8272

Services, LLC, an Arkansas limited liability company, on or about July 8, 2016, for 31,963 square feet of warehouse space located at 1  315 North 13th Street, Rogers, Arkansas (as amended, "Arkansas Sublease"). The Arkansas Sublease term is two (2) years, and rent is $10,228.16 per month.

    **c.**    **Truck Leases** – The Debtor entered into that certain Vehicle Lease Service Agreement on or about May 4, 2015 with Penske Truck Leasing Co., L.P. for approximately 3 trucks (as amended, the "Penske Lease"). Additionally, the Debtor entered into that certain Truck Lease & Service Agreement on or about May 5, 2015 with Ryder Truck Rental, Inc. d/b/a Ryder Transportation Services for approximately 6 trucks ("Ryder Lease," with the Penske Lease, the "Truck Leases").

    **D.**    **The Debtor's Assets**

    **1.**    **Machinery & Equipment**. The bulk of the Debtor's assets are certain machinery and equipment used in the operation of its business ("Equipment"). As of February 2018, the Equipment's gross liquidation value is approximately $3 to $4.5 million.

    **2.**    **Intellectual Property.** The Debtor is the owner of that certain patent no. 8,668,540 registered on March 11, 2014 ("Patent"), and those certain trademarks no. 85-120,008 and 85-092,939, registered on August 31, 2010 and July 26, 2010, respectively ("Trademarks," together with the Patent, the "IP"). The IP's value is approximately $19,720.92.

    **3.**    **Securities.** The Debtor owns 100% of the equity interest in Regenesys Glass Processing, LLC, a California limited liability company ("Regenesys"). The value of the Debtor's ownership interest in Regenesys is approximately $0.

    **4.**    **Other Assets.** In addition to the Equipment, IP, securities, substantial good will and other general intangibles, as of the Petition Date, the Debtor had approximately: (i) $9,838,316.99, at book value, of property and equipment; (ii) $811,638.75, at book value, of leased property-tenant improvements-net; (iii)

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

11

$495,547.95, at book value of physical inventory; (iv) $7,129,561.34 at book value, in receivables, prepaid expenses, and other current assets; and (v) $0 in cash.

### E. The Debtor's Liabilities

The Debtor's total liabilities stood at approximately $32,888,318.41 as of the Petition Date, of which approximately $25,927,581.91 is secured debt and approximately $6,960,736.50 is unsecured debt. Details regarding the Debtor's principal creditors are as follows:

#### 1. The Debtor's Secured Creditor

**a.** **SummitBridge National Investments V LLC**– on or about February 6, 2012, the Debtor entered into that certain Credit Agreement (as amended, the "SummitBridge Loan Agreement") with Bank of America, N.A. ("BofA"), whereby BofA made to the Debtor (i) that certain revolving loan in the maximum principal commitment amount of $15,000,000; and (ii) that certain acquisition term loan in the maximum principal commitment amount of $35,000,000 (collectively, the "SummitBridge Loans"). Thereafter, BofA assigned the SummitBridge Loans to SummitBridge National Investments V LLC ("SummitBridge"). The SummitBridge Loans are guaranteed by Regenesys. The SummitBridge Loans are secured by a blanket lien on the Debtor's personal property, as well as the IP and the Debtor's 100% equity interest in Regenesys. On or about June 21, 2017, the Debtor and Regenesys entered into that certain Forbearance Agreement with SummitBridge, whereby the Debtor acknowledged events of default under the SummitBridge Loans, including the maturity of the loans, and pursuant to which SummitBridge agreed to forbear from exercising its rights and remedies under the loan documents through December 31, 2017. Since that time, the Debtor and SummitBridge engaged in negotiations to resolve the default under the SummitBridge Loan Agreement. However, a resolution was not reached.

### F. Management of the Debtor

The Debtor is governed by a Board of Directors, which elects officers to manage the Debtor. The following table lists Debtor's officers/management personnel:

EMERGENCY MOTION FOR
POST-PETITION FINANCING

4819-4465-8272

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

| Name | Position |
|------|----------|
| Jim Taggart | Chief Executive Officer |
| Jack Rockwood | President |
| Ken Taggart | Executive Vice President |
| Jeff Bell | VP of Operations |
| Michael Keltner | Controller |

### G. Purpose Behind the Case Filing & Strategy for Reorganization

In or around January 2016, prior to BofA selling the SummitBridge Loans to SummitBridge, BofA revoked the Debtor's ability to draw from its revolving credit line. The Debtor relied on those funds for working capital, as accounts receivable[4] are not consistent enough to provide cash flow necessary for operations on a daily basis. As a result, the Debtor could not perform under the Forbearance Agreement with SummitBridge, which expired on or about December 31, 2017. Thereafter, SummitBridge threatened to move for the appointment of a receiver over the Debtor to liquidate the Debtor's assets. The Debtor filed the Case in order to stay SummitBridge's collection efforts, and obtain time to attempt to reorganize its liabilities and maintain its business as a going concern. The Debtor intends to operate by utilizing the proceeds of the DIP Loan and post-petition receivables.

## IV. RELIEF REQUESTED

Debtor requests the entry of an Interim Order and the Final Order:

### A. Authorization for Post-Petition Financing on an Interim Basis

1) Authorizing the Debtor, as borrower, to obtain post-petition financing during the period from the entry of the Interim Order through and including the earlier of (i) the entry of a Final Order or (ii) the date that is forty-five (45) days after the entry of

---

[4] The Debtor pays some of its customers for the electronics it recycles, and then resells the materials once recycled for a profit. However, by the time it sells the processed materials, the Debtor will have paid for and received additional recyclables from that same customer. As a result, the Debtor's accounts receivable and accounts payable are in a constant state of flux.

EMERGENCY MOTION FOR
POST-PETITION FINANCING

4819-4465-8272

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

the Interim Order if the Final Order entry date shall not have occurred by such date (the "Interim Period"), and subject to the terms and conditions of the Interim Order and the DIP Loan Documents, in an aggregate outstanding principal amount not to exceed $2,300,000.00 (the "Interim Advance"). The Debtor submits that it will use the Interim Advance, as set forth in the Budget, to: pay its post-petition operating expenses, which include, but are not limited to payroll, insurance, utilities, rent, ordinary and necessary repair and maintenance obligations, and to fund the expenses of the Bankruptcy Case, including but not limited the Debtor's professional fees. Furthermore, as set forth in the Budget, the Debtor anticipates that it will require approximately $2.3 Million in the next 15 days in order to pay the above-mentioned expenses. Since the Debtor will not utilize any of its pre-petition account receivables, the Debtor anticipates that it will incur approximately $440,000 in expenses from the Petition Date through the close of business on Friday, April, 27, 2018, an additional approximately $695,000 for the week of Monday, April 30, 2018 through Friday May 4, 2018, and an additional approximately $1.15 Million for the week of Monday, May 7, 2018 through Friday, May 11, 2018. The Debtor anticipates that it will take a minimum of three weeks to collect any of its receivables generated post-petition as the Debtor ramps up its post-petition operations. During that period, the Debtor will continue to incur expenses, as noted above and as set forth in the Budget, and thus requires funding from the DIP Loan in order to cover such expenses.

2)     Authorizing and empowering the Debtor, on an Interim basis, to enter into the DIP Loan Documents and all other related documents and agreements and to perform such other and further acts as may be required in connection with the DIP Loan Documents.

3)     Providing, pursuant to Sections 364(c), that the obligations under the DIP Loan Documents, including, without limitation, principal, accrued interest, and all other obligations and amounts due from time to time under the DIP Loan Documents:

4819-4465-8272

i.      Shall be DIP Superpriority Claims, as defined above; and

ii.     Secured by the DIP Lien, as defined above; and

**B.**    **Authorization to Use Post-Petition Financing on an Interim Basis**

1)    Authorizing the Debtor, on an interim basis, pursuant to Bankruptcy Code Sections 105, 361, 363, 541, and 553, Bankruptcy Rules 2002, 4001, and 9014, and Local Rule 4001, to use post-petition Cash Collateral (as defined under Section 363) in accordance with terms of the DIP Loan Documents and the Budget, subject to any variance provided by the DIP Loan Agreement and otherwise approved by Lender.

**C.**    **Authorization for Post-Petition Financing on a Final Basis**

1)    Authorizing the Debtor, as borrower, to obtain post-petition financing up to the principal amount of $6.0 Million from the Lender, pursuant to the terms of the DIP Loan Documents and the Final Order. The Debtor will use the DIP Loan to: pays its post-petition operating expenses, which include, but are not limited to payroll, insurance, utilities, rent, ordinary and necessary repair and maintenance obligations, and to fund the expenses of the Bankruptcy Case, including but not limited the Debtor's professional fees, as set forth in more detail in the Budget.

2)    Authorizing and empowering the Debtor, on a final basis, to enter into the DIP Loan Documents and all other related documents and agreements and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

3)    Providing, pursuant to Sections 364(c), that the obligations under the DIP Loan Documents, including, without limitation, principal, accrued interest, and all other obligations and amounts due from time to time under the DIP Loan Documents:

i.      Shall be DIP Superpriority Claims, as defined above; and

ii.     Secured by the DIP Lien, as defined above; and

iii.    Secured by the DIP Chapter 5 Lien, as defined above.

**D.**    **Authorization to Use Post-Petition Cash Collateral on a Final Basis**

Authorizing the Debtor, pursuant to Bankruptcy Code Sections 105, 361, 363, 541,

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

EMERGENCY MOTION FOR
POST-PETITION FINANCING

4819-4465-8272

and 553, Bankruptcy Rules 2002, 4001, and 9014, and Local Rule 4001, to use post-petition Cash Collateral (as defined under Section 363) in accordance with terms of the DIP Loan Documents and the Budget, subject to any variance provided by the DIP Loan Agreement and otherwise approved by Lender.

## V.    <u>LEGAL ARGUMENT</u>

### A.    <u>The Debtor Should Be Authorized to Obtain the Proposed DIP Loan from the Lender to Maintain its Business and Preserve the Value of its Assets.</u>

Pursuant to Section 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interest of the estate. *See e.g., In re Simasko Production Co.*, 47 B.E. 444, 448-9 (D. Colo. 1985) (authorizing interim financing agreement where the debtor's business judgment indicated financing was necessary and for the benefit of the estate); *In re Ames Dept. Stores*, 115 B.E. 34, 38 (Bankr. S.D.N.Y. 1990) (which respect to post-petition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties").  Section 364(c) provides in pertinent part, that:

> (c)   If the trustee [or debtor-in-possession] is unable to obtain unsecured credit allowable under Section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
> (1) with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

Section 364 is structured with an escalating series of inducements which a debtor-in-possession may offer to attract credit during the post-petition period.  *In re Photo Promotion Associates, Inc.*, 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), *aff'd* 881 F.2d 6

Snell & Wilmer

L.L.P.

LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

16

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

(2d. Cir. 1989). Where a trustee or debtor in possession cannot otherwise obtain unsecured prepetition credit, such credit may be obtained under certain carefully proscribed conditions. *In re T.M. Sweeney & Sons LTL Services*, 131 B.R. 984, 989 (Bankr. N.D. Ill. 1991). For example, if creditors are unwilling to extend unsecured credit to a debtor-in-possession, further inducements are offered, with court approval after notice and a hearing, including, without limitation, liens equal to or senior to existing liens on encumbered property in accordance with 11 U.S.C. § 364(d). *In re Photo Promotion Associates, Inc.*, 87 B.R. at 839.

Section 364(c) also enumerates certain incentives that a court may grant to post-petition lenders. However, the list set forth Section 364(c) is not exhaustive. Courts have frequently authorized the use of inducements not specified in the statute. *See e.g., In re Ellingsen MacLean Oil Co.*, 834 F.2d 599 (6th Cir. 1987) (affirming financing order which prohibited any challenges to the validity of already existing liens); *In re Defender Drug Stores*, 126 B.R. 76 (Bankr. D. Ariz. 1991) (authorizing enhancement fee to post-petition lender), *aff'd* 145 B.R. 312, 316 (9th Cir. B.A.P. 1992) ("[b]ankruptcy courts … have regularly authorized post-petition financial arrangements containing lender incentives beyond the explicit priorities and liens specified in Section 364").

Here, the Debtor's post-petition cash flow alone will be insufficient to pay its immediate and ongoing expenses. Additional financing is necessary to maintain business operations pending the Debtor's plan of reorganization for the benefit of its creditors. Subject to the approval of the Court, and in order to obtain the necessary DIP Loan, the Debtor has agreed to provide the Lender with (1) the DIP Superpriority Claims; (2) the DIP Lien; and (3) the DIP Chapter 5 Lien. For all of the reasons explained herein, the Debtor believes that granting the Lender the foregoing protections is warranted, appropriate, and necessary given the circumstances of this case, where the Lender has agreed to provide the Debtor with a critically necessary emergency DIP Loan and the consensual use of post-petition Cash Collateral thereafter, without which the Debtor would be forced to cease operations.

17

4819-4465-8272

Two facts courts traditionally consider in determining whether to authorize post-petition financing which contemplates the granting of a security interest in favor of the lender are: (1) whether the debtor is unable to obtain unsecured credit under Section 364(b), *i.e.*, by allowing a lender only an administrative claim under Section 364(b)(1)(A); and (2) whether the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender. *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D.Pa. 1987); *see also In re Aqua Assoc.*, 123 B.R. 192, 195 (Bankr. E.D.Pa. 1991). The Debtors submit that all of these standards have been satisfied in this case.

### 1. The Debtor Is Unable to Obtain Unsecured Credit or Secured Credit on a Junior Lien Basis

In satisfying the standards of Section 364, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available under § 364(a) and (b). *See In re Snowshoe Co.*, 789 F.2d 1085, 1089 (4th Cir. 1986) (trustee had demonstrated good faith effort that credit was not obtainable without senior lien by unsuccessfully contacting other financial institutions in the immediate geographic area; "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *Ames, supra,* 115 B.R. at 40 (finding that debtors demonstrated the unavailability of unsecured financing where debtors approached four lenders).

To date, the best (and only current) post-petition financing commitment that has been provided to the Debtor is the one offered by the Lender. During the last several months, the Debtor's principals diligently sought financing from both traditional and non-traditional lenders. Despite their efforts, the Debtor's principals were unable to locate a traditional or non-traditional lender that would extend a loan to the Debtor. While one traditional lender was initially interested in providing a debt facility to the Debtor, it subsequently declined to provide a debt facility, in part, due to the small amount of the total facility.

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

18

In order to avoid a complete shutdown of the Debtor's business, the immediate liquidation of the Debtor's assets, and the possible dismissal or conversion of the Debtor's Bankruptcy Case, the Debtor diligently sought other sources of additional financing before the Petition Date. Considering the circumstances and that lenders are likely not willing to lend to a debtor in financial distress without obtaining superpriority claims and liens to protect and secure claims arising from post-petition financing, the Debtor believed it would be unable to obtain sufficient financing on a timely basis from sources other than the Lender on terms and subject to conditions more favorable than under the terms of the DIP Loan Documents.

The Lender offered to provide the Debtor with post-petition financing but solely on the terms and conditions outlined in the DIP Loan Documents. Accordingly, the Debtor agreed to provide the Lender with the DIP Superpriority Claims, the DIP Lien, and DIP Chapter 5 Lien, as well as the other customary protections set forth in the DIP Loan Documents. The Debtor has little doubt that, even if there were another lender who was willing to provide it with the necessary post-petition financing, such lender would also require protections upon terms that would be no more favorable than those offered by the Lender. Indeed most, if not all, of the other lenders that the Debtor contacted to provide post-petition financing that responded were also requiring similar terms and conditions to those set forth in the DIP Loan Documents. The terms and conditions set forth in the DIP Loan Documents were negotiated extensively, in good faith, and at arm's length by the parties.

After considering all of their alternatives, the Debtor has concluded, in the exercise of its sound business judgment, that the DIP Loan (particularly in conjunction with the authorization to use post-petition Cash Collateral to be provided by the Lender) represents the best financing presently available to the Debtor.

**2.      The Terms of the Proposed Post-petition DIP Loan from the Lender Are Fair, Reasonable, and Adequate.**

The Debtor submits that, under the current circumstances, the terms of the

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

19

proposed DIP Loan from the Lender are extremely fair, reasonable, and adequate. The proposed DIP Loan has a contract rate of interest of eight percent (8%) and a default rate of interest of twelve percent (12%). The Lender is not charging origination points or fees associated with the DIP Loan and is not charging any of the other additional fees and costs typically associated with a post-petition loan to a bankruptcy debtor. The Lender is well aware of the fact that the Debtor would have very little chance of avoiding an immediate shutdown of its business if not for the DIP Loan offered by the Lender. The Lender has agreed to provide the DIP Loan to the Debtor in an effort to assist the Debtor in preserving the going concern value of the Debtor's business and to facilitate the successful consummation of the Debtor's reorganization. The Debtor submits that the benefits afforded to the Debtor by the DIP Loan justify the protections being afforded under the terms of the DIP Loan Documents. The DIP Loan offers the Debtor its best, and likely only, opportunity to maintain and preserve the value of its assets while pursuing its plan of reorganization, which will benefit all creditors and parties in interest.

Based on the foregoing, the Debtor believes that: (1) the terms and conditions of the proposed DIP Loan under the DIP Loan Documents are fair and reasonable, reflect the Debtor's exercise of its prudent business judgment in light of the current circumstances and are supported by reasonably equivalent value and fair consideration; (2) the DIP Loan has been negotiated in good faith and at arm's length by the Debtor and the Lender; and (3) any credit extended, loans made, and other financial accommodations extended to the Debtor by the Lender have been extended, issued, or made, as the case may be, in "good faith" within the meaning of Section 364.

### 3.    The Proposed DIP Loan from the Lender is Necessary and Proper

While determining whether to approve such a transaction, a court is authorized to act in its informed discretion. *In re Ames Department Stores, Inc.*, 115 B.R. at 37. The Court should give broad deference to the business decision of a Chapter 11 debtor, particularly with respect to a debtor's business judgment regarding the need for and proposed use of funds. *Richmond Leasing Co. v. Capital Bank N.A.*, 762 F.2d 1303, 1311

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

EMERGENCY MOTION FOR
POST-PETITION FINANCING

4819-4465-8272

(5th Cir. 1985). As the court noted in the *In re Ames Dept. Stores, Inc.* "the court's discretion under section 364 is to be utilized on the grounds that permit the reasonable business judgment [of the Debtor] to be exercised . . . ." *In re Ames Department Stores, Inc.*, 115 B.R. at 40.

There is no dispute that, without substantial post-petition financing, the Debtor will be forced to immediately cease business operations and engage in a fire sale of its assets without the ability to maximize their value through its planned reorganization, which it plans to effectuate within the exclusivity period, if not sooner, and which will benefit all creditors. In contrast, the proposed DIP Loan affords the Debtor the ability to maintain the going-concern value of its business and provides the Debtor with the time necessary to pursue an orderly reorganization. The Debtor has therefore concluded that obtaining the proposed DIP Loan from the Lender is critically important and is in the best interest of the Debtor's estate.

### B. The Debtor Should Be Authorized to Use Post-Petition Cash Collateral Provided by the DIP Loan to Pay Necessary Operating Expenses as Set Forth in the Budget

### 1. The Debtor Must be Authorized to Use Post-Petition Cash Collateral to Operate, Maintain, and Preserve Its Assets in Accordance with the Budget

The Debtor's use of property of the estate is governed by Section 363. 11 U.S.C. § 363(c). Section 363(c)(1) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section … 1108 … of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

A debtor-in-possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363. 11 U.S.C. § 1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title,

EMERGENCY MOTION FOR
POST-PETITION FINANCING

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

4819-4465-8272

1　securities, deposit accounts or other cash equivalents in which the estate and an entity

2　other than the estate have an interest." 11 U.S.C. § 363(a). Section 363(c)(2) establishes

3　a special requirement with respect to "cash collateral" providing that the trustee or debtor

4　in possession may use "cash collateral" under subsection (c)(1) if:

5　　　　　(A) each entity that has an interest in such cash collateral
6　　　　　consents; or

7　　　　　(B) the court, after notice and a hearing, authorizes such use,
　　　　　sale or lease in accordance with the provisions of this section.

8　11 U.S.C. §§ 363(c)(2)(A) and (B).

9　　　　It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral

10　for the purpose of maintaining and operating its property. 11 U.S.C. § 362(c)(2)(B); *In re*

11　*Oak Glen R-Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); *In re Tucson Industrial*

12　*Partners*, 129 B.R. 614 (9th Cir. B.A.P. 1991). In addition, where the debtor is operating

13　a business, it is extremely important that access to cash collateral be allowed in order to

14　facilitate the goal of reorganization: "[T]he purpose of Chapter 11 is to rehabilitate

15　debtors and generally access to cash collateral is necessary to operate a business." *In re*

16　*Dynaco Corp.*, 162 B.R. 389 (Bankr. D.N.H. 1993) (quoting *In re Stein*, 19 B.R. 458, 459

17　(Bankr. E.D. Pa. 1982).

18　　　　For all the reasons discussed herein, the Debtor has no ability to continue to

19　maintain its business operations or preserve the value of their assets unless they: (1) obtain

20　the DIP Loan from the Lender, which will result in the Debtor's cash becoming the

21　Lender's Cash Collateral; and (2) have the ability to use post-petition Cash Collateral to

22　pay the Debtor's projected expenses in accordance with the Budget. The Debtor's

23　inability to pay those expenses would cause immediate and irreparable harm to its estate.

24　Indeed the Debtor's inability to pay their expenses, including utilities, insurance, payroll,

25　and other operating expenses set forth in the Budget would result in the immediate or near

26　immediate shutdown of its business and the decimation of its value (going concern or

27　otherwise). The maintenance of the Debtor's business and preservation of its assets are

28　critical to maximizing value and providing for recoveries to creditors in this case.

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

22

EMERGENCY MOTION FOR
POST-PETITION FINANCING

**2.     The Lender Has Consented to the Debtor's Use of Post-Petition Cash Collateral**

Pursuant to Section 363(c)(2), the Court may authorize a debtor in possession to use a secured creditor's cash collateral if the secured creditor consents to the use of cash collateral or is adequately protected.  *In re Mellor*, 734 F.2d at 1400; *see also In re O'Connor*, 808 F.2d at 1398; *In re McCombs Properties VI, Ltd.*, 88 B.R. at 265.

Here, the Lender has consented to the Debtor's use of post-petition Cash Collateral to pay the expenses set forth in the Budget in accordance with the provisions of the DIP Loan Documents.  Based on the foregoing, the Debtor submits that the requirements of Section 363(c)(2) have been satisfied and that it should be authorized to use the Lender's post-petition Cash Collateral in accordance with the Budget.

**C.     11 US.C. § 552 Cuts Off Any Security Interest That SummitBridge Has in the Debtor's Assets**

Section 552(a) provides that "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case."  In other words, "Section 552(a) cuts off security interests on property acquired by the debtor after the petition date even if there is an "after-acquired" clause in the security agreement." *In re Skagit Pacific Corp.*, 316 B.R. 330, 335 (B.A.P. 9th Cir. 2004); *see also In re Bering Trader, Inc.*, 944 F.2d 500, 501 (9th Cir. 1991) ("[T]he general rule [is] that a prepetition security interest does not extend to property acquired by the estate after the filing of the petition."); *In re Endresen*, 548 B.R. 258, 268 (B.A.P. 9th Cir. 2016) ("[P]roperty acquired postpetition by the debtor or the estate is not subject to any lien resulting from any prepetition security agreement.").  Thus, any security interest that SummitBridge may have in the Debtor's assets does not extend to post-petition property acquired by the Debtor or its estate.  Accordingly, SummitBridge has no interest in the post-petition collateral that the Debtor grants the Lender a first position security interest in pursuant to

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California  92626-7689

23

4819-4465-8272

the DIP Loan Documents.[5]

### D.     The Waiver of Any Applicable Stay is Appropriate.

For the reasons noted herein, the Debtor will suffer immediate and irreparable harm if the Debtor is not able to pay the expenses set forth in the Budget, pending a final hearing on the Motion.   The terms of the Interim Order must become effective immediately to ensure that the Debtor will be able to obtain the proposed DIP Loan from the Lender and use the post-petition Cash Collateral provided by the DIP Loan to pay its urgent expenses.   Based on the foregoing, the Debtor respectfully requests that any applicable stay, including the stay provided under Bankruptcy Rule 6004, be waived to allow the Interim Order to become immediately effective.

## VI.   NOTICE

Pursuant to Bankruptcy Rule 4001(b)(1) and Local Rule 4001(d), the Debtor, contemporaneously with the filing of this Motion, served this Motion on SummitBridge, the United States Trustee, and the Debtor's twenty (20) largest unsecured creditors. Furthermore, as of the filing date, this Motion is a public record and available for inspection after that time.  Therefore, the Debtor believes that all parties entitled to notice under the Bankruptcy Code, Bankruptcy Rules, and Local Rules have been served with a copy of this Motion and will receive actual notice.

## VII.   CONCLUSION

WHEREFORE, for all of the foregoing reasons, the Debtor respectfully requests that the Court:

(1)     affirm the adequacy of the notice given;

(2)     grant the relief requested in this Motion on an interim basis;

(3)     enter the proposed Interim Order in substantially the form attached hereto as Exhibit A;

---

[5] To the extent that SummitBridge has a security interest in the Debtor's pre-petition assets, the Debtor grants the Lender a junior lien on such assets.  Therefore, the Debtor is not attempting to "prime" any pre-petition security interest that SummitBridge may have in the Debtor's assets.

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

EMERGENCY MOTION FOR
POST-PETITION FINANCING

4819-4465-8272

(4)     schedule a Final Hearing on the Motion to consider entry of a Final Order granting the relief requested in this Motion on a final basis; and

(5)     grant such further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 24th day of April, 2018.

SNELL & WILMER L.L.P.


By: */s/  Michael B. Reynolds*
    Michael B. Reynolds
    Christopher H. Bayley
    Steven D. Jerome
    600 Anton Blvd., Suite 1400
    Costa Mesa, CA 92626
    *Proposed Attorneys for Debtor*

EMERGENCY MOTION FOR
POST-PETITION FINANCING

4819-4465-8272

# EXHIBIT A

**22**

Michael B. Reynolds (CA Bar #174534)
Christopher H. Bayley (AZ Bar #010764)[1]
Steven D. Jerome (AZ Bar #018420)[2]
SNELL & WILMER L.L.P.
600 Anton Blvd, Suite 1400
Costa Mesa, California  92626-7689
Telephone:    714.427.7000
Facsimile:      714.427.7799
Email: mreynolds@swlaw.com
          cbayley@swlaw.com
          sjerome@swlaw.com
*Proposed Attorneys for Debtor*

Nanette D. Sanders (CA Bar #120169)
RINGSTAD & SANDERS LLP
4343 Von Karman Ave., Suite 300
Newport Beach, CA 92660
Telephone:      (949) 851-7450
Email: Nanette@ringstadlaw.com
*Proposed Special Counsel for Debtor*

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| In Re: | Case No. _____ |
| ECS REFINING, Inc., | Chapter 11 |
| Debtor. | DCN:    MBR-003 |
| | **INTERIM ORDER (1) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. § 364; (2) GRANTING LIENS AND SUPERPRIORITY CLAIMS PURSUANT TO § 364; (3) AUTHORIZING THE USE OF POST-PETITION CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (4) SCHEDULING A FINAL HEARING; AND (5) GRANTING RELATED RELIEF** |

---

[1] Application for admission *pro hac vice* is pending.
[2] Application for admission *pro hac vice* is pending.

INTERIM ORDER RE POST-PETITION FINANCING

4811-3961-4048

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

Upon the "Emergency *Ex Parte* Motion for Order (1) Authorizing Debtor to Obtain Post-Petition Financing Pursuant to 11 U.S.C. § 364; (2) Granting Liens and Superpriority Claims Pursuant to § 364; (3) Authorizing the Use of Post-Petition Cash Collateral Pursuant to 11 U.S.C. § 363; (4) Scheduling a Final Hearing; and (5) Granting Related Relief" dated April 24, 2018 (the **"DIP Motion"**), ECS Refining, Inc. (the "Debtor"), as debtor and debtor-in-possession, in the above-referenced case (the "Bankruptcy Case"), seeking entry of an interim order (this **"Interim Order"**) pursuant to sections 105(a), 361, 362, 363, 364, 365, 507, and 552 of Title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**) and Rules 4001(c) and 4001(d) of the Local Rules of Bankruptcy Procedure for the Eastern District of California (the "Local Rules"), that, among other things:

1.      authorizes the Debtor to enter into a secured, super-priority, multiple draw term credit facility (such facility, the "DIP Facility") of up to $2,300,000.00 in aggregate principal amount pursuant to the terms of (a) this Interim Order, (b) that certain "Loan Agreement" in substantially the form attached hereto as Exhibit A (as the same may be amended, restated, supplemented or otherwise modified from time to time and subject to the restrictions set forth herein, the "DIP Loan Agreement")[3] among the Debtor and Butch & Sundance, LLC as the lender (the "Lender"), and (c) any and all other Loan Documents (as defined in the DIP Loan Agreement) (together with the DIP Loan Agreement, collectively, the "DIP Loan Documents"), which, if approved on a final basis, would consist of $6,000,000.00 in new money funding (the "DIP Loan"), of which up to approximately $2,300,000.00 shall be available upon entry of this Interim Order, subject to the terms and conditions of this Interim Order, the Final Order (as defined below), and the DIP Loan Documents (any DIP Loan made to or for the benefit or account of the Debtor, and all other obligations and liabilities of the Debtor arising under the DIP Loan

---

[3] Unless otherwise specified, all capitalized terms used herein without definition shall have the respective meanings given such terms in the DIP Credit Agreement.

INTERIM ORDER RE POST-PETITION FINANCING

Documents are collectively referred to as the "DIP Obligations");

2.      approves the terms of, and authorizes and directs the Debtor to execute and deliver, and perform under, the DIP Loan Documents and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

3.      authorizes and directs the Debtor to grant the Lender (1) superpriority administrative expense claims having recourse to any unencumbered pre-petition assets and all post-petition assets of the Debtor (the "DIP Superpriority Claims"), (2) a valid, binding, continuing, enforceable, fully perfected, and unavoidable first priority security interest and lien granted to the Lender (the "DIP Lien", as more fully defined herein) in and on any unencumbered pre-petition assets and all post-petition assets of the Debtor and a junior valid, binding, continuing, enforceable, fully perfected, and unavoidable first priority security interest and lien granted to the Lender on all encumbered pre-petition assets, subject only to the valid and enforceable existing liens, which shall be, and deemed to be, immediately secured (without any further filings);

4.      authorizes the Debtor to use post-petition "cash collateral," as such term is defined in Section 363 of the Bankruptcy Code (the "Cash Collateral");

5.      vacates the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order;

6.      schedules a final hearing on the DIP Motion to be held within 30 days after the entry of this Interim Order (the "Final Hearing") to consider entry of a final order that grants all of the relief requested in the DIP Motion on a final basis (the "Final Order"); and

7.      waives any applicable stay, including under Bankruptcy Rule 6004, and provides for immediate effectiveness of this Interim Order.

Having considered the DIP Motion, the Omnibus Declaration of Jack Rockwood in Support of First Day Motions, the DIP Credit Agreement, and the evidence submitted at the interim hearing (the "Interim Hearing") on the DIP Motion; and in accordance with

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

3

Bankruptcy Rules 2002, 4001, and 9014 and all applicable Local Rules, notice of the DIP Motion and the Interim Hearing having been given; an Interim Hearing having been held and concluded on _____; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtor and its estate pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Debtor, its estate, its creditors, and all parties-in-interest, and is essential for the continued operation of the Debtor's business; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**IT IS FOUND AND DETERMINED** that:

**A.     Petition Date**.  On April 24, 2018 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Eastern District of California (the "Bankruptcy Court"). The Debtor has continued in the management and operation of its business and property as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No statutory committee of unsecured creditors (to the extent such committee is appointed, the "Committee"), trustee, or examiner has been appointed in the Bankruptcy Case.

**B.     Jurisdiction and Venue**.  The Bankruptcy Court has core jurisdiction over the Bankruptcy Case, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  Venue for the Bankruptcy Case is proper before the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The legal predicates for the relief sought herein are Sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, and Local Rule 4001.

**C.     Authority**.  The Debtor has duly authorized entry into the DIP Loan Documents to which it is a party by all necessary corporate action and, upon execution, the DIP Loan Documents will constitute a legal, valid, and binding obligation of the Debtor in accordance with their terms.

**D.     Notice**.  The Interim Hearing was held pursuant to the authorization of Bankruptcy Rule 4001.  The Debtor provided notice of the Interim Hearing and the relief

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California  92626-7689

INTERIM ORDER RE POST-PETITION FINANCING

requested in the DIP Motion, whether by facsimile, electronic mail, overnight courier, hand delivery, and/or telephone to certain parties-in-interest, including: (a) the Office of the United States Trustee for the Eastern District of California (the "U.S. Trustee"); (b) SummitBridge National Investments V LLC ("SummitBridge"); and (c) the Debtor's twenty (20) largest unsecured creditors. Such notice of the DIP Motion, the relief requested therein, and the Interim Hearing is sufficient under the circumstances.

**E.    Findings Regarding the DIP Facilities**.

1.    Need for Post-Petition Financing.  The Debtor has an immediate need to obtain the DIP Facility and use post-petition Cash Collateral, among other things, to permit the orderly continuation of the operation of their business, to maintain business relationships with vendors, suppliers, and customers, to make payroll, to make capital expenditures, and to satisfy other working capital and operation needs.  The Debtor's access to sufficient working capital and liquidity through the use of borrowing under the DIP Facility and through the use of post-petition Cash Collateral is vital to the preservation and maintenance of the going concern value of the Debtor and its successful reorganization.

2.    No Credit Available on More Favorable Terms.  The Debtor has been and continues to be unable to obtain financing on more favorable terms from sources other than the Lender under the DIP Loan Documents.  The Debtor is unable to obtain adequate unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense without incurring prohibitive litigation and/or execution expenses that would erode the value of the Debtor's estate and harm all parties-in-interest.  The most favorable terms the Debtor is able to obtain credit on are those terms provided herein and in the DIP Loan Documents pursuant to Sections 364(c)(1) and 364(c)(2) of the Bankruptcy Code, including, without limitation, the DIP Superpriority Claims and the DIP Lien, as defined herein (all of the foregoing, collectively, the "DIP Protections").

**F.    Business Judgment and Good Faith Pursuant to Section 364(e).**

1.    The Lender has indicated a willingness to provide post-petition secured

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California  92626-7689

5

4811-3961-4048

financing via the DIP Facility to the Debtor in accordance with the DIP Loan Documents and this Interim Order.

2. The terms and conditions of the DIP Facility pursuant to the DIP Loan Documents and this Interim Order, and the fees, costs, expenses, and attorney fees paid and to be paid thereunder, are fair, reasonable, and the best available under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and is supported by reasonably equivalent value and consideration.

3. Based on the record presented to the Bankruptcy Court at the Interim Hearing, the DIP Facility and the DIP Loan Documents were negotiated in good faith and at arms' length among the Debtor, on the one hand, and the Lender, on the other hand, and all of the DIP Obligations shall be deemed to have been extended by the Lender for valid business purposes and uses and in good faith, as that term is used in Section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by Section 364(e) of the Bankruptcy Code, and the DIP Protections shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code in the event this Interim Order or any other order or any provision hereof or thereof is vacated, reversed, amended, or modified on appeal or otherwise.

**G.** **Relief Essential; Best Interest**.  For the reasons stated above, the Debtor has requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and 4001(c)(2).  Absent granting the relief set forth in this Interim Order, the Debtor's estate and its ability to successfully reorganize will be immediately and irreparably harmed. Consummation of the DIP Facility in accordance with this Interim Order and the DIP Loan Documents is therefore in the best interests of the Debtor's estate.

**NOW, THEREFORE**, on the DIP Motion, the record before the Bankruptcy Court with respect to the DIP Motion, and good and sufficient cause appearing,

**IT IS ORDERED** that:

1. **Motion Granted**.  The DIP Motion is granted in accordance with the terms and conditions set forth in this Interim Order and the DIP Loan Documents.  To the extent

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd. Suite 1400
Costa Mesa, California 92626-7689

INTERIM ORDER RE POST-PETITION FINANCING

of any inconsistencies between the Interim Order and the DIP Loan Documents, the provisions of this Interim Order shall control. Any objections to the DIP Motion with respect to the entry of this Interim Order that have not been withdrawn, waived, or settled, are hereby denied and overruled.

2.   **DIP Loan Documents and DIP Protections**.

a.   <u>Approval of DIP Loan Documents</u>.   The Debtor is expressly and immediately authorized and directed to (i) establish the DIP Facility, (ii) execute, deliver, and perform under the DIP Loan Documents and to incur the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Loan Documents, and (iii) execute, deliver, and perform under all other instruments, certificates, agreements, and documents which may be required or necessary for performance by the Debtor under the DIP Facility.   The Debtor is hereby authorized to do and perform all acts, pay the principal, interest, fees, costs, expenses, attorneys' fees, and other amounts described in the DIP Loan Documents to the extent authorized under this Interim Order, as such have become due or become due pursuant to the DIP Loan Documents and this Interim Order.   Upon their execution and delivery, the DIP Loan Documents shall represent valid and binding obligations of the Debtor enforceable against the Debtor in accordance with their terms.

b.   <u>Authorization to Incur DIP Obligations</u>.   To enable the Debtor to continue to operate its business, during the period from the entry of this Interim Order through and including the earlier of (i) the entry of a Final Order or (ii) the date that is forty-five (45) days after the entry of this Interim Order if the Final Order entry date shall not have occurred by such date (the "<u>Interim Period</u>"), and subject to the terms and conditions of this Interim Order and the DIP Loan Documents, the Debtor is hereby authorized to borrow DIP Loans under the DIP Facility in an aggregate outstanding principal amount not to exceed $2,300,000.00 (the "<u>Interim Advance</u>").   The Interim Advance shall be used to: pay its operating expenses, which include, but are not limited to

INTERIM ORDER RE POST-PETITION FINANCING

4811-3961-4048

payroll, insurance, utility, and repair and maintenance obligations, and to fund the expenses of the Bankruptcy Case, all as set forth in the budget attached to the DIP Motion (the "Budget").

       c.     Post Interim Period. Following the expiration of the Interim Period, the Debtor's authority to borrow further DIP Loans will be governed by the terms of the Final Order.

       d.     Application of DIP Facility Proceeds. The proceeds of the DIP Facility (net of any amounts used to pay fees, principal, interest, costs, and expenses of the DIP Facility pursuant to, and in accordance with, the DIP Loan Documents and this Interim Order) shall be used in accordance with the terms and conditions of the DIP Loan Documents and this Interim Order, to pay its operating expenses, which include, but are not limited to payroll, insurance, utilities, and ordinary and necessary repair and maintenance obligations, and to fund the expenses of the Bankruptcy Case, including but not limited to the Debtor's professional fees, as set forth in the Budget. Without limiting the foregoing, the Debtor shall not be permitted to make any payments on account of any pre-petition debt or obligation prior to the effective date of any confirmed Chapter 11 plan, except as otherwise ordered by the Bankruptcy Court or as otherwise provided in the DIP Loan Documents.

       e.     Conditions Precedent. The Lender shall have no obligation to make any DIP Loan or make any other extension of credit or financial accommodation in respect of the DIP Facility or otherwise during the Interim Period unless and until all conditions precedent to the making of any such DIP Loan or other extension of credit or financial accommodation under the DIP Loan Documents and this Interim Order have been satisfied in full or waived by the Lender in accordance with the DIP Loan Documents and this Interim Order.

       f.     DIP Liens. Effective immediately upon the entry of this Interim Order, the Lender is hereby granted the following liens (which shall immediately, and without any further action by any person, be valid, binding, permanent, perfected,

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

INTERIM ORDER RE POST-PETITION FINANCING

4811-3961-4048

continuing, enforceable, and non-avoidable):

(1) a lien, as provided for in the DIP Loan Documents, in and on any unencumbered pre-petition assets and all post-petition assets of the Debtor, now existing or hereafter acquired, including, without limitation, all such cash and cash equivalents, and any investment in such cash or cash equivalents, money, motor vehicles and rolling stock, inventory, goods, accounts receivable, other rights to payment, intercompany loans and other investments, investment property, contracts, contract rights, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, documents of title**,** letters of credit, letter of credit rights, supporting obligations, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, capital stock or equity interests of subsidiaries, tax refunds, insurance proceeds, commercial tort claims, membership interests and other equity ownership interests, and all rents, products, substitutions, accessions, profits, replacements, and cash and non-cash proceeds of all of the foregoing (the "Post-Petition DIP Lien");

(2) a lien, as provided for in the DIP Loan Documents, in and on any and pre-petition assets of the Debtor, subject only to any existing, as of the Petition Date, valid, perfected and unavoidable liens, which shall be, and deemed to be, immediately secured (without any further filings) (the "Pre-Petition DIP Lien"). (the Post-Petition DIP Lien and the Pre-Petition DIP Lien are collectively referred to herein as the "DIP Lien")

g. <u>DIP Lien Priority</u>. Notwithstanding anything to the contrary contained in this Interim Order or the DIP Loan Documents, and for the avoidance of doubt, the Post-Petition DIP Lien granted to the Lender shall in each and every case be first priority senior liens.

h. <u>Enforceable Obligations</u>. The DIP Loan Documents shall constitute and evidence the valid and binding DIP Obligations of the Debtor, which DIP Obligations shall be enforceable against the Debtor, its estate, and any successors thereto (including,

INTERIM ORDER RE POST-PETITION FINANCING

4811-3961-4048

1   without limitation, any trustee or other estate representative), and its creditors, in

2   accordance with the terms of the DIP Loan Documents and this Interim Order. No

3   obligation, payment, transfer, or grant of security under the DIP Loan Documents or this

4   Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the

5   Bankruptcy Code or under any applicable law (including, without limitation, under

6   Sections 502(d), 544, 547, 548 or 549 of the Bankruptcy Code or under any applicable

7   state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar

8   statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset,

9   re-characterization, subordination (whether equitable, contractual, or otherwise),

10   counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code, or

11   any applicable law or regulation by any person or entity.

12          i.    <u>DIP Superpriority Claims</u>. In addition to the DIP Lien granted

13   herein, (1) effective immediately upon entry of this Interim Order, all of the DIP

14   Obligations authorized to be incurred by the Debtor pursuant to this Interim Order and (2)

15   effective immediately upon entry of the Final Order, all of the DIP Obligations shall

16   constitute allowed superpriority administrative expense claims pursuant to Section

17   364(c)(1) of the Bankruptcy Code, which shall have priority, subject only to the payment

18   of the Carve-Out, as defined herein, over all administrative expenses of the kind specified

19   in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a),

20   507(b), 546(c), 726, or 1114 of the Bankruptcy Code, or otherwise (the "<u>DIP</u>

21   <u>Superpriority Claims</u>"). The DIP Superpriority Claims shall for purposes of Section

22   1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed

23   under Section 503(b) of the Bankruptcy Code and shall be payable from and have

24   recourse to all post-petition property of the Debtor and all proceeds thereof and any pre-

25   petition unencumbered assets of the Debtor and all proceeds thereof. Other than as

26   provided in the DIP Loan Documents and this Interim Order with respect to the Carve-

27   Out, no costs or expenses of administration, including, without limitation, professional

28   fees allowed and payable under Sections 328, 330, 331, and 363 of the Bankruptcy Code,

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

INTERIM ORDER RE POST-PETITION FINANCING

4811-3961-4048

or otherwise, that have been or may be incurred in these proceedings, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Lien or the DIP Superpriority Claims, or with any other claim of the Lender arising hereunder.

3. **Authorization to Use Proceeds of DIP Facility, Including Post-Petition Cash Collateral.**

Subject to the terms and conditions of this Interim Order and the DIP Loan Documents, (a) the Debtor is authorized to use proceeds of the DIP Loan, and (b) the Debtor is authorized to use all of the Lender's post-petition Cash Collateral. The Debtor's right to use proceeds of the DIP Loan and post-petition Cash Collateral shall terminate (i) automatically upon the occurrence of the Maturity Date (under and as defined in the DIP Credit Agreement) or (ii) immediately upon notice to such effect by the Lender to the Debtor after the occurrence and during the continuance of an Event of Default, as defined in the DIP Loan Documents (the applicable termination date specified in clause (i) or (ii) above, the "Termination Date").

4. **Automatic Post-Petition Lien Perfection**. This Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, and priority of the DIP Lien without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction, (b) obtaining consents from any landlord, licensor, or other party-in-interest, (c) complying with any requirement, under the Uniform Commercial Code or otherwise, to specifically identify any commercial tort claim, or (d) taking any other action to validate or perfect the DIP Lien or to entitle the DIP Lien to the priorities granted herein. Notwithstanding the foregoing, the Lender may, in its sole discretion, file financing statements, mortgages, security agreements, notices of liens, or other similar documents, and is hereby granted relief from the automatic stay of Section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been filed or recorded at the time of and on the Petition Date. Any

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

11

INTERIM ORDER RE POST-PETITION FINANCING

provision of any loan document, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the payment of any fees or obligations to any governmental entity or non-governmental entity in order for the Debtor to pledge, grant, mortgage, sell, assign, or otherwise transfer any interest or the proceeds thereof or other collateral subject to the DIP Lien is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the liens on such interests or the proceeds of any assignment and/or sale thereof by the Debtor in favor of the Lender in accordance with the terms of the DIP Loan Documents and this Interim Order.

5.     **Carve Out**.  The DIP Lien and DIP Superpriority Claims shall be subject and subordinate to payment of the Carve-Out (as defined below) solely in the event of the delivery of a Carve-Out Trigger Notice (as defined below) after the occurrence and during the continuance of an Event of Default under, and as defined in, the DIP Loan Documents:

a.     For purposes of this Interim Order, "Carve-Out" means (i) all unpaid fees required to be paid in the Bankruptcy Case to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a)(6), in such amount agreed to by the Office of the United States Trustee or as determined by the Bankruptcy Court, whether arising prior to or after the delivery of the Carve-Out Trigger Notice; (ii) fees, disbursements, costs, and expenses which are incurred after the Petition Date and before the delivery of a Carve-Out Trigger Notice in an amount not to exceed the $750,000.00, less any amount actually paid to each such Professional, retained by the Debtor and any Committee pursuant to Bankruptcy Code Sections 327, 330, 363 and 1103 (collectively, the "Professionals"), to the extent allowed at any time by the Bankruptcy Court and owed pursuant to such Professionals' respective engagement letters; (iii) the fees, disbursements, costs and expenses of Professionals in an aggregate amount not to exceed $250,000.00 that are incurred after the delivery of a Carve-Out Trigger Notice and which are ultimately allowed by the Bankruptcy Court (the "Carve-Out Cap").  The term

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

4811-3961-4048

"<u>Carve-Out Trigger Notice</u>" shall mean a written notice delivered by the Lender to the Debtor's lead counsel, the U.S. Trustee, and lead counsel to any Committee appointed in the Bankruptcy Case, which notice may be delivered at any time following the occurrence and during the continuation of any Event of Default under the DIP Loan Documents, expressly stating that the Carve-Out (and the Carve-Out Cap) is invoked.

b.      Following the delivery of the Carve-Out Trigger Notice after the occurrence and during the continuance of any Event of Default under the DIP Loan Documents, any payments actually made pursuant to Bankruptcy Code Sections 327, 328, 330, 331, 363, 503 or 1103 or otherwise, to Professionals shall (i) not be paid from the proceeds of any DIP Loan or post-petition Cash Collateral until such time as all retainers, if any, held by such Professionals have been reduced to zero, and (ii) in the case of any payments made on account of any fees and expenses described in clause (iii) of the definition of Carve-Out, reduce the Carve-Out Cap on a dollar-for-dollar basis.

c.      Nothing herein shall be construed as consent to the allowance of any Professional fees or expenses of the Debtor, or any Committee in the Bankruptcy Case, or of any other person or entity, or shall affect the right of the Lender to object to the allowance and payment of such fees and expenses.

6.      **Waiver of Section 506(c) Claims**.  Subject to entry of the Final Order, as a further condition of the DIP Facility and any obligation of the Lender to make credit extensions pursuant to the DIP Loan Documents (and their consent to the payment of the Carve-Out to the extent provided herein), no costs or expenses of administration of the Bankruptcy Case shall be charged against or recovered from or against the Lender or any collateral subject to the DIP Lien pursuant to Section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the Lender, and no such consent shall be implied from any action, inaction, or acquiescence of the Lender.

7.      **After-Acquired Property**.  Except as otherwise provided in this Interim Order, pursuant to Section 552(a) of the Bankruptcy Code, all property acquired by the Debtor on or after the Petition Date is not, and shall not be, subject to any lien of any

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

13          INTERIM ORDER RE POST-PETITION FINANCING

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

person or entity resulting from any security agreement entered into by the Debtor prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtor that is subject to a valid, enforceable, perfected, and unavoidable lien as of the Petition Date which is not subject to subordination under the Bankruptcy Code or other provisions or principles of applicable law.

8. **Proceeds of Subsequent Financing**. If at any time prior to the indefeasible payment in full of all DIP Obligations (including subsequent to the confirmation of a Chapter 11 plan), the Debtor's estate, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to Sections 364(b), 364(c), 364(d) or any other provision of the Bankruptcy Code in violation of the DIP Loan Documents, then all of the cash proceeds derived from such credit or debt and all post-petition Cash Collateral shall immediately be turned over to the Lender, until indefeasible payment in full of the DIP Obligations in accordance with the DIP Loan Documents.

9. **Disposition of Collateral Subject to the DIP Lien**. The Debtor shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the collateral subject to the DIP Lien without the prior written consent of the Lender under the DIP Loan Documents (and no such consent shall be implied from any other action, inaction, or acquiescence by the Lender or any order of this Bankruptcy Court), except for sales of inventory in the ordinary course of business or except as otherwise permitted in the DIP Loan Documents and this Interim Order and approved by the Bankruptcy Court to the extent required under applicable bankruptcy law. Except to the extent otherwise expressly provided in the DIP Loan Documents, all proceeds from the sale, transfer, lease, encumbrance, or other disposition of any collateral subject to the DIP Lien outside the ordinary course of business shall be remitted to the Lender until payment in full of the DIP Obligations in accordance with the terms of the DIP Loan Documents.

10. **Events of Default**.

a. <u>Rights and Remedies Upon Event of Default</u>. Any automatic stay

INTERIM ORDER RE POST-PETITION FINANCING

otherwise applicable to the Lender is hereby modified, without requiring prior notice to, or authorization of, the Bankruptcy Court, to the extent necessary to permit the Lender to exercise (i) immediately upon the occurrence and during the continuance of an Event of Default, all rights and remedies under this Interim Order and the DIP Loan Documents, and (ii) upon the occurrence and during the continuance of an Event of Default and the giving of three business days prior written notice (the "Enforcement Notice") to the Debtor (with a copy to the United States Trustee and the lead counsel to any Committee), all rights and remedies against the collateral provided for in the DIP Loan Documents or applicable law including, without limitation, the right to enforce the DIP Lien through state law foreclosure proceedings; provided, however, immediately following the giving of an Enforcement Notice by the Lender any obligation otherwise imposed on the Lender to provide any loan or other financial accommodation to the Debtor pursuant to the DIP Facility (other than to permit the Debtor to use post-petition Cash Collateral) shall immediately be suspended. Following the giving of an Enforcement Notice by the Lender, the Debtor and any Committee shall be entitled to an emergency hearing before the Bankruptcy Court; provided, however, that any such emergency hearing shall be limited to the issue of whether or not an Event of Default has occurred, and the Debtor, Committee or any other party in interest shall not have any right to contest whether or not the automatic stay shall be lifted or modified as provided herein or the DIP Loan Documents. Upon entry of the Final Order, neither any Committee nor the Debtor shall have any right to contest whether or not the automatic stay shall be lifted or modified as provided herein or the DIP Loan Documents. Subject to any order of the Bankruptcy Court that is entered during such three business-day period, the automatic stay, as to the Lender, shall automatically terminate at the end of such notice period.

        b.      Subject to the limitations in this Paragraph 10, the automatic stay imposed under Bankruptcy Code Section 362(a) is hereby modified pursuant to the terms of the DIP Credit Agreement as necessary to (i) permit the Debtor to incur all liabilities and obligations to the Lender under the DIP Loan Documents, the DIP Facility, and this

INTERIM ORDER RE POST-PETITION FINANCING

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

1   Interim Order, (ii) authorize the Lender to retain and apply payments hereunder, and (iii)

2   otherwise to the extent necessary to implement and effectuate the provisions of this

3   Interim Order.

4        11.    **Restriction on Use of Proceeds**.   Notwithstanding anything herein to the

5   contrary, no proceeds from the DIP Facility, or any portion of the Carve-Out, may be used

6   by the Debtor, any Committee, or any trustee or other estate representative appointed in

7   the Bankruptcy Case, or any other person, party, or entity to (or to pay any professional

8   fees and disbursements incurred in connection therewith) (a) request authorization to

9   obtain post-petition loans or other financial accommodations pursuant to Bankruptcy

10   Code Section 364(c) or (d), or otherwise, other than (i) from the Lender or (ii) with the

11   express written consent of the Lender; (b) investigate, assert, join, commence, support, or

12   prosecute any action for any claim, counter-claim, action, proceeding, application, motion,

13   objection, defense, or other contested matter seeking any order, judgment, determination

14   or similar relief against, or adverse to the interests of, in any capacity, the Lender, and its

15   officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with

16   respect to any transaction, occurrence, omission, action, or other matter (including formal

17   discovery proceedings in anticipation thereof), including, without limitation, (i) any

18   claims and defenses, any avoidance actions or other actions arising under Chapter 5 or

19   Section 724(a) of the Bankruptcy Code; (ii) any so-called "lender liability" claims or

20   causes of action; (iii) any action with respect to the validity, enforceability, priority, and

21   extent of the DIP Obligations; (iv) any action seeking to invalidate, set aside, avoid, or

22   subordinate, in whole or in part, any of the DIP Protections; (v) any action seeking, or

23   having the effect of, preventing, hindering, or otherwise delaying the Lender's assertion,

24   enforcement, or realization on the collateral subject to the DIP Protections in accordance

25   with the DIP Loan Documents or this Interim Order; or (vi) any action seeking to modify

26   any of the rights, remedies, priorities, privileges, protections, and benefits granted to the

27   Lender hereunder or under the DIP Loan Documents.

28        12.    **Proof of Claim**.   The Lender shall not be required to file a proof of claim

INTERIM ORDER RE POST-PETITION FINANCING

1    evidencing the DIP Obligations or the DIP Protections, in the Bankruptcy Case.

2          13.    **Preservation of Rights Granted Under the Interim Order**.

3          a.    No Non-Consensual Modification or Extension of the Interim Order.

4    Unless all DIP Obligations have been paid in full, the Debtor shall not seek, and it shall

5    constitute an Event of Default (resulting, among other things, in the termination of the

6    Debtor's right to use post-petition Cash Collateral), if there is entered (i) an order, except

7    for the Final Order, amending, supplementing, extending, or otherwise modifying this

8    Interim Order or (ii) an order converting or dismissing the Bankruptcy Case, in each case,

9    without the prior written consent of the Lender, and no such consent shall be implied by

10   any other action, inaction, or acquiescence.

11          b.    Dismissal.    If any order dismissing the Bankruptcy Case (under

12   Section 1112 of the Bankruptcy Code or otherwise) is at any time entered, (i) such order

13   shall have no effect on the DIP Protections, and the DIP Protections shall continue in full

14   force and effect and shall maintain their priorities as provided in this Interim Order until

15   all DIP Obligations have been indefeasibly paid in full, and all DIP Protections, shall,

16   notwithstanding such dismissal, remain binding on all parties-in-interest, and (ii) the

17   Bankruptcy Court shall retain jurisdiction, notwithstanding such dismissal, for the

18   purposes of enforcing such DIP Protections.

19          c.    Modification of the Interim Order.  Based on the findings set forth in

20   this Interim Order and in accordance with Section 364(e) of the Bankruptcy Code, which

21   is applicable to the DIP Facility, in the event any or all of the provisions of this Interim

22   Order are hereafter reversed, modified, vacated, or stayed by a subsequent order of the

23   Bankruptcy Court or any other court, the Lender shall be entitled to the protections

24   provided in Section 364(e) of the Bankruptcy Code, and no such reversal, modification,

25   vacatur, or stay shall affect (i) the validity, priority, or enforceability of any of the DIP

26   Protections granted or incurred prior to the actual receipt of written notice by the Lender

27   of the effective date of such reversal, modification, vacatur, or stay or (ii) the validity or

28   enforceability of any lien or priority authorized or created hereby or pursuant to the DIP

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

17

Loan Documents. Notwithstanding any such reversal, modification, vacatur, or stay, any DIP Protections incurred or granted by the Debtor prior to the actual receipt of written notice by the Lender of the effective date of such reversal, modification, vacatur, or stay shall be governed in all respects by the original provisions of this Interim Order, and the Lender shall be entitled to all of the DIP Protections and all other rights, remedies, liens, priorities, privileges, protections, and benefits granted in Section 364(e) of the Bankruptcy Code, this Interim Order, and the DIP Loan Documents.

        d.    <u>Survival of the Interim Order.</u> The provisions of this Interim Order and the DIP Loan Documents, any actions taken pursuant hereto or thereto, all of the DIP Protections, and all other rights, remedies, liens, priorities, privileges, protections, and benefits granted to the Lender shall survive, and shall not be modified, impaired, or discharged by, the entry of any order confirming any plan of reorganization in the Bankruptcy Case, converting the Bankruptcy Case to a case under Chapter 7, dismissing the Bankruptcy Case, providing for abstention from handling or retaining of jurisdiction of the Bankruptcy Case in the Bankruptcy Court, or by any other act or omission. The terms and provisions of this Interim Order, including all of the DIP Protections, and all other rights, remedies, liens, priorities, privileges, protections, and benefits granted to the Lender, shall continue in full force and effect notwithstanding the entry of any such order, and such DIP Protections shall continue in the Bankruptcy Case, and shall maintain their respective priorities as provided by this Interim Order. The DIP Obligations shall not be discharged by the entry of an order confirming a Chapter 11 plan in the Bankruptcy Case, the Debtor having waived such discharge pursuant to Section 1141(d)(4) of the Bankruptcy Code.

        14.    **Other Rights and Obligations**.

        a.    <u>Binding Effect.</u> The provisions of this Interim Order, including all findings herein, and the DIP Loan Documents shall be binding upon all parties-in-interest in the Bankruptcy Case, including, without limitation, the Lender, any Committee, and the Debtor and their respective successors and assigns (including any Chapter 7 or Chapter 11

INTERIM ORDER RE POST-PETITION FINANCING

4811-3961-4048

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

1  trustee hereinafter appointed or elected for the Debtor's estate, an examiner appointed

2  pursuant to Section 1104 of the Bankruptcy Code, or any other fiduciary or responsible

3  person appointed as a legal representative of the Debtor or with respect to the property of

4  the Debtor's estate), in the Bankruptcy Case or upon dismissal of the Bankruptcy Case.

5             b.     <u>No Waiver.</u>   Neither the failure of the Lender to seek relief or

6  otherwise exercise its rights and remedies under this Interim Order, the DIP Loan

7  Documents, or otherwise (or any delay in seeking or exercising same), shall constitute a

8  waiver of the Lender's rights hereunder, thereunder, or otherwise. Except as expressly

9  provided herein, nothing contained in this Interim Order (including, without limitation, the

10  authorization of the use of any post-petition Cash Collateral) shall impair or modify any

11  rights, claims, or defenses available in law or equity to the Lender, including, without

12  limitation, rights to a swap agreement, securities contract, commodities contract, forward

13  contract or repurchase agreement with the Debtor to assert rights of setoff or other rights

14  with respect thereto as permitted by law (or the right of the Debtor to contest such

15  assertion). Except as prohibited by this Interim Order, the entry of this Interim Order is

16  without prejudice to, and does not constitute a waiver of, expressly or implicitly, or

17  otherwise impair the Lender under the Bankruptcy Code or under non-bankruptcy law, to

18  (i) request conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy

19  Code, dismissal of the Bankruptcy Case, or the appointment of a trustee in the Bankruptcy

20  Case, (ii) propose, subject to the provisions of Section 1121 of the Bankruptcy Code, any

21  Chapter 11 plan with respect to the Debtor, or (iii) exercise any of the rights, claims, or

22  privileges (whether legal, equitable, or otherwise) of the Lender.

23             c.     <u>No Third Party Rights.</u> Except as explicitly provided for herein, this

24  Interim Order does not create any rights for the benefit of any third party, creditor, equity

25  holder, or any direct, indirect, or incidental beneficiary. In determining to make any loan

26  or financial accommodation (whether under the DIP Loan Documents or otherwise) or to

27  permit the use of post-petition Cash Collateral or in exercising any rights or remedies as

28  and when permitted pursuant to this Interim Order or the DIP Loan Documents, the

INTERIM ORDER RE POST-PETITION FINANCING

Lender shall not (i) be deemed to be in control of the operations of the Debtor, or (ii) owe any fiduciary duty to the Debtor, its creditors, equity holders, or estate.

d.　　<u>No Marshaling.</u>　The Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the collateral under the DIP Loan Documents.

e.　　<u>Amendments.</u>　The Debtor is authorized and empowered, without further notice and hearing or approval of the Bankruptcy Court, to amend, modify, supplement, or waive any provision of the DIP Loan Documents in accordance with the provisions thereof, in each case unless such amendment, modification, supplement, or waiver (i) increases the interest rate, (ii) increases the aggregate lending commitments of the Lender in respect of the DIP Facility, (iii) changes the Maturity Date (under and as defined in the DIP Loan Documents) or (iv) adds or amends any Event of Default. No waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by or on behalf the Debtor, the Lender, and, except as provided herein, approved by the Bankruptcy Court.

f.　　<u>Inconsistency.</u>　In the event of any inconsistency between the terms and conditions of the DIP Loan Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

g.　　<u>Enforceability.</u>　This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

h.　　<u>Preservation of Claims and Causes of Actions.</u>　Nothing in this Interim Order shall constitute a release or waiver of any claims, causes of action, or rights against any party, individual, or entity, except for the waivers of the Lender contained

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

20

4811-3961-4048

herein or the DIP Loan Documents.

i.     Headings.  Paragraph headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

15.    **Final Hearing.**

The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility will be held on _____, before the Hon. _____ at the United States Bankruptcy Court, _____. If no objections to the relief sought in the Final Hearing are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final Order may be presented by the Debtor and entered by the Bankruptcy Court.

16.    Final Hearing Notice.  Within one business day of entry of this Interim Order, the Debtor shall serve, by United States mail, first-class postage prepaid, (such service constituting adequate notice of the Final Hearing) (i) notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice") and (ii) a copy of this Interim Order, on the parties having been given notice of the Interim Hearing and to any other party that has filed a request for notices with the Bankruptcy Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed.  The Final Hearing Notice shall state that any party-in-interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Bankruptcy Court no later than _____, which objections shall be served so that the same are received on or before such date by:  (a) counsel for the Debtor, Snell & Wilmer, L.L.P., One Arizona Center, 400 E. Van Buren St., Ste. 1900, Phoenix, Arizona 85004, Attn: Christopher H. Bayley; (b) counsel for the Lender, _____; (c) counsel to any Committee; and (d) the Office of the United States Trustee for the Eastern District of California and shall be filed with the Clerk of the United States Bankruptcy Court for the Eastern District of California, in each case to allow actual receipt of the foregoing no later than _____.

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California  92626-7689

21

17. <u>Retention of Jurisdiction.</u> The Bankruptcy Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

DATED:

_____

Honorable _____
United States Bankruptcy Judge

**Snell & Wilmer**
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

22

INTERIM ORDER RE POST-PETITION FINANCING

4811-3961-4048

# EXHIBIT B-1

# LOAN AGREEMENT
## (REVOLVING LINE OF CREDIT)

---

This LOAN AGREEMENT (REVOLVING LINE OF CREDIT) is made as of April ____, 2018, by and between ECS Refining, Inc., a Delaware corporation ("Borrower" or "Debtor"); and Butch & Sundance, LLC, a Delaware limited liability company ("Lender").

## RECITALS

A.      Borrower has applied to Lender for a revolving line of credit to fund working capital in connection with Borrower's operations.

NOW, THEREFORE, in consideration of the covenants and conditions herein contained, the parties agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1      <u>Definitions</u>.  As used herein, the following terms shall have the meanings set forth below:

"<u>Acceptable Plan of Reorganization</u>" means a Plan of Reorganization that provides for the payment in full in cash of the Obligations under the Loan Documents upon the effective date of such Acceptable Plan of Reorganization and is otherwise reasonably acceptable to the Required Lenders.

"<u>Advance</u>" means a disbursement of Loan proceeds.

"<u>Affiliate</u>" of any Person means any other Person directly or indirectly Controlling or Controlled by or under direct or indirect common Control with such Person.  The term "Affiliate" does not include the officers, directors, or employees of a Person, if the Person is a corporation, and does not include the employees of a Person, if the Person is a limited liability company or limited partnership.

"<u>Agreement</u>" means this Loan Agreement (Revolving Line of Credit), as the same may be amended and supplemented as hereinafter provided.

"<u>Anti-Corruption Laws</u>" means all laws, rules and regulations of any jurisdiction applicable to Borrower or its subsidiaries from time to time concerning or relating to bribery or corruption.

"<u>Authorized Representative of Borrower</u>" means the Person or Persons designated by Borrower to submit requests for Advances on behalf of Borrower, and to take any and all actions on the part of Borrower under any of the Loan Documents.

"<u>Avoidance Actions</u>" means any and all claims arising under Chapter 5 of the Bankruptcy Code, including without limitation under sections 502(d), 544, 545, 547, 548, 550, and 553 of the Bankruptcy Code and any other avoidance action under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, non-bankruptcy law, and the proceeds thereof, whether real or personal, tangible or intangible, and wherever located, and whether now existing or hereafter acquired, including proceeds, products, rents, and profits thereof.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for Eastern District of California or any other court having jurisdiction over the Case from time to time.

"<u>Borrower</u>" has the meaning set forth in the introductory paragraph of this Agreement.

"<u>Borrower Formation Documents</u>" means (a) the articles of incorporation of Borrower and (b) the bylaws of Borrower, and all modifications and amendments to those documents, pursuant to which Borrower has been formed and exists.

"<u>Budget</u>" means the Debtor's budget attached hereto as Exhibit 1, setting forth (a) in reasonable detail the receipts and disbursements of the Debtor on a thirteen week basis from the Petition Date through and including the week of July 16, 2018, and each successive thirteen week period thereafter until the Maturity Date and (b) the Debtor's projected balance sheet and statement of income as of the end of each month occurring prior to Maturity Date, as such budget may be amended or modified from time to time by the Debtor provided that the Lender shall have provided prior written consent to any such amendment or modification.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday or other day on which commercial banks in Sacramento, California are authorized or required by law to remain closed.

"<u>Carve-Out</u>" means the term "Carve-Out" in the Final DIP Order, or, prior to the entry of the Final DIP Order, the Interim DIP Order.

"<u>Carve-Out Amount</u>" means, at any time, the aggregate amount of the following expenses incurred in accordance with the Budget and unpaid at such time: (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. §1930(a) plus interest pursuant to 31 U.S.C. § 3717; (b) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $750,000.00; (c) to the extent allowed by the Bankruptcy Court at any time, all unpaid fees, disbursements, costs, and expenses incurred by professionals or professional firms retained by the Debtor and any official committee of creditors at any time before or on the first business day following delivery by the Lender of a Carve-Out Trigger Notice; and (d) to the extent allowed by the Bankruptcy Code at any time, all unpaid fees, disbursements, costs, and expenses incurred by professionals or professional firms retained by the Debtor and any official committee of creditors at any time after the first business day following delivery by the Lender of the Carve-Out Trigger Notice, in an aggregate amount not to exceed $250,000.00 (the "<u>Carve-Out Trigger Notice Cap</u>"); provided that, the foregoing expenses shall not include ineligible professional expenses.

"<u>Carve-Out Reserve Account</u>" means a deposit account of the Debtor to be established prior to the Effective Date, which shall be used solely to escrow funds for the payment of the Carve-Out Amount.

"<u>Carve-Out Trigger Notice</u>" means a written notice delivered by the Lender to the Debtor, its counsel, the US Trustee, and lead counsel to any official committee of creditors, which notice may be delivered following the occurrence and during the continuance of an Event of Default, and stating that the Carve-Out Trigger Notice Cap has been invoked.

"<u>Case</u>" means the voluntary case of the Debtor filed under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"<u>Change in Law</u>" means, the adoption or taking effect of, or any change in, any Law, or any change in the interpretation, administration or application of any law by any Governmental Authority, central bank or comparable agency charged with the interpretation, administration or application thereof,

4824-6734-7297

or compliance by any Lender with any request, guideline or directive (whether or not having the force of law) of any such authority, central bank or comparable agency occurring after the Closing Date, provided, however, that notwithstanding anything herein to the contrary, the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law" regardless of the date enacted, adopted or issued.

"Closing Date" means the date upon which Borrower and Lender have executed and delivered this Agreement and each of the conditions precedent and other requirements in Article 8 have been satisfied, as determined by Lender in its sole and absolute discretion.

"Code" means the Internal Revenue Code of 1986, as amended, and any successor statute promulgated in replacement thereof, together with all temporary, final and other Treasury Regulations promulgated under the Code.

"Collateral" means all property, assets, interests in property, and rights to property securing any or all of the payment and other Obligations of Borrower under the Loan Documents from time to time.

"Control," when used with respect to any Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "Controlling" and "Controlled" have meanings correlative to the foregoing.

"Debt" shall mean, as of any applicable date of determination, the total liabilities of a Person at such time, as determined in accordance with GAAP. In the case of Borrower, the term "Debt" shall include, without limitation, the Indebtedness.

"Default Interest Rate" means as set forth in the Note.

"Distributions" shall mean all dividends and other distributions made by Borrower to its shareholders, partners, owners or members, as the case may be, other than salary, bonuses, and other compensation for services expended in the current accounting period.

"Event of Default" means the occurrence of any of the events listed in Section 9.1 of this Agreement.

"Final DIP Order" means a final order entered or approved by the Bankruptcy Court authorizing the Loan and the Loan Documents in substantially the form of the Interim DIP Order, with only such modifications in form and substance that are satisfactory to the Lender (as the same may be amended, supplemented, or modified from time to time after entry thereof with the written consent of the Lender, in its sole discretion).

"Financing Statement" means one or more UCC financing statements and/or addenda and amendments thereto, to be prepared by Lender on behalf of Borrower, as debtor, in favor of Lender, as secured party, and perfecting Lender's security interest in the Collateral now owned or hereafter acquired by Borrower, in form and substance satisfactory to Lender, filed with the applicable Secretary of State and in such other offices for recording or filing such statements in such jurisdictions as Lender shall desire to perfect Lender's liens and security interests or reflect such interests in appropriate public records.

"First Day Orders" means all orders entered or to be entered by the Bankruptcy Court granting the relief requested in the motions filed with the Bankruptcy Court on the Petition Date or within five (5) business days of the Petition Date or based on motions filed on or about the Petition Date, which shall each be in form and substance reasonably satisfactory to the Lender.

"Fiscal Year" means the fiscal year of Borrower ending on each December 31.

"Governmental Authority" means any arbitrator, other private adjudicator, court, government or governmental authority (federal, state, local or foreign).

"Indebtedness" shall mean any and all present and future indebtedness, obligations or liabilities of Borrower to Lender, howsoever arising, evidenced or incurred, whether absolute or contingent, direct or indirect, voluntary or involuntary, liquidated or unliquidated, joint or several, now or hereafter existing or arising, due or to become due, whether known or unknown, and whether originally payable to Lender or to a third party and subsequently acquired by Lender, including, without limitation, (a) any and all direct indebtedness of Borrower to Lender, including indebtedness evidenced by any and all promissory notes; (b) any and all indebtedness, obligations or liabilities of Borrower to Lender arising under any guaranty where Borrower has guaranteed the payment of indebtedness owing to Lender from a third party; (c) any and all indebtedness, obligations or liabilities of Borrower to Lender arising from applications or agreements for the issuance of letters of credit; (d) late charges, loan fees or charges and overdraft indebtedness; (e) any agreement to indemnify Lender for environmental liability or to clean up hazardous waste; (f) any and all indebtedness, obligations or liabilities for which Borrower would otherwise be liable to Lender were it not for the invalidity, irregularity or unenforceability of them by reason of any bankruptcy, insolvency or other law or order of any kind, or for any other reason, including, without limit, liability for interest and attorneys' fees on, or in connection with, any of the Indebtedness from and after the filing by or against Borrower of a bankruptcy petition, whether an involuntary or voluntary bankruptcy case, including, without limitation, all attorneys' fees and costs incurred in connection with motions for relief from stay, cash collateral motions, nondischargeability motions, preference liability motions, fraudulent conveyance liability motions, fraudulent transfer liability motions and all other motions brought by Borrower, Lender or third parties in any way relating to Lender's rights with respect to Borrower, or third party and/or affecting any collateral securing any obligation owed to Lender by Borrower or any third party, probate proceedings, on appeal or otherwise; (g) any and all amendments, modifications, restatements, renewals and/or extensions of any of the above, including, without limit, amendments, modifications, restatements, renewals and/or extensions which are evidenced by new or additional instruments, documents or agreements; (h) all costs incurred by Lender in establishing, determining, continuing, or defending the validity or priority of its security interest, or in pursuing its rights and remedies under this Agreement, the other Loan Documents or under any other agreement between Lender and Borrower or in connection with any proceeding involving Lender as a result of any financial accommodation to Borrower; and (i) all costs of collecting Indebtedness, including, without limit, attorneys' fees and costs.

"Interim Availability Amount" means, as of any date of determination, the lesser of (a) the sum of $2,300,000.00; and (b) such lower amount as the Bankruptcy Court may order.

"Interim DIP Order" means an interim order entered or approved by the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Lender in its sole discretion) in the form set forth as Exhibit 2, with changes to such form as are satisfactory to the Lender, in its sole discretion, approving the Loan Documents, which Interim DIP Order shall, among other things (a) have been entered on such prior notice to such parties as may be satisfactory to the Lender in its sole discretion, (b) authorize the extensions of credit in respect of the Loan in the

amounts and on the terms set forth herein, and (c) grant the Superpriority Claim status and other collateral and liens referred to herein and in the other Loan Documents.

"Lender" means Butch & Sundance, LLC, a Delaware limited liability company.

"Lender Superpriority Claim" has the meaning given to such term in Security Agreement, Interim DIP Order and Final DIP Order.

"Lien" and "Liens" mean, respectively, each and all of the following:

      (a)      Any lease or other right to use;

      (b)      Any assignment as security, conditional sale, grant in trust, lien, mortgage, pledge, security interest, title retention arrangement, other encumbrance, or other interest or right securing the payment of money or the performance of any other liability or obligation, whether voluntarily or involuntarily created (including, without limitation, involuntary liens) and whether arising by agreement, document, or instrument, under any law, ordinance, regulation, or rule (federal, state, or local), or otherwise; and

      (c)      Any option, right of first refusal, or other interest or right.

"Loan" the revolving line of credit described herein from Lender to Borrower.

"Loan Amount" means the amount of $6,000,000.00.

"Loan Documents" means the documents described in Section 8.1, and any other guaranties, agreements, documents, or instruments now or hereafter evidencing, guarantying or securing the Obligations of Borrower hereunder, as this Agreement, the other documents described in Section 8.1, and such other agreements, documents, and instruments may be amended, modified, extended, renewed, or supplemented from time to time.

"Loan Party" means Borrower and any other person guarantying or pledging collateral for the Loan.

"Maturity Date" means May 1, 2019.

"Note" means the Promissory Note (Revolving Line of Credit) of even date herewith evidencing the Loan for the Loan Amount.

"Obligations" means, as the context requires, the duties and obligations of Borrower under the Loan Documents from time to time.

"Occupational Safety and Health Law" means the Occupational Safety and Health Act of 1970, as amended, and any other federal, state or local statute, law, ordinance, code, rule, regulation, order or decree regulating, relating to or imposing liability or standards of conduct concerning employee health and/or safety.

"Orders" means, collectively, the Interim DIP Order and the Final DIP Order.

"Permitted Lien" and "Permitted Liens" mean, respectively, each and all of the following, to the extent such Liens are valid, enforceable and unavoidable: (i) SummitBridge Pre-Petition Liens, (ii) pre-petition Liens upon any goods or equipment acquired or held by Debtor to secure the purchase price of

such goods or equipment, (iii) other matters which have been approved in writing by Lender, (iv) equipment leases entered into in the ordinary course of business, provided that such debt is not evidenced by a note and is paid when due and provided in any event that the amount owed pursuant to such equipment leases shall not exceed $500,000.00 during any twelve-month period, and (v) taxes not yet due.

"Person" means any natural person, any unincorporated association, any corporation, any partnership, any joint venture, any limited liability company, any trust, any other legal entity, or any Governmental Authority.

"Petition Date" means April 24, 2018, the date on which the Debtor became a debtor in the Case.

"Plan Effective Date" means the date of the effectiveness of an Acceptable Plan of Reorganization that has been confirmed pursuant to a final order of the Bankruptcy Court.

"Plan of Reorganization" means a plan of reorganization or plan of liquidation in the Case.

"Projections" means the financial projections and any forward-looking statements of the Debtor furnished to the Lender by or on behalf of the Debtor prior to the Effective Date.

"Revolving Commitment Period" means the period from and including the Effective Date to but excluding the Termination Date.

"Sanctions" economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"Security Agreement" means that certain Security Agreement (All Personal Property Assets) of even date herewith between Borrower, as debtor, and Lender, as secured party, relating to the Collateral of Borrower, as it may be from time to time amended, modified, extended, renewed, substituted, and/or supplemented.

"SummitBridge" means SummitBridge National Investments V LLC.

"SummitBridge Pre-Petition Liens" means the liens asserted by SummitBridge as successor in interest to Bank of America, N.A. pursuant to the Credit Agreement dated February 6, 2012 and associated loan documents.

"Termination Date" means the earliest to occur of (a) May 1, 2018, if the Bankruptcy Court shall not have entered the Interim DIP Order by the end of such date, (b) May 11, 2018, if the Bankruptcy Court shall not have entered the Final DIP Order by the end of such date, (c) the effective date of the Acceptable Plan of Reorganization that is confirmed pursuant to an order entered by the Bankruptcy Court in the Case, and/or (d) the acceleration of any Loan in accordance with the terms of this Agreement.

"Unmatured Event of Default" means any condition or event that with notice or passage of time, or both, would be an Event of Default.

1.2     Accounting Terms.  For purposes of this Agreement, all accounting terms not otherwise defined herein or in the Recitals shall have the meanings assigned to them in conformity with generally accepted accounting principles ("GAAP").

4824-6734-7297

## ARTICLE 2
## REVOLVING LINE OF CREDIT

2.1 <u>Agreement to Lend and Borrow</u>. Subject to the terms and conditions of this Agreement, Lender agrees to lend to Borrower and Borrower agrees to borrow from Lender the Loan up to the Loan Amount. The Loan is a revolving credit facility and amounts repaid may be reborrowed in unlimited repetition subject to the satisfaction of the terms of this Agreement with respect to each advance of proceeds of the Loan.

2.2 <u>Evidence of Indebtedness Under Loan</u>. The Loan shall be evidenced by the Note. Disbursements of the Loan shall be charged and funded under the Note. In the event of any inconsistency between the Note and this Agreement, the provisions of this Agreement shall prevail.

2.3 <u>No Deductions</u>. All payments of principal or interest hereunder or under the Note shall be made (a) without deduction of any present and future taxes, levies, imposts, deductions, charges or withholdings, which amounts shall be paid by Borrower, and (b) without any other set off. Borrower will pay the amounts necessary such that the gross amount of the principal and interest received by Lender is not less than that required hereby and by the Note.

2.4 <u>Late Charges</u>. To the extent any principal and interest due under any Loan Document is not paid within 10 calendar days of the due date therefore, and, to the extent that the following described fee is deemed to constitute interest, subject to <u>Section 15</u> of the Note, in addition to any interest or other fees and charges due hereunder or under the applicable Loan Document, Borrower shall pay a late charge as set forth in the Note. Borrower agrees that the charges set forth herein are reasonable compensation to Lender for the acceptance and handling of such late payments.

2.5 <u>Payment at Maturity</u>. The outstanding principal balance of the Loan, together with all unpaid accrued interest thereon, and all other amounts payable by Borrower with respect to the Note or pursuant to the terms of any other Loan Documents, shall be due and payable on the Maturity Date in lawful money of the United States of America at P.O. Box 61178, Palo Alto, CA 94306, in same day funds, not later than 1:00 p.m. (Pacific Standard Time).

2.6 <u>Application of Payments</u>. Unless otherwise agreed to, in writing, or otherwise required by applicable law, payments will be applied first to accrued, unpaid interest, then to principal, and any remaining amount to any unpaid collection costs, late charges and other charges; <u>provided</u>, <u>however</u>, that upon the occurrence of an Event of Default or an Unmatured Event of Default, Lender reserves the right to apply payments among principal, interest, late charges, collection costs and other charges at its sole and absolute discretion. Subject to the following sentence, all prepayments on the Loan shall be applied in such order and manner as Borrower may from time to time direct. Any payments received by Lender after the occurrence of an Event of Default or an Unmatured Event of Default hereunder or under any of the Loan Documents shall be applied in such order and to such Loan as Lender may, in its sole and absolute discretion, elect.

2.7 <u>Security</u>. Payment of the Note shall be secured by the Security Agreement.

7

ARTICLE 3
RESERVED

ARTICLE 4
LOAN DISBURSEMENTS

4.1     Advances.

   4.1.1     Advances in General.  Upon satisfaction of all conditions set forth in this Agreement, Lender shall, subject to the limitations of this Article 4, disburse to Borrower the first Advance of funds from the Loan and other Advances of the Loan as requested by Borrower in accordance with this Agreement.  Advances of the Loan disbursed under this Agreement shall be evidenced by the Note and secured by the Security Agreement.

   4.1.2     Loan Limitation.  The aggregate principal amount of all advances outstanding at any one time under the Note (the "Aggregate Outstanding Amount") shall not exceed the Loan Amount.  If at any time the Aggregate Outstanding Amount exceeds the Loan Amount, Borrower shall immediately pay Lender an amount equal to such excess.

4.2     Use of Advances of the Loan.  As provided in this Agreement, the Loan may be used only to provide short term working capital to pay current expenses of Borrower's operations including payroll, insurance, utilities, ordinary and necessary repair and maintenance obligations, and to fund the expenses of the Case, including but not limited the Borrower's professional fees.

4.3     Requests for Advances.

   4.3.1     Method for Requesting Advances.  Borrower shall request Advances of the Loan not more frequently than twice per month or as otherwise approved by Lender.  Requests for Advances of the Loan shall be made upon such form as may be prescribed by Lender from time to time, signed by an Authorized Representative of Borrower.  Lender shall fund each approved requisition within five Business Days following receipt of all supporting instruments and documents which Lender may require.

   4.3.2     Representation and Warranty Accompanying Each Requisition.  Each requisition shall thereby constitute, without the necessity of specifically containing a written statement, a representation and warranty by Borrower that the representations and warranties of Borrower contained in this Agreement are true and correct in all material respects as if made on the date of the request for an Advance.

4.4     Amount of and Conditions to Advances.

   4.4.1     Amount of Advances.  Provided that the conditions of Sections 4.3.1 and 4.3.2 are satisfied, as applicable, Lender shall disburse (within the period set forth in Section 4.3.1) the amount of the Advance of the Loan requested by Borrower.

   4.4.2     Conditions to Advances.  The following conditions and limitations shall apply to all Advances:

      (a)     The representations and warranties of Borrower contained in this Agreement shall be true and correct in all material respects as of the date of the Advance; and

8

(b)      No Event of Default or Unmatured Event of Default shall exist under this Agreement or any other Loan Document.

ARTICLE 5
REPRESENTATIONS AND WARRANTIES

5.1    Consideration.  As an inducement to Lender to execute this Agreement and to disburse the proceeds of the Loan, Borrower represents and warrants to Lender that the following statements set forth in this Article 5 are true, correct and complete as of the date hereof and will be true, correct and complete as of the Closing Date.

5.2    Organization, Powers and Good Standing.

5.2.1    Organization and Powers.  Borrower is a corporation, duly incorporated and validly existing under the laws of the state of its formation.  Borrower has all requisite power and authority and the legal right to own and operate its properties, to carry on its businesses as now conducted and as proposed to be conducted, and to enter into and perform this Agreement and the other Loan Documents.  The address of Borrower's chief executive office and principal place of business is 2222 S. Sinclair Avenue, Stockton, CA 95215.

5.2.2    Good Standing.  Borrower has made all filings and is in good standing in the state of its formation and in each other jurisdiction in which the character of the property it owns or the nature of the business it transacts makes such filings necessary or where the failure to make such filings could have a materially adverse effect on the business, operations, assets or condition (financial or otherwise) of Borrower.

5.2.3    Non-Foreign Status.  Borrower is not a "foreign corporation," "foreign partnership," "foreign trust," or "foreign estate," as those terms are defined in the Code and the regulations promulgated thereunder.  Borrower's U.S. employer identification number is as set forth in the W-9 forms delivered to Lender.

5.3    Authorization of Loan Documents.

5.3.1    Authorization.  The execution, delivery and performance of the Loan Documents by Borrower are within Borrower's powers and have been duly authorized by all necessary action by Borrower.

5.3.2    No Conflict.  The execution, delivery and performance of the Loan Documents by Borrower will not violate (a) Borrower's Formation Documents; (b) any legal requirement affecting Borrower or any of its properties; or (c) any agreement by which Borrower is bound or to which it is a party and will not result in or require the creation (except as provided in or contemplated by this Agreement) of any Lien upon any of Borrower's properties.

5.3.3    Governmental and Private Approvals.  All governmental or regulatory orders, consents, permits, authorizations and approvals required for the due execution, delivery and performance by Borrower of the Loan Documents have been obtained and are in full force and effect.  No approvals, authorizations or consents of any trustee or holder of any indebtedness or obligation of Borrower are required for the due execution, delivery and performance by Borrower of the Loan Documents.

4824-6734-7297

5.3.4 <u>Binding Obligations</u>. This Agreement and the other Loan Documents have been duly executed by Borrower, and are legally valid and binding obligations of Borrower, enforceable against Borrower in accordance with their terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity.

5.4 <u>No Material Defaults</u>. There exists no material violation of or material default by Borrower and no event has occurred which, upon the giving of notice or the passage of time, or both, would constitute a default with respect to (a) the terms of any instrument evidencing or securing any indebtedness of Borrower, (b) any lease, compact or other agreement affecting the use and occupancy of any of Borrower's property to which Borrower is a party, or (c) any mortgage, instrument, agreement or document by which Borrower or any of its properties are bound which: (i) involves any Loan Document, (ii) involves any of Borrower's property and is not adequately covered by insurance, (iii) might materially and adversely affect the ability of Borrower to perform its obligations under any of the Loan Documents or any other material instrument, agreement or document to which it is a party, or (iv) might adversely affect the first priority of the liens created by this Agreement or any of the Loan Documents.

5.5 <u>Litigation; Adverse Facts</u>. There is no action, suit, investigation, proceeding or arbitration (whether or not purportedly on behalf of Borrower) at law or in equity or before or by any foreign or domestic court or other governmental entity (a "<u>Legal Action</u>") pending or, to the knowledge of Borrower, threatened against or affecting Borrower, or any of its assets which could reasonably be expected to result in any material adverse change in the business, operations, assets or condition (financial or otherwise) of Borrower or would materially and adversely affect Borrower's ability to perform its obligations under the Loan Documents. There is no basis known to Borrower for any such action, suit or proceeding. Borrower is not (a) in violation of any applicable law which violation materially and adversely affects or may materially and adversely affect the business, operations, assets or condition (financial or otherwise) of Borrower, (b) subject to, or in default with respect to any other legal requirement that would have a materially adverse effect on the business, operations, assets or condition (financial or otherwise) of Borrower, or (c) in default with respect to any material agreement to which Borrower is a party or by which it is bound. There is no Legal Action pending or threatened against or affecting Borrower questioning the validity or the enforceability of this Agreement or any of the other Loan Documents.

5.6 <u>Title to Properties; Liens</u>. Borrower has good, sufficient and legal title to all properties and assets reflected in its most recent balance sheet delivered to Lender, except for assets disposed of in the ordinary course of business since the date of such balance sheet.

5.7 <u>Disclosure</u>. There is no fact known to Borrower that materially and adversely affects the business, operations, assets or condition (financial or otherwise) of Borrower that has not been disclosed in this Agreement or in other documents, certificates and written statements furnished to Lender in connection herewith.

5.8 <u>Payment of Taxes</u>. All tax returns and reports of Borrower required to be filed by it have been timely filed, and all taxes, assessments, fees and other governmental charges upon Borrower and upon its properties, assets, income and franchises which are due and payable have been paid when due and payable. Borrower knows of no proposed tax assessment against it that would be material to the condition (financial or otherwise) of Borrower, and Borrower has not contracted with any Governmental Authority in connection with such taxes.

5.9 <u>Securities Activities</u>. Borrower is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any margin stock

(as defined within Regulations G, T and U of the Board of Governors of the Federal Reserve System), and not more than 25% of the value of Borrower's assets consists of such margin stock. No part of the Loan will be used to purchase or carry any margin stock or to extend credit to others for that purpose or for any other purpose that violates the provisions of Regulations U or X of said Board of Governors.

5.10    <u>Government Regulations</u>. Borrower is not subject to regulation under the Investment Company Act of 1940, the Federal Power Act, the Public Utility Holding Company Act of 1935, the Interstate Commerce Act or to any federal or state statute or regulation limiting its ability in incur indebtedness for money borrowed.

5.11    <u>Financial Condition</u>. The financial statements and all financial data previously delivered to Lender in connection with the Loan and/or relating to Borrower are true, correct and complete in all material respects. Such financial statements comply with the requirements of the Loan Documents and fairly present the financial position of the parties who are the subject thereof as of the date thereof. No material adverse change has occurred in such financial position and, except for this Loan, no borrowings have been made by Borrower since the date thereof which are secured by, or might give rise to, a Lien or claim against the proceeds of this Loan, or other assets of Borrower.

5.12    <u>Personal Property</u>. Borrower is now and shall continue to be the sole owner of the Collateral free from any adverse Lien or adverse claim of any kind whatsoever, except for (a) Liens in favor of Lender, and (b) any Permitted Lien.

5.13    <u>Other Loan Documents</u>. Each of the representations and warranties of Borrower contained in any of the other Loan Documents is true and correct in all material respects. All of such representations and warranties are incorporated herein for the benefit of Lender.

5.14    <u>Contracts; Labor Matters</u>. Except as disclosed to Lender in writing (a) Borrower is not subject to any charge, corporate restriction, judgment, decree or order, which materially affects its business, property, assets, operations or condition, financial or otherwise; (b) no labor contract to which Borrower is a party or is otherwise subject is scheduled to expire prior to the Maturity Date; (c) Borrower has not, within the two-year period preceding the date of this Agreement, taken any action which would have constituted or resulted in a "plant closing" or "mass layoff" within the meaning of the Federal Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar applicable federal, state or local law, and Borrower has no reasonable expectation that any such action is or will be required at any time prior to the Maturity Date; and (d) on the date of this Agreement (i) Borrower is not a party to any labor dispute and (ii) there are no strikes or walkouts relating to any labor contracts to which Borrower is a party or is otherwise subject.

5.15    <u>Occupational Safety and Health Matters</u>. Except as disclosed to Lender in writing, Borrower and each property, operation and facility that Borrower may own, operate or control (a) complies in all respects with all applicable Occupational Safety and Health Laws, except to the extent the noncompliance would not have a material adverse effect on the financial condition, business, assets or prospects of Borrower; (b) is not subject to any judicial or administrative proceeding alleging the violation of any Occupational Safety and Health Law; (c) has not received any notice (i) that it may be in violation of any Occupational Safety and Health Law, (ii) threatening the commencement of any proceeding relating to allegedly unlawful, unsafe or unhealthy conditions, or (iii) alleging that it is or may be responsible for any response, cleanup, or corrective action, including but not limited to any remedial investigation/feasibility studies, under any Occupational Safety and Health Law; (d) is not the subject of federal or state investigation evaluating whether any investigation, remedial action or other response is needed to respond to any allegedly unsafe or unhealthful condition; (e) has not filed any notice under or relating to any Occupational Safety and Health Law indicating or reporting any potentially unsafe or

4824-6734-7297

unhealthful condition, and there exists no basis for such notice irrespective of whether or not such notice was actually filed; and (f) has no known contingent liability in connection with any unsafe or unhealthful condition.

ARTICLE 6
AFFIRMATIVE COVENANTS

6.1     Consideration.  As an inducement to Lender to execute this Agreement and to make each disbursement of the Loan, Borrower hereby covenants as set forth in this Article 6, which covenants shall remain in effect so long as either the Note shall remain unpaid or any obligation of Borrower under any other Loan Documents remain outstanding or unperformed.

6.2     Notices of Claims and Litigation.  Borrower shall promptly inform Lender in writing of (a) all material adverse changes in the financial condition of Borrower, and (b) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower which could materially affect the financial condition of Borrower.

6.3     Financial Records.  Borrower shall maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

6.4     Insurance.

6.4.1     Borrower will keep, and will cause each subsidiary to keep, all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted.

6.4.2     Borrower will maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person.  In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loan, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.  All such insurance shall be provided by insurers having an A.M. Best policyholders rating reasonably acceptable to Lender.  Borrower will not, and will not permit any subsidiary or other Person, to bring or keep any article on any business location, or cause or allow any condition to exist, if the presence of such article or the occurrence of such condition could reasonably cause the invalidation of any insurance required by this Section 6.4, or would otherwise be prohibited by the terms thereof.

6.4.3     Borrower will furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following:  (a) the name of the insurer; (b) the risks insured; (c) the amount of the policy; (d) the properties insured; (e) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (f) the expiration date of the policy.  In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the

12

actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

6.4.4     In the event Borrower fails to provide Lender with evidence of the insurance coverage required by this Agreement, Lender may purchase insurance at Borrower's expense to protect Lender's interests in the Collateral. This insurance may, but need not, protect Borrower's interests. The coverage purchased by Lender may not pay any claim made by Borrower or any claim that is made against Borrower in connection with the Collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by this Agreement. If Lender purchases insurance pursuant to this Section, to the fullest extent provided by law Borrower will be responsible for the costs of that insurance, including interest and other charges imposed by Lender in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to the Obligations. The costs of the insurance may be more than the cost of insurance Borrower is able to obtain on its own.

6.5     Other Agreements. Borrower shall comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

6.6     Loan Proceeds. Borrower shall use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

6.7     Taxes, Charges and Liens. Borrower shall pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and Liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a Lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, Lien or claim so long as (a) the legality of the same shall be contested in good faith by appropriate proceedings, and (b) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, Lien, or claim in accordance with GAAP.

6.8     Performance. Borrower shall perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Loan Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender promptly in writing of any default in connection with any agreement, which default is alleged to be or is reasonably likely to be in excess of $50,000.00.

6.9     Operations. Borrower shall maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive personnel; conduct its business affairs in a reasonable and prudent manner.

6.10     Environmental Studies. Borrower shall promptly conduct and complete at Borrower's expense all such investigations and testings as may be required by any governmental authority, or as requested by Lender if Borrower has received any notice, summons, Lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity where there is damage to the environment and/or other natural resources.

4824-6734-7297

6.11    <u>Compliance with Governmental Requirements</u>.  Borrower shall comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral.  Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized.  Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

6.12    <u>Inspection</u>.  Borrower shall permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records.  If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

6.13    <u>Environmental Compliance and Reports</u>.  Borrower shall comply in all respects with any and all environmental laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment and which activity is in violation of applicable environmental laws, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within 30 days after receipt thereof a copy of any notice, summons, Lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

6.14    <u>Additional Assurances</u>.  Borrower shall make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all security interests.

6.15    <u>Reporting Requirements</u>.  Borrower shall deliver to Lender promptly upon Lender's request, and periodically if Lender shall so require, such written statements, schedules or reports (which shall be certified if required by Lender) in such form, containing such information and accompanied by such documents as may be satisfactory to Lender from time to time concerning the Collateral, Borrower's financial condition or business operations or any other matter or matters, including, without limitation, copies of federal, state and local tax returns of Borrower, and permit Lender, its agents and designees, to discuss Borrower's financial condition and business operations with Borrower's officers and employees.

6.15.1    Borrower shall furnish or cause to be furnished to Lender, in form and content acceptable to Lender:

(a)    As soon as the same are available, and in any event within 120 days after the end of each Fiscal Year of Borrower, audited annual financial statements of Borrower, certified and signed by the chief financial officer of Borrower in form satisfactory to Lender, and audited by independent certified public accountants, in all cases reasonably acceptable to Lender, prepared in accordance with GAAP or other

system of accounting reasonably acceptable to Lender, including balance sheets as of the end of such Fiscal Year and statements of income and retained earnings and a statement of cash flows, and setting forth in comparative form the balance sheet, income statement, retained earnings and cash flow figures for the preceding Fiscal Year.

(b)     As soon as the same are available, and in any event within 45 days after the close of each of the first three quarterly periods of each Fiscal Year, company-prepared financial statements for Borrower, prepared in accordance with GAAP or other system of accounting reasonably acceptable to Lender, including balance sheets as of the end of such period, statements of income and retained earnings and a statement of cash flows, in each case for the portion of the Fiscal Year ending with such fiscal period, all certified and signed by the chief financial officer of Borrower in form satisfactory to Lender.  All balance sheets shall set forth in comparative form figures for the preceding year end and the corresponding period in the preceding Fiscal Year.  All such income statements shall reflect year-to-date figures.

(c)     As soon as available, and in any event within 30 days of the date filed (including any extensions thereof) with the Internal Revenue Service, complete copies of the annual federal income tax returns of Borrower, together with all schedules and K-1s attached thereto.

(d)     As soon as the same are available, and in any event on or before January 31 of each Fiscal Year of Borrower, financial projections covering the next Fiscal Year and specifying the assumptions used in creating the projections, in all cases reasonably acceptable to Lender, including a balance sheets, statement of income and a statement of cash flows.

(e)     Such other information respecting the condition of Borrower as Lender may from time to time reasonably request.

6.15.2     Together with the financial statements referred to in Sections 6.15.1(a) and 6.15.1(b) above, Borrower shall provide Lender with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate, further certifying that, as of the date of the certificate, no Event of Default or Unmatured Event of Default exists under this Agreement, all in form and substance satisfactory to Lender.

6.16     Repayment.  Borrower shall repay the Loan in accordance with its terms and the terms of this Agreement and the Note.

6.17     Change of Location.  Borrower shall immediately notify Lender in writing of any additions to or changes in the location of Borrower's businesses.

6.18     Title to Assets and Property.  Borrower shall maintain good and marketable title to all of Borrower's assets and properties.

6.19     Notice of Default, Litigation; Change in Management.  Promptly upon learning of the occurrence of any of the following, Borrower shall provide Lender with written notice thereof, describing the same and the steps being taken by Borrower with respect thereto:  (a) the occurrence of any Event of Default, or (b) the institution of, or any adverse determination in, any litigation, arbitration proceeding or

governmental proceeding, or (c) any change in the management of Borrower, including, without limitation, any change in the holder of the office of President, Chief Executive Officer or Chief Financial Officer (or equivalent) of Borrower.

6.20    Other Information.  From time to time Borrower will provide Lender with such other information as Lender may reasonably request.

6.21    Employee Benefit Plans.  So long as this Agreement remains in effect, Borrower will maintain each employee benefit plan as to which Borrower may have any liability, in compliance with all applicable requirements of law and regulations.

6.22    Recovery of Additional Costs.  If the imposition of or any change in any law, rule, regulation or guideline, or the interpretation or application of any thereof by any court or administrative or governmental authority (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would (a) increase the cost to Lender for extending or maintaining the credit facilities to which this Agreement relates, (b) reduce the amounts payable to Lender under this Agreement or the other Loan Documents, or (c) reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefore, within five days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

6.23    Criminal Proceedings.  Borrower shall promptly notify Lender in writing of any threatened or actual commencement of a criminal proceeding or investigation with respect to any Loan Party or, except for misdemeanors or motor vehicle related proceedings, their directors, officers, employees and agents.

6.24    Extraordinary Loss.  Borrower shall promptly notify Lender in writing of any event causing extraordinary loss or depreciation of the value of Borrower's assets (whether or not insured) and the facts with respect thereto.

6.25    Maintenance of Properties.  Borrower shall maintain all properties and improvements necessary to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and cause replacements and repairs to be made when necessary for the proper conduct of its business.

6.26    Patents, Franchises, etc.  Borrower shall maintain, preserve and protect all licenses, patents, franchises, trademarks and trade names of Borrower or licensed by Borrower which are necessary to the conduct of the business of Borrower as now conducted, free of any conflict with the rights of any other person.

6.27    Notice of Event of Default.  Borrower shall immediately notify Lender in writing of the occurrence of any Event of Default or any event or existing condition which, with the giving of notice and/or the lapse of time, could constitute an Event of Default or which might materially and adversely affect the financial conditions or operations of Borrower and the facts with respect thereto.

6.28    USA Patriot Act.  Without the prior written consent of Lender, Borrower will not: (a) be or become subject at any time to any law, regulation, or list of any Governmental Authority (including,

4824-6734-7297

without limitation, the U.S. Office of Foreign Asset Control list) that prohibits or limits Lender from making any advance or extension of credit to Borrower or from otherwise conducting business with Borrower, or (b) fail to provide documentary and other evidence of Borrower's identity as may be requested by Lender at any time to enable Lender to verify Borrower's identity or to comply with any applicable law or regulation, including, without limitation, Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318.

6.29    <u>Loan Proceeds</u>.   Borrower shall not, and shall ensure that its directors, officers, employees and agents shall not request any Loan or use the proceeds of any Loan (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws or (b) in any manner that would result in the violation of any applicable Sanctions.

ARTICLE 7
NEGATIVE COVENANTS

7.1    <u>Indebtedness and Liens</u>.   Borrower shall not (a) except for the Permitted Indebtedness and trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume Indebtedness, including capital leases, or (b) except for Permitted Liens, sell, transfer, mortgage, assign, pledge, lease, grant a Lien in, or encumber any of Borrower's assets.

7.2    <u>Continuity of Operations</u>.   Borrower shall not (a) engage in any business activities substantially different than those in which Borrower is presently engaged, or (b) cease operations, liquidate, merge, transfer, acquire or consolidate with any other Person, change ownership, dissolve or transfer or sell Collateral out of the ordinary course of business, or (c) purchase or retire any of Borrower's outstanding membership interests, or (d) alter or amend Borrower's capital structure.

7.3    <u>Loans, Acquisitions and Guaranties</u>.   Borrower shall not (a) loan, invest in or advance money or assets to any other Person, (b) purchase, create or acquire any interest in any Person, or (c) incur any obligation as surety or guarantor other than in the ordinary course of business.

7.4    <u>Agreements</u>.   Borrower shall not enter into any agreement containing any provisions which would be violated or breached by the performance of its obligations under this Agreement or in connection herewith.

7.5    <u>Fiscal Year</u>.  Borrower shall not change its Fiscal Year.

7.6    <u>Subsidiaries</u>.   Borrower shall not organize or cause to exist any subsidiaries without Lender's prior written consent, which consent may be conditioned, without limitation, upon the granting by such subsidiary of a guarantee of payment of the Note and all other indebtedness of Borrower to Lender.  Lender shall have the right at any time and from time to time at its sole discretion to require any existing subsidiaries to guarantee the Obligations.

7.7    <u>Change of Name</u>.  Borrower shall not change the name of Borrower.

7.8    <u>Trade Names</u>.   Borrower shall not use any trade name other than Borrower's true corporate name.

ARTICLE 8
CONDITIONS PRECEDENT; DISBURSEMENT

8.1    <u>Closing</u>.  Lender's obligation to close the Loan and to disburse the Loan and to perform the remainder of its obligations under this Agreement are expressly conditioned upon:

8.1.1    Receipt and approval by Lender of each of the following items and the satisfaction by Borrower of the following conditions:

(a)    <u>Good Standing of Borrower; Borrower's Operating Documents</u>. Borrower shall have submitted to Lender (i) a certificate issued by the appropriate agency of its state of formation certifying that Borrower is in good standing under the laws of said state, (ii) a copy of the Borrower Formation Documents, and (iii) a copy of resolutions of the board of directors of Borrower authorizing the execution of the Loan Documents and the consummation of the transactions contemplated thereby, which shall be certified as true and correct by the Authorized Representative of Borrower.

(b)    <u>Financial Statements</u>.  Current financial statements of Borrower.

(c)    <u>Attorney Fees</u>.  The payment of attorneys' fees and costs incurred by Lender to document and close the Loan.

(d)    <u>Insurance</u>.  Evidence satisfactory to Lender that Borrower has complied with the insurance requirements set forth in <u>Section 6.4</u>.

(e)    <u>Other Items</u>.  Such other items or documents as Lender may reasonably require.

8.1.2    The representations and warranties of Borrower herein and elsewhere in the Loan Documents shall be true and correct;

8.1.3    No Event of Default or Unmatured Event of Default shall exist or would exist upon closing under this Agreement or any of the other Loan Documents;

8.1.4    Borrower's delivery to Lender of the following documents, in form and content satisfactory to Lender, duly executed (and acknowledged where necessary) by the appropriate parties thereto:

(a)    This Agreement;

(b)    The Note;

(c)    The Security Agreement;

(d)    An officer's certificate and resolutions of the members of Borrower; and

(e)    Such other documents that Lender may reasonably require.

## ARTICLE 9
## EVENTS OF DEFAULT AND REMEDIES

9.1     <u>Events of Default</u>.  The occurrence of any one or more of the following shall constitute an Event of Default under this Agreement:

9.1.1     Failure by Borrower to pay the entire outstanding balance of the Note on the Maturity Date.

9.1.2     Failure by Borrower to pay any monetary amount (except at maturity) within 10 days after the date due under any Loan Document.

9.1.3     Except as otherwise provided in this <u>Section 9.1</u>, any failure by Borrower to perform any obligation not involving the payment of money, or to comply with any other term or condition applicable to Borrower under any Loan Document and the expiration of 30 days after written notice of such failure by Lender to Borrower.

9.1.4     A change in Control shall occur.

9.1.5     Any representation or warranty by Borrower in any Loan Document is materially false, incorrect, or misleading as of the date made.

9.1.6     The entry of an order in the Case or any other proceeding under the Bankruptcy Code: (i) approving additional financing under Section 364(c) or (d) of the Bankruptcy Code, (ii) granting any Lien upon or affecting any Collateral other than Liens permitted under this Agreement; (iii) permitting the use of cash collateral, except as permitted hereby or with the prior written consent of the Lender, or (iv) authorizing or approving any other action adverse to the Lender or its rights and remedies or its interest in the Collateral, or any person or entity seeking the entry of an order in furtherance of any of the foregoing if any of the proceeds of the Loans provided hereunder are proposed to be used in such additional financing.

9.1.7     Entry of an order dismissing, or the Borrower filing a motion or any other pleading seeking the dismissal of, the Chapter 11 case or converting the Chapter 11 Case to a Chapter 7 case.

9.1.8     Entry of an order, or the Borrower filing a motion or any other pleading seeking the entry of an order, appointing a Chapter 11 Trustee or an examiner in the Case having enlarged powers (beyond those specifically enumerated and set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code).

9.1.9     Entry of an order granting, or the Borrower filing a motion or any other pleading seeking the entry of an order granting: (a) any other party in the Case a superpriority administrative expense claim, (b) modifying the Loan Documents, the Interim DIP Order, the Final DIP Order, (c) granting relief from the automatic stay to permit any secured creditor (other than Lender) to enforce or otherwise take action with respect to any Collateral, or (d) any breach by the Borrower of any provision of either the Interim DIP Order or Final DIP Order, except as consented to in writing by the Lender in accordance with this Agreement.

9.1.10     The payment by the Borrower of any pre-Petition Date claim unless such payment is permitted by the Budget or made pursuant to any order entered by the Bankruptcy Court in form and substance acceptable to Lender.

4824-6734-7297

9.1.11    The commencement of any action against the Lender by or on behalf of the Borrower or its bankruptcy estate.

9.1.12    The Interim DIP Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification or amendment, without the prior written consent of the Lender.

9.1.13    The Final DIP Order shall not have been entered by the Bankruptcy Court on or before May 11, 2018.

9.1.14    The Final DIP Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any modification or amendment, without the prior written consent of the Lender.

9.1.15    From and after entry of the Final DIP Order, if a waiver of claims under Section 506(c) of the Bankruptcy Code is granted in the Final DIP Order, a motion or other pleading seeking the allowance of, and/or the entry of order allowing, any claim under Section 506(c) of the Bankruptcy Code or otherwise against the Lender and/or the Collateral.

9.1.16    The filing of any Chapter 11 plan or any amendment thereto or related disclosure statement, or the entry of an order confirming any such Chapter 11 plan or approving any such disclosure statement or any such amendment, in each case that is not reasonably acceptable to the Lender.

9.1.17    Any termination or modification of the exclusivity periods set forth in section 1121 of the Bankruptcy Code unless consented to by the Lender.

9.1.18    The exclusive right of the Debtor to file a plan pursuant to section 1121 of the Bankruptcy Code lapses or is otherwise terminated, unless consented to by the Lender.

9.1.19    Entry of an order granting, any other party in the Case, including but not limited to SummitBridge, relief from the automatic stay of section 362 of the Bankruptcy Code, unless consented to by the Lender.

9.1.20    Borrower (a) is unable or admits in writing its inability to pay its post-Petition Date monetary obligations as they become due, (b) fails to pay when due any monetary obligation, whether such obligation be direct or contingent, to any Person in excess of $100,000.00, unless such obligation is being contested in good faith by Borrower, as determined by Lender in its reasonable discretion, (c) makes a general assignment for the benefit of creditors, or (d) applies for, consents to, or acquiesces in, the appointment of a trustee, receiver, or other custodian for Borrower or the property of Borrower or any part thereof, or in the absence of such application, consent, or acquiescence, a trustee, receiver, or other custodian is appointed for Borrower or the property of Borrower or any part thereof, and such appointment is not discharged within 90 days.

9.1.21    Any litigation or proceeding is commenced before any Governmental Authority against or affecting Borrower or the property of Borrower or any part thereof that exceeds $50,000.00 individually or $100,000.00 in the aggregate, and such litigation or proceeding is not defended diligently and in good faith by Borrower.

9.1.22        A final judgment or decree for monetary damages or a monetary fine or penalty (not subject to appeal or as to which the time for appeal has expired) is entered against Borrower by any Government Authority, which, together with the aggregate amount of all other such judgments or decrees against Borrower that remain unpaid or that have not been discharged or stayed, exceeds $50,000, and such judgment or decree is not paid and discharged or stayed or appealed within 30 days after the entry thereof.

9.1.23        All or any material part of the property of Borrower is attached, levied upon, or otherwise seized by legal process, and such attachment, levy, or seizure is not quashed, stayed, or released within 20 days of the date thereof.

9.1.24        The occurrence of any event of default or default, as such terms are defined in any other Loan Document, including, without limitation, any default in any agreement, obligation or instrument between Borrower and Lender or between Borrower and any Affiliate of Lender.

9.2        <u>Remedies</u>.

9.2.1        <u>General Remedies</u>.  Notwithstanding any provision to the contrary herein or any of the other Loan Documents, upon the happening of any Event of Default under this Agreement: (a) Lender's obligation to make further disbursements of the Loan shall abate, and (b) if the Event of Default shall not be cured within the applicable notice and cure periods, then Lender shall, at its option, (i) have the remedies provided in the Loan Document breached by Borrower, including, without limitation, the option to declare all outstanding indebtedness to be immediately due and payable without presentment, demand, protest or notice of any kind, and (ii) the following remedies: (A) Lender's obligation to make further disbursements to Borrower shall terminate; (B) Lender may, at its option, apply any of Borrower's funds in its possession to the outstanding indebtedness under the Note whether or not such indebtedness is then due; (C) Lender may exercise all rights and remedies available to it under any or all of the Loan Documents; and (D) Lender may, at its option, reduce the Loan Amount to an amount equal to the then-current outstanding balance of the Loan.  All sums expended by Lender for such purposes shall be deemed to have been disbursed to and borrowed by Borrower and shall be secured by the Security Agreement.

9.2.2        <u>Power of Attorney</u>.  Borrower hereby constitutes and appoints Lender, or an independent contractor selected by Lender, as its true and lawful attorney-in-fact with full power of substitution for the purposes of performance of Borrower's obligations under this Agreement in the name of Borrower.  It is understood and agreed that the foregoing power of attorney shall be deemed to be a power coupled with an interest which cannot be revoked until repayment of the Loan.  The power of attorney provided in this <u>Section 9.2.2</u> may only be exercised upon and during the continuance of an Event of Default.

ARTICLE 10
EXPENSES AND INDEMNITY

10.1        <u>Payment of Expenses</u>.  Borrower shall pay all taxes and assessments and all expenses, charges, costs, and fees provided for in this Agreement or relating to the Loan, including, without limitation, any fees incurred for recording or filing any of the Loan Documents, title insurance premiums and charges, tax service contract fees, fees of any consultants, reasonable fees and expenses of Lender's counsel, in negotiating, documenting, administering and enforcing the Loan, whether prior to or after the Closing Date, documentation and processing fees, printing, and duplicating expenses, air freight charges, escrow fees, costs of surveys, costs of inspections of the Collateral, premiums of hazard insurance

policies and surety bonds, and fees for any appraisal and appraisal review required by Lender. Borrower hereby authorizes Lender to disburse the proceeds of the Loan to pay such expenses, charges, costs, and fees notwithstanding that Borrower may not have requested a disbursement of such amount, with concurrent written notice given to Borrower of such disbursement. Lender may make such disbursements notwithstanding the fact that the Loan is not "in balance" or that Borrower is in default under the terms of this Agreement or any other Loan Document. Such disbursement shall be added to the outstanding principal balance of the Note. The authorization hereby granted shall be irrevocable, and no further direction or authorization from Borrower shall be necessary for Lender to make such disbursements. However, the provision of this <u>Section 10.1</u> shall not prevent Borrower from paying such expense, charges, costs, and fees from its own funds. All such expenses, charges, costs, and fees shall be Borrower's obligation regardless of whether or not Borrower has requested and met the conditions for an Advance. The Obligations on the part of Borrower under this <u>Section 10.1</u> shall survive the closing of the Loan and the repayment thereof. Borrower hereby authorizes Lender, in its sole and absolute discretion, to pay such expenses, charges, costs, and fees at any time by a disbursement of the Loan.

     10.2    <u>Indemnification</u>. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER AGREES TO PROTECT, INDEMNIFY, DEFEND AND SAVE HARMLESS LENDER, ITS DIRECTORS, OFFICERS, AGENTS, ATTORNEYS, AND EMPLOYEES FOR, FROM, AND AGAINST ANY AND ALL LIABILITY, EXPENSE, OR DAMAGE OF ANY KIND OR NATURE AND FOR, FROM, AND AGAINST ANY SUITS, CLAIMS, OR DEMANDS, INCLUDING REASONABLE ATTORNEY'S FEES AND EXPENSES ON ACCOUNT OF ANY MATTER OR THING OR ACTION, WHETHER IN SUIT OR NOT, ARISING OUT OF THIS AGREEMENT OR THE LOAN DOCUMENTS, OR IN CONNECTION HEREWITH. Upon receiving knowledge of any suit, claim, or demand asserted by a third party that Lender believes is covered by this indemnity, Lender shall give Borrower notice of the matter and an opportunity to defend it, at Borrower's sole cost and expense, with legal counsel satisfactory to Lender. Lender may also require Borrower to so defend the matter. The Obligations on the part of Borrower under this <u>Section 10.2</u> shall survive the closing of the Loan and the repayment thereof.

ARTICLE 11
MISCELLANEOUS

     11.1    <u>Assignment</u>. Borrower shall not assign any of its rights under this Agreement.

     11.2    <u>Notices</u>. All notices, requests, demands and consents to be made hereunder to the parties hereto shall be in writing and shall be delivered by hand or sent by registered mail or certified mail, postage prepaid, return receipt requested (except for any notice address which is a post office box, in which case notice may be given by first class mail), through the United States Postal Service to the addresses shown below, or such other address which the parties may provide to one another in accordance herewith. Such notices, requests, demands and consents, if sent by mail, shall be deemed given two Business Days after deposit in the United States mail, and if delivered by hand, shall be deemed given when delivered.

     To Lender:        Butch & Sundance, LLC
                    P.O. Box 61178
                    Palo Alto, CA 94306

4824-6734-7297

To Borrower:          ECS Refining, Inc.
                      2222 S. Sinclair Avenue
                      Stockton, CA 95215
                      Attention:  Jack Rockwood

11.3     <u>Inconsistencies with the Loan Documents</u>.  In the event of any inconsistencies between the terms of this Agreement and any terms of any of the Loan Documents, the terms of this Agreement shall govern and prevail as between Borrower and Lender.

11.4     <u>No Waiver</u>.  No disbursement of Loan proceeds shall constitute a waiver of any conditions to Lender's obligation to make further disbursements nor, in the event Borrower is unable to satisfy any such conditions, shall any such waiver have the effect of precluding Lender from thereafter declaring such inability to constitute a default or Event of Default under this Agreement.

11.5     <u>Incorporation of Preamble, Recitals and Exhibits</u>.  The preamble, recitals, and exhibits hereto are hereby incorporated into this Agreement.

11.6     <u>Titles and Headings</u>.  The headings at the beginning of each section of this Agreement are solely for convenience and are not part of this Agreement.  Unless otherwise indicated, each reference in this Agreement to a section or an exhibit is a reference to the respective section herein or exhibit hereto.

11.7     <u>Number and Gender</u>.  In this Agreement the singular shall include the plural and the masculine shall include the feminine and neuter gender and vice versa, if the context so requires.

11.8     <u>Brokers</u>.  Borrower and Lender represent to each other that neither of them knows of any brokerage commissions or finders' fee due or claimed with respect to the transaction contemplated hereby.  Borrower and Lender shall indemnify and hold harmless the other party for, from and against any and all loss, damage, liability, or expense, including costs and reasonable attorney fees, which such other party may incur or sustain by reason of or in connection with any misrepresentation by the indemnifying party with respect to the foregoing.

11.9     <u>Change, Discharge, Termination, or Waiver</u>.  No provision of this Agreement may be changed, discharged, terminated, or waived except in writing signed by the party against whom enforcement of the change, discharge, termination, or waiver is sought.  No failure on the part of Lender to exercise, and no delay by Lender in exercising, any right or remedy under the Loan Documents or under the law shall operate as a waiver thereof.

11.10     <u>Disbursements in Excess of Loan Amount</u>.  In the event the total disbursements by Lender exceed the Loan Amount, to the extent permitted by the laws of the State of California, the total of all disbursements shall be secured by the Security Agreement.  All other sums expended by Lender pursuant to this Agreement or any other Loan Documents shall be deemed to have been paid to Borrower and shall be secured by, among other things, the Security Agreement.

11.11     <u>Participations; Assignments</u>.  Lender shall have the right at any time to sell, assign, transfer, negotiate, or grant participations in all or any part of the Loan or the Note to one or more participants without Borrower's approval.  Borrower hereby acknowledges and agrees that any such disposition will give rise to a direct obligation of Borrower to each such purchaser, assignee, transferee, or holder.  Lender may at any time, without the consent of Borrower, assign all or any portion of its rights under this Agreement and the Note to a Federal Reserve Bank.

4824-6734-7297

11.12   <u>Counterparts</u>. This Agreement may be executed in any number of counterparts each of which shall be deemed an original, but all such counterparts together shall constitute but one agreement. Borrower and Lender agree and acknowledge that facsimile signature pages will be acceptable and shall be conclusive evidence of execution of any Loan Document, resolution or other agreement relating to the Loan. Borrower shall deliver originally signed signature pages to Lender within five business days of its execution of any Loan Document, resolution or other agreement relating to the Loan.

11.13   <u>Time is of the Essence</u>. Time is of the essence of this Agreement.

11.14   <u>Attorneys' Fees</u>. Borrower agrees to pay all costs of administration, enforcement and collection and preparation for any Event of Default or any action taken by Lender (including, without limitation, reasonable attorneys' fees), whether or not any action or proceeding is brought (including, without limitation, all such costs incurred in connection with any bankruptcy, receivership, or other court proceedings (whether at the trial or appellate level)), together with interest thereon from the date of demand at the Default Interest Rate.

11.15   <u>Integration</u>. The Loan Documents contain the complete understanding and agreement of Borrower and Lender and supersede all prior representations, warranties, agreements, arrangements, understandings, and negotiations.

11.16   <u>Binding Effect</u>. The Loan Documents will be binding upon, and inure to the benefit of, Borrower and Lender and their respective successors and assigns. Borrower may not delegate its Obligations under the Loan Documents.

11.17   <u>Survival</u>. The representations, warranties, and covenants of Borrower and the Loan Documents shall survive the execution and delivery of the Loan Documents and the making of the Loan.

11.18   <u>Exchange of Information</u>. Borrower agrees that Lender may exchange financial information about Borrower with its Affiliates and other related entities and its participants and prospective participants. Borrower agrees that Lender may provide any information Lender may have about Borrower or about any matter relating to this Agreement or any of the Loan Documents to any parent of Lender or any of its subsidiaries or Affiliates or their successors, or to any one or more purchasers or potential purchasers of the Loan. Borrower agrees that Lender may at any time sell, assign, or transfer one or more interests or participations in all or any part of its rights or obligations in and to this Agreement and the other Loan Documents to one or more purchasers whether or not related to or affiliated with Lender.

11.19   <u>Governing Law; Submission to Jurisdiction</u>. **THIS AGREEMENT, EACH NOTE AND EACH OTHER LOAN DOCUMENT, AND ALL MATTERS RELATING HERETO OR THERETO OR ARISING THEREFROM (WHETHER SOUNDING IN CONTRACT LAW, TORT LAW OR OTHERWISE), SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF CALIFORNIA, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES. BORROWER HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE STATE OF CALIFORNIA AND IRREVOCABLY AGREES THAT, SUBJECT TO LENDER'S ELECTION, ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS SHALL BE LITIGATED IN SUCH COURTS. BORROWER EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS. BORROWER HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE**

4824-6734-7297

**MADE UPON BORROWER BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO BORROWER AT THE ADDRESS SET FORTH IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE 10 DAYS AFTER THE SAME HAS BEEN POSTED.**

      11.20  <u>Waiver of Jury Trial</u>.  **EACH OF BORROWER AND LENDER HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH OF BORROWER AND LENDER ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH OF BORROWER AND LENDER WARRANTS AND REPRESENTS THAT EACH HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.**

      11.21  <u>USA PATRIOT ACT NOTIFICATION</u>.  Required Notice:

      "<u>USA PATRIOT ACT</u>.  Lender hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "*Act*"), it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the Act."

[SIGNATURE PAGE FOLLOWS]

4824-6734-7297

IN WITNESS WHEREOF, Lender and Borrower have caused this Agreement to be duly executed and delivered as of the date first above written.

ECS Refining, Inc., a Delaware corporation

By: _____

Name: _____

Title: _____

"Borrower"

Signature Page to Loan Agreement

4824-6734-7297

Butch & Sundance, LLC, a Delaware limited liability company.

By:_____
Name:_____
Title:_____

"Lender"

Signature Page to Loan Agreement

EXHIBIT B-2

## SECURED PROMISSORY NOTE
(Revolving Line of Credit)

Stockton, California

$6,000,000.00                                                    April _____, 2018

1.      FUNDAMENTAL PROVISIONS.

The following terms will be used as defined terms in this Secured Promissory Note (as it may be amended, modified, extended and renewed from time to time, this "Note"):

"Borrower" shall mean ECS Refining, Inc., a Delaware corporation.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in Sacramento, California, are authorized or required by law to remain closed.

"Default Interest Rate" shall mean 12.5% per annum.

"Interest Rate" shall mean a fixed rate of interest at all times equal to 8.0% per annum.

"Lender" shall mean Butch & Sundance, LLC, a Delaware limited liability company.

"Loan" shall mean the revolving line of credit loan from Lender to Borrower in up to the Loan Amount and evidenced by this Note.

"Loan Agreement" shall mean that certain Loan Agreement of even date herewith between Borrower, as Borrower, and Lender, as Lender. Capitalized terms used herein and otherwise undefined shall have the meanings set forth in the Loan Agreement.

"Loan Amount" shall mean up to $6,000,000.00.

"Loan Documents" shall mean the Loan Agreement, this Note, the Security Agreement, and any other documents securing the repayment of this Note.

"Maturity Date" shall mean the May 1, 2019.

"Security Agreement" shall mean that certain Security Agreement (All Assets) of even date herewith between Borrower, as Debtor, and Lender, as Secured Party.

2.      PROMISE TO PAY. For value received, Borrower promises to pay, in accordance with Paragraph 3(c) below, to the order of Lender, at its office at P.O. Box 61178, Palo Alto, CA 94306 or at such other place as the holder hereof may from time to time designate in writing, the Loan Amount, or so much thereof as shall from time to time be disbursed under the Loan Agreement, together with accrued interest from the date of disbursement on the unpaid principal balance at the Interest Rate.

3.      INTEREST; PAYMENTS.

(a)      Absent an Event of Default hereunder or under any of the Loan Documents, each advance made hereunder shall bear interest at the Interest Rate in effect from time to time.  Interest shall be calculated on the basis of a 360-day year and actual days elapsed.  All interest payable under this Note is computed using this method.  This calculation method results in a higher effective interest rate than the

numeric interest rate stated in this Note. By executing below, Borrower hereby acknowledges and agrees to the calculation of the Interest Rate in accordance with a year of 360 days and acknowledges that calculation of interest in accordance with this paragraph will increase the Loan's effective interest rate above the stated Interest Rate and Default Interest Rate, as applicable.

(b) All payments of principal and interest due hereunder shall be made (i) without deduction of any present and future taxes, levies, imposts, deductions, charges or withholdings, which amounts shall be paid by Borrower, and (ii) without any other set off. Borrower will pay the amounts necessary such that the gross amount of the principal and interest received by the holder hereof is not less than that required by this Note.

(c) Borrower shall pay to Lender all accrued, unpaid interest, with one (1) final "balloon" payment of all unpaid principal, accrued unpaid interest, and any other amounts due hereunder due and payable on the Maturity Date. If any payment of principal and interest to be made by Borrower hereunder shall become due on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in computing the interest in such payment.

(d) Borrower may prepay all or any portion of the principal amount of this Note, provided that if Borrower makes any such prepayment other than on a Monthly Payment Date (whether made voluntarily or involuntarily as a result of an acceleration of the Maturity Date or otherwise), Borrower shall also pay all accrued interest on the principal amount prepaid with such prepayment.

4.    <u>PREPAYMENT</u>.

(a) Borrower may prepay the Loan, in whole or in part, at any time without penalty or premium.

(b) This Note evidences a revolving line of credit. Borrower may re-borrow proceeds of the Loan prior to the Maturity Date in accordance with the terms and conditions of the Loan Agreement. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.

5.    <u>LAWFUL MONEY</u>. Principal and interest are payable in lawful money of the United States of America.

6.    <u>APPLICATION OF PAYMENTS/LATE CHARGE</u>.

(a) Absent the occurrence of an Event of Default hereunder or under any of the other Loan Documents, any payments received by the holder hereof pursuant to the terms hereof shall be applied first to the payment of all interest accrued to the date of such payment, next to principal, and the balance, if any, to the payment of sums, other than principal and interest, due the holder hereof pursuant to the Loan Documents. Any payments received by the holder hereof after the occurrence of an Event of Default hereunder or under any of the Loan Documents, shall be applied to the amounts specified in this <u>Paragraph 6(a)</u> in such order as the holder hereof may, in its sole discretion, elect.

(b) If any payment of interest and/or principal is not received by the holder hereof within 10 days after such payment is due, then in addition to the remedies conferred upon the holder hereof pursuant to <u>Paragraph 9</u> hereof and the other Loan Documents, (i) a late charge of 5% of the amount of the installment due and unpaid (excluding any balloon payment due on maturity) or $10.00, whichever is greater, will be added to the delinquent amount to compensate the holder hereof for the expense of

2

handling the delinquency for any payment past due in excess of 10 days, regardless of any notice and cure periods, and (ii) the amount due and unpaid (including, without limitation, the late charge) shall bear interest at the Default Interest Rate, computed from the date on which the amount was due and payable until paid.

7.      <u>SECURITY</u>.  This Note is secured by, <u>inter alia</u>, the Security Agreement, which Security Agreement creates a lien on that certain personal property described therein.

8.      <u>EVENT OF DEFAULT</u>.  The occurrence of any Event of Default (as defined in the Loan Agreement) shall constitute an Event of Default hereunder.

9.      <u>REMEDIES</u>.  Upon the occurrence of an Event of Default, then at the option of the holder hereof, the entire balance of principal together with all accrued interest thereon, and all other amounts payable by Borrower under the Loan Documents shall, without demand or notice, immediately become due and payable.  Upon the occurrence of an Event of Default (and so long as such Event of Default shall continue), all amounts due and payable by Borrower under the Loan Documents shall bear interest at the Default Interest Rate, subject to the limitations contained in <u>Paragraph 14</u> hereof.  No delay or omission on the part of the holder hereof in exercising any right under this Note or under any of the other Loan Documents hereof shall operate as a waiver of such right.

10.     <u>WAIVER</u>.  Borrower, endorsers, guarantors, and sureties of this Note hereby waive diligence, demand for payment, presentment for payment, protest, notice of nonpayment, notice of protest, notice of intent to accelerate, notice of acceleration, notice of dishonor, and notice of nonpayment, and all other notices or demands of any kind (except notices specifically provided for in the Loan Documents) and expressly agree that, without in any way affecting the liability of Borrower, endorsers, guarantors, or sureties, the holder hereof may extend any maturity date or the time for payment of any installment due hereunder, otherwise modify the Loan Documents, accept additional security, release any Person liable, and release any security or guaranty. Borrower, endorsers, guarantors, and sureties waive, to the full extent permitted by law, the right to plead any and all statutes of limitations as a defense.

11.     <u>CHANGE, DISCHARGE, TERMINATION, OR WAIVER</u>.  No provision of this Note may be changed, discharged, terminated, or waived except in a writing signed by the party against whom enforcement of the change, discharge, termination, or waiver is sought. No failure on the part of the holder hereof to exercise and no delay by the holder hereof in exercising any right or remedy under this Note or under the law shall operate as a waiver thereof.

12.     <u>ATTORNEYS' FEES</u>.  If this Note is not paid when due or if any Event of Default occurs, Borrower promises to pay all costs of enforcement and collection and preparation therefor, including but not limited to, reasonable attorneys' fees, whether or not any action or proceeding is brought to enforce the provisions hereof (including, without limitation, all such costs incurred in connection with any bankruptcy, receivership, or other court proceedings (whether at the trial or appellate level)).

13.     <u>SEVERABILITY</u>.  If any provision of this Note is unenforceable, the enforceability of the other provisions shall not be affected and they shall remain in full force and effect.

14.     <u>INTEREST RATE LIMITATION</u>.  Borrower hereby agrees to pay an effective rate of interest that is the sum of the interest rate provided for herein, together with any additional rate of interest resulting from any other charges of interest or in the nature of interest paid or to be paid in connection with the Loan, including, without limitation, any other fees to be paid by Borrower pursuant to the provisions of the Loan Documents. Lender and Borrower agree that none of the terms and provisions contained herein or in any of the Loan Documents shall be construed to create a contract for the use,

3

forbearance or detention of money requiring payment of interest at a rate in excess of the maximum interest rate permitted to be charged by the laws of the State of California. In such event, if any holder of this Note shall collect monies which are deemed to constitute interest which would otherwise increase the effective interest rate on this Note to a rate in excess of the maximum rate permitted to be charged by the laws of the State of California, all such sums deemed to constitute interest in excess of such maximum rate shall, at the option of the holder, be credited to the payment of other amounts payable under the Loan Documents or returned to Borrower.

15.     NUMBER AND GENDER.  In this Note the singular shall include the plural and the masculine shall include the feminine and neuter gender, and vice versa.

16.     HEADINGS.  Headings at the beginning of each numbered section of this Note are intended solely for convenience and are not part of this Note.

17.     INTEGRATION.  The Loan Documents contain the complete understanding and agreement of the holder hereof and Borrower and supersede all prior representations, warranties, agreements, arrangements, understandings, and negotiations.

18.     BINDING EFFECT.  The Loan Documents will be binding upon, and inure to the benefit of, the holder hereof, Borrower, and their respective successors and assigns. Borrower may not delegate its obligations under the Loan Documents.

19.     TIME OF THE ESSENCE.  Time is of the essence with regard to each provision of the Loan Documents as to which time is a factor.

20.     SURVIVAL.  The representations, warranties, and covenants of the Borrower in the Loan Documents shall survive the execution and delivery of the Loan Documents and the making of the Loan.

21.     CHOICE OF LAW.  THIS NOTE HAS BEEN DELIVERED IN CALIFORNIA, AND SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA.   THE COURTS OF CALIFORNIA, FEDERAL OR STATE, SHALL HAVE JURISDICTION OF ALL LEGAL ACTIONS ARISING OUT OF THIS NOTE.  BY EXECUTING THIS NOTE, THE UNDERSIGNED SUBMITS TO THE JURISDICTION OF THE FEDERAL AND STATE COURTS OF CALIFORNIA.

22.     JURY WAIVER.  BORROWER AND LENDER (BY ITS ACCEPTANCE HEREOF) HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG BORROWER AND LENDER ARISING OUT OF OR IN ANY WAY RELATED TO THIS NOTE OR ANY OTHER RELATED DOCUMENT OR LOAN DOCUMENT. THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO PROVIDE THE FINANCING DESCRIBED HEREIN OR IN THE OTHER LOAN DOCUMENTS.

[Signature Page Follows]

4848-2868-3105

IN WITNESS WHEREOF, Borrower has executed this Note as of the date first written above.

ECS Refining, Inc., a Delaware corporation

By:_____

Name:_____

Title:_____

"BORROWER"

Signature Page to Secured Promissory Note

4848-2868-3105

# EXHIBIT B-3

# SECURITY AGREEMENT
### (All Assets)

1.    <u>THE SECURITY</u>.    ECS Refining, Inc., a Delaware corporation ("<u>Debtor</u>"), hereby pledges, assigns and grants to Butch & Sundance, LLC, a Delaware limited liability company ("<u>Secured Party</u>"), a security interest in the following described property whether now owned or hereafter acquired by Debtor, other than assets specifically defined herein as not constituting part of the Collateral (the "<u>Collateral</u>"), on the terms and conditions set forth in this Security Agreement dated as of April 24, 2018 (this "<u>Agreement</u>"):

All assets of Debtor, including, without limitation:

(a)    All accounts, contract rights, chattel paper, instruments, deposit accounts, letter of credit rights, payment intangibles and general intangibles, including all amounts due to Debtor from a factor; and all returned or repossessed goods which, on sale or lease, resulted in an account or chattel paper.

(b)    All goods and inventory, including all materials, work in process and finished goods.

(c)    All machinery, furniture, fixtures and other equipment of every type now owned or hereafter acquired by Debtor.

(d)    All instruments, notes, chattel paper, documents, certificates of deposit, securities and investment property of every type.  The Collateral shall include all liens, security agreements, leases and other contracts securing or otherwise relating to the foregoing.

(e)    All general intangibles, including, but not limited to, (i) all patents, and all unpatented or unpatentable inventions; (ii) all trademarks, service marks, and trade names; (iii) all copyrights and literary rights; (iv) all computer software programs; (v) all mask works of semiconductor chip products; (vi) all trade secrets, proprietary information, customer lists, manufacturing, engineering and production plans, drawings, specifications, processes and systems; and (vii) interests in limited liability companies, partnerships or corporations.  The Collateral shall include all good will connected with or symbolized by any of such general intangibles; all contract rights, documents, applications, licenses, materials and other matters related to such general intangibles; all tangible property embodying or incorporating any such general intangibles; and all chattel paper and instruments relating to such general intangibles.

(f)    All negotiable and nonnegotiable documents of title covering any Collateral.

(g)    All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral.

(h)    All substitutes or replacements for any Collateral, all cash or non-cash proceeds, products, rents and profits of any Collateral, all income, benefits and property receivable on account of the Collateral, all rights under warranties and insurance contracts, letters of credit, guaranties or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral, and all proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the Collateral and sums due from a third party which has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(i)        All books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory ("Books and Records").

(j)        Any and all claims arising under Chapter 5 of the Bankruptcy Code, including without limitation Sections 502(d), 544, 547, 548, 549, 550 and 553, any other avoidance action under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, non-bankruptcy law, and the proceeds thereof, whether real or personal, tangible or intangible, and wherever located, and whether now existing or hereafter acquired, including proceeds, products, rents, and profits thereof ("Chapter 5 Lien").

2.        THE INDEBTEDNESS.  The Collateral secures and will secure all Indebtedness of Debtor to Secured Party.  "Indebtedness" shall have the meaning given to such term in that certain Loan Agreement of even date herewith between Debtor, as Borrower, and Secured Party, as Lender (the "Loan Agreement").[1]

3.        THE DIP SUPERPRIORITY CLAIMS.  In addition to the Collateral, the Orders (as defined in the Loan Agreement) entered by the Bankruptcy Court (as defined in the Loan Agreement) shall conclude and determine that the Indebtedness shall constitute allowed superpriority administrative expense claims pursuant to Section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject only to the payment of the Carve-Out (as defined in the Loan Agreement) over all administrative expenses of the kind specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, or 1114 of the Bankruptcy Code, or otherwise (the "DIP Superpriority Claims").  The DIP Superpriority Claims shall for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under Section 503(b) of the Bankruptcy Code and shall be payable from and have recourse to all post-petition property of the Debtor and all proceeds thereof and any pre-petition unencumbered assets of the Debtor and all proceeds thereof.  Other than as provided in the Loan Agreement, the Interim DIP Order (as defined in the Loan Agreement), and this Final DIP Order (as defined in the Loan Agreement) with respect to the Carve-Out (as defined in the Loan Agreement), no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Sections 328, 330, 331, and 363 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Case (as defined in the Loan Agreement), and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Superpriority Claims.

4.        DEBTOR'S COVENANTS.  Debtor represents, covenants and warrants that unless compliance is waived by Secured Party in writing:

(a)        Debtor will properly preserve the Collateral; defend the Collateral against any adverse claims and demands; and keep accurate Books and Records.

(b)        Debtor is organized as a corporation incorporated in the State of Delaware. Debtor will notify Secured Party in writing prior to any change in its state of organization or in the location of any Collateral, including the Books and Records.

(c)        Debtor will notify Secured Party in writing prior to any change in Debtor's name.

---

[1]        All capitalized terms not defined herein shall have the meaning set forth in the Loan Agreement.

(d)     Debtor will not grant any security interest in any of the Collateral except to Secured Party, and Debtor will keep the Collateral free of all Liens (as defined in the Loan Agreement) except for Permitted Liens (as defined in the Loan Agreement).

(e)     Debtor will promptly notify Secured Party in writing of any event which affects the value of the Collateral, the ability of Debtor or Secured Party to dispose of the Collateral, or the rights and remedies of Secured Party in relation thereto, including, but not limited to, the levy of any legal process against any Collateral and the adoption of any marketing order, arrangement or procedure affecting the Collateral, whether governmental or otherwise.

(f)     Debtor shall pay all costs necessary to preserve, defend, enforce and collect the Collateral, including but not limited to taxes, assessments, insurance premiums, repairs, rent, storage costs and expenses of sales, and any costs to perfect Secured Party's security interest (collectively, the "Collateral Costs").  Without waiving Debtor's default for failure to make any such payment, Secured Party at its option may pay any such Collateral Costs, and discharge encumbrances on the Collateral, and such Collateral Costs payments shall be a part of the Indebtedness and bear interest at the rate set out in the Indebtedness.  Debtor agrees to reimburse Secured Party on demand for any Collateral Costs so incurred.

(g)     Until Secured Party exercises its rights to make collection, Debtor will diligently collect all Collateral.

(h)     If any Collateral is or becomes the subject of any registration certificate, certificate of deposit or negotiable document of title, including any warehouse receipt or bill of lading, Debtor shall promptly deliver such document to Secured Party, together with any necessary endorsements.

(i)     Debtor will not engage in any sale or disposition of Collateral without Secured Party's prior written consent.

(j)     Debtor shall not lease or agree to lease any Collateral without Secured Party's prior written consent.

(k)     Debtor will, at its expense, diligently prosecute all patent, trademark or service mark or copyright applications pending on or after the date hereof, will maintain in effect all issued patents and will renew all trademark and service mark registrations, including payment of any and all maintenance and renewal fees relating thereto.  Debtor will at its expense protect and defend all rights in the Collateral against any material claims and demands of all persons other than Secured Party and will, at its expense, enforce all rights in the Collateral against any and all infringers of the Collateral where such infringement would materially impair the value or use of the Collateral to Debtor or Secured Party.  Debtor will not license or transfer any of the Collateral, except for such licenses as are customary in the ordinary course of Debtor's business, or except with Secured Party's prior written consent.

5.      ADDITIONAL REQUIREMENTS AT SECURED PARTY'S OPTION.  Debtor agrees that Secured Party may at its option at any time, whether or not Debtor is in default:

(a)     Require Debtor to deliver to Secured Party (i) copies of or extracts from the Books and Records, and (ii) information on any contracts or other matters affecting the Collateral.

(b)      Examine the Collateral, including the Books and Records, and make copies of or extracts from the Books and Records, and for such purposes enter at any reasonable time upon the property where any Collateral or any Books and Records are located.

(c)      Require Debtor to deliver to Secured Party any instruments, chattel paper or letters of credit which are part of the Collateral, and to assign to Secured Party the proceeds of any such letters of credit.

(d)      Notify any account debtors, any buyers of the Collateral, or any other persons of Secured Party's interest in the Collateral.

6.      <u>AUTHORIZATION TO FILE FINANCING STATEMENTS</u>.  Debtor hereby irrevocably authorizes Secured Party at any time and from time to time to file in any filing office in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of Debtor or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Uniform Commercial Code, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by Article 9 of the Uniform Commercial Code, for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether Debtor is an organization, the type of organization and any organizational identification number issued to Debtor and (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates.  Debtor agrees to furnish any such information to Secured Party promptly upon Secured Party's request.  Debtor also ratifies its authorization for Secured Party to have filed in any Uniform Commercial Code jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof.

7.      <u>DEFAULTS</u>.  Any one or more of the following shall be a default hereunder:

(a)      Any Indebtedness is not paid when due, after giving effect to any applicable notice, grace or cure periods, or any default occurs under any agreement relating to the Indebtedness, after giving effect to any applicable notice, grace or cure periods.

(b)      Debtor breaches any term, provision, warranty or representation under this Agreement, or under any other obligation of Debtor to Secured Party, and such breach remains uncured after any applicable cure period.

(c)      Secured Party fails to have an enforceable Lien on or security interest in the Collateral.

(d)      Any Lien of any kind or character attaches to any Collateral, except for Permitted Liens.

(e)      Debtor breaches any term, provision, warranty or representation under the Loan Agreement (Revolving Line of Credit) between Debtor and Lender dated April 24, 2018 and such breach remains uncured after any applicable cure period.

8.      <u>SECURED PARTY'S REMEDIES AFTER DEFAULT</u>.  In the event of any default, Secured Party may do any one or more of the following, to the extent permitted by law:

(a)      Declare any Indebtedness immediately due and payable, without notice or demand.

4

4843-2130-3137.3

(b)     Enforce the security interest given hereunder pursuant to the Uniform Commercial Code and any other applicable law.

(c)     Require Debtor to obtain Secured Party's prior written consent to any sale, lease, agreement to sell or lease, or other disposition of any Collateral consisting of inventory.

(d)     Require Debtor to segregate all collections and proceeds of the Collateral so that they are capable of identification and deliver daily such collections and proceeds to Secured Party in kind.

(e)     Require Debtor to direct all account debtors to forward all payments and proceeds of the Collateral to a post office box under Secured Party's exclusive control.

(f)     Require Debtor to assemble the Collateral, including the Books and Records, and make them available to Secured Party at a place designated by Secured Party.

(g)     Enter upon the property where any Collateral, including any Books and Records, are located and take possession of such Collateral and such Books and Records, and use such property (including any buildings and facilities) and any of Debtor's equipment, if Secured Party deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral.

(h)     Demand and collect any payments on and proceeds of the Collateral.  In connection therewith Debtor irrevocably authorizes Secured Party to endorse or sign Debtor's name on all checks, drafts, collections, receipts and other documents, and to take possession of and open the mail addressed to Debtor and remove therefrom any payments and proceeds of the Collateral.

(i)     Grant extensions and compromise or settle claims with respect to the Collateral for less than face value, all without prior notice to Debtor.

(j)     Use or transfer any of Debtor's rights and interests in any Intellectual Property now owned or hereafter acquired by Debtor, if Secured Party deems such use or transfer necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral. Debtor agrees that any such use or transfer shall be without any additional consideration to Debtor.  As used in this paragraph, "Intellectual Property" includes, but is not limited to, all trade secrets, computer software, service marks, trademarks, trade names, trade styles, copyrights, patents, applications for any of the foregoing, customer lists, working drawings, instructional manuals, and rights in processes for technical manufacturing, packaging and labeling, in which Debtor has any right or interest, whether by ownership, license, contract or otherwise.

(k)     Have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral.

(l)     Take such measures as Secured Party may deem necessary or advisable to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and Debtor hereby irrevocably constitutes and appoints Secured Party as Debtor's attorney-in-fact to perform all acts and execute all documents in connection therewith.

4843-2130-3137.3

(m)      Exercise any other remedies available to Secured Party at law or in equity.

9.      <u>MISCELLANEOUS</u>.

(a)      Any waiver, express or implied, of any provision hereunder and any delay or failure by Secured Party to enforce any provision shall not preclude Secured Party from enforcing any such provision thereafter.

(b)      Debtor shall, at the request of Secured Party, execute such other agreements, documents, instruments, or financing statements in connection with this Agreement as Secured Party may reasonably deem necessary.

(c)      All notes, security agreements, subordination agreements and other documents executed by Debtor or furnished to Secured Party in connection with this Agreement must be in form and substance satisfactory to Secured Party.

(d)      All rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by law. Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

(e)      All terms not defined herein are used as set forth in the Uniform Commercial Code as adopted in the State of California.

(f)      In the event of any action by Secured Party to enforce this Agreement or to protect the security interest of Secured Party in the Collateral, or to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, Debtor agrees to pay the costs and expenses thereof, together with reasonable attorneys' fees to the extent permitted by law.

(g)      In the event Secured Party seeks to take possession of any or all of the Collateral by judicial process, Debtor hereby irrevocably waives any bonds and any surety or security relating thereto that may be required by applicable law as an incident to such possession, and waives any demand for possession prior to the commencement of any such suit or action.

(h)      This Agreement shall constitute a continuing agreement, applying to all future as well as existing transactions, whether or not of the character contemplated at the date of this Agreement, and if all transactions between Secured Party and Debtor shall be closed at any time, shall be equally applicable to any new transactions thereafter.

(i)      Secured Party's rights hereunder shall inure to the benefit of its successors and assigns. In the event of any assignment or transfer by Secured Party of any of the Indebtedness or the Collateral, Secured Party thereafter shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but Secured Party shall retain all rights and powers hereby given with respect to any of the Indebtedness or the Collateral not so assigned or transferred. All representations, warranties and agreements of Debtor shall be binding upon the successors and assigns of Debtor.

(j)      <u>CHOICE OF LAW AND JURISDICTION</u>. THIS AGREEMENT HAS BEEN DELIVERED IN CALIFORNIA, AND SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA. THE COURTS OF

4843-2130-3137.3

CALIFORNIA, FEDERAL OR STATE, SHALL HAVE NON-EXCLUSIVE JURISDICTION OF ALL LEGAL ACTIONS ARISING OUT OF THIS AGREEMENT.  BY EXECUTING THIS AGREEMENT, THE UNDERSIGNED SUBMITS TO THE JURISDICTION OF THE FEDERAL AND STATE COURTS OF CALIFORNIA.

(k)    WAIVER OF JURY TRIAL.  DEBTOR WAIVES, AND, BY ACCEPTING THIS AGREEMENT, SECURED PARTY SHALL BE DEEMED TO WAIVE, ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (i) UNDER THIS AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT, OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR (ii) ARISING FROM ANY BANKING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT AND DEBTOR AGREES, AND, BY ACCEPTING THIS AGREEMENT, SECURED PARTY SHALL BE DEEMED TO AGREE, THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

[SIGNATURE PAGES FOLLOW]

4843-2130-3137.3

IN WITNESS WHEREOF, Debtor has executed this Agreement as of the date first written above.

DEBTOR:

ECS Refining, Inc., a Delaware corporation

By: _____
Name: _____
Title: _____

Address for Notices:

2222 S. Sinclair Avenue
Stockton, CA 95215

Signature Page to Security Agreement (All Assets)

SECURED PARTY:

Butch & Sundance, LLC, a Delaware limited liability company

By:_____
Name:_____
Title:_____


Address for Notices:

P.O. Box 61178
Palo Alto, CA 94306

# EXHIBIT C

## 3 week Critical Spending

| | 1 Monday 4/23/2018 | 2 Tuesday 4/24/2018 | 3 Wednesday 4/25/2018 | 4 Thursday 4/26/2018 | 5 Friday 4/27/2018 | 6 Saturday 4/28/2018 | 7 Sunday 4/29/2018 |
|---|---|---|---|---|---|---|---|
| Payroll | | | | | | | |
| ADP Payroll fees/Office charges | | | | | $ 1,000 | | |
| ECS CA - Settlement Vendors | | | $ 53,048 | | | | |
| ECS TX - Settlement Vendors | | | $ 22,190 | | | | |
| AMS - Settlement Vendors | | | $ 136,364 | | | | |
| ECS CA - Freight Carriers/Fuel | $ 6,833 | $ 6,833 | $ 6,833 | $ 6,833 | $ 6,833 | | |
| ECS TX - Freight Carriers/Fuel | $ 6,833 | $ 6,833 | $ 6,833 | $ 6,833 | $ 6,833 | | |
| AMS - Freight Carriers/Fuel | $ 1,333 | $ 1,333 | $ 1,333 | $ 1,333 | $ 1,333 | | |
| ECS CA - Building Leases/Rents | | | | | | | |
| ECS CA - Building Leases/Rents | | | | | | | |
| AMS - Building Leases/Rents | | | | | | | |
| ECS CA - Equipment Leases/Rents | | | | | | | |
| ECS CA - Equipment Leases/Rents | | | | | | | |
| AMS - Equipment Leases/Rents | | | | | | | |
| ECS CA - Packing/Operating/Production Supplies | $ 5,500 | $ 5,500 | $ 5,500 | $ 5,500 | $ 5,500 | | |
| ECS TX - Packing/Operating/Production Supplies | $ 1,600 | $ 1,600 | $ 1,600 | $ 1,600 | $ 1,600 | | |
| AMS - Packing/Operating/Production Supplies | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | | |
| ECS CA - Waste/Garbage | $ 4,500 | $ 4,500 | $ 4,500 | $ 4,500 | $ 4,500 | | |
| ECS TX - Waste/Garbage | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | | |
| ECS CA - Machinery/Equipment Maintenance | $ 1,600 | $ 1,600 | $ 1,600 | $ 1,600 | $ 1,600 | | |
| ECS TX - Machinery/Equipment Maintenance | $ 800 | $ 800 | $ 800 | $ 800 | $ 800 | | |
| Security | | | | | $ 5,000 | | |
| Uniforms | | | | | $ 5,000 | | |
| Employee Med, Den. Vis, Benefits | | | | | | | |
| Workers Comp, General Liability, Vehicle, etc. Insurances | | | | | $ 39,000 | | |
| Professional Fees | | | | | $ 7,500 | | |
| Internet/Telecom connections | | | | | $ 7,500 | | |
| Utilities | | | | | $ 22,500 | | |
| Postage/UPS/Fed-Ex | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | | |
| American Express | | | | | $ 10,000 | | |
| Legal fees | | | | | | | |
| **Totals** | $ 32,550 | $ 32,550 | $ 244,152 | $ 32,550 | $ 130,050 | | |
| | | | | | $ 471,852 | | |

| | 8 Monday 4/30/2018 | 9 Tuesday 5/1/2018 | 10 Wednesday 5/2/2018 | 11 Thursday 5/3/2018 | 12 Friday 5/4/2018 | 13 Saturday 5/5/2018 | 14 Sunday 5/6/2018 | 15 Monday 5/7/2018 | 16 Tuesday 5/8/2018 | 17 Wednesday 5/9/2018 | 18 Thursday 5/10/2018 | 19 Friday 5/11/2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | $ 510,000 | |
| | | | | | | | | | | | $ 1,000 | |
| | | | $ 66,310 | | | | | | | $ 66,310 | | |
| | | | $ 22,190 | | | | | | | $ 22,190 | | |
| | | | $ 136,364 | | | | | | | $ 136,364 | | |
| | | | | | $ 4,500 | | | | | | | |
| | $ 6,833 | $ 6,833 | $ 6,833 | $ 6,833 | $ 6,833 | | | $ 6,833 | $ 6,833 | $ 6,833 | $ 6,833 | $ 6,833 |
| | $ 6,833 | $ 6,833 | $ 6,833 | $ 6,833 | $ 6,833 | | | $ 6,833 | $ 6,833 | $ 6,833 | $ 6,833 | $ 6,833 |
| | $ 1,333 | $ 1,333 | $ 1,333 | $ 1,333 | $ 1,333 | | | $ 1,333 | $ 1,333 | $ 1,333 | $ 1,333 | $ 1,333 |
| | $ 30,000 | $ 160,000 | | | | | | | | | | |
| | $ 6,000 | $ 40,000 | | | | | | | | | | |
| | $ 1,000 | $ 10,000 | | | | | | | | | | |
| | $ 5,500 | $ 5,500 | $ 5,500 | $ 5,500 | $ 5,500 | | | $ 5,500 | $ 5,500 | $ 5,500 | $ 5,500 | $ 5,500 |
| | $ 1,600 | $ 1,600 | $ 1,600 | $ 1,600 | $ 1,600 | | | $ 1,600 | $ 1,600 | $ 1,600 | $ 1,600 | $ 1,600 |
| | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | | | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 |
| | $ 4,500 | $ 4,500 | $ 4,500 | $ 4,500 | $ 4,500 | | | $ 4,500 | $ 4,500 | $ 4,500 | $ 4,500 | $ 4,500 |
| | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | | | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 |
| | $ 1,600 | $ 1,600 | $ 1,600 | $ 1,600 | $ 1,600 | | | $ 1,600 | $ 1,600 | $ 1,600 | $ 1,600 | $ 1,600 |
| | $ 800 | $ 800 | $ 800 | $ 800 | $ 800 | | | $ 800 | $ 800 | $ 800 | $ 800 | $ 800 |
| | | | | | $ 5,000 | | | | | | | $ 5,000 |
| | | | | | $ 5,000 | | | | | | | $ 5,000 |
| | | | | | | | | | | | | $ 180,000 |
| | | | | | $ 7,500 | | | | | | | $ 7,500 |
| | | | | | $ 7,500 | | | | | | | $ 7,500 |
| | | | | | $ 22,500 | | | | | | | $ 22,500 |
| | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | | | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 |
| | | | | | $ 10,000 | | | | | | | $ 10,000 |
| | $ 69,550 | $ 242,550 | $ 257,414 | $ 32,550 | $ 94,550 | | | $ 32,550 | $ 32,550 | $ 257,414 | $ 543,550 | $ 270,050 |
| | | | | | $ 696,614 | | | | | | | $ 1,136,114 |

| 20 Saturday 5/12/2018 | 21 Sunday 5/13/2018 | $ 2,304,581 |
|---|---|---|

EXHIBIT D

**ECS Refining, Inc.**
*Weekly Cash Flow Projection*

| | 1 Forecast 04/23/18 | 2 Forecast 04/30/18 | 3 Forecast 05/07/18 | 4 Forecast 05/14/18 | 5 Forecast 05/21/18 | 6 Forecast 05/28/18 | 7 Forecast 06/04/18 | 8 Forecast 06/11/18 | 9 Forecast 06/18/18 | 10 Forecast 06/25/18 | 11 Forecast 07/02/18 | 12 Forecast 07/09/18 | 13 Forecast 07/16/18 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash In - Collections | - | - | 185,455 | 185,455 | 504,227 | 576,420 | 627,199 | 622,784 | 742,571 | 808,361 | 807,738 | 818,777 | 1,369,334 | 7,248,320 |
| DIP Funding, net | - | - | | | | | | | | | | | | - |
| Cash Out - all Disbursements | (471,852) | (696,614) | (1,136,114) | (449,614) | (1,214,811) | (824,402) | (1,198,711) | (512,211) | (1,224,711) | (578,266) | (1,446,575) | (513,075) | (1,425,575) | (11,692,533) |
| Net Cash | (471,852) | (696,614) | (950,660) | (264,160) | (710,584) | (247,982) | (571,512) | 110,572 | (482,140) | 230,096 | (638,837) | 305,702 | (56,241) | (4,444,213) |
| Cap Ex | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Cumulative** | **(471,852)** | **(1,168,467)** | **(2,119,127)** | **(2,383,286)** | **(3,093,870)** | **(3,341,852)** | **(3,913,364)** | **(3,802,792)** | **(4,284,932)** | **(4,054,837)** | **(4,693,674)** | **(4,387,972)** | **(4,444,213)** | |
| | | | | | | | | | | | | | | |
| Total Collections | - | - | 185,455 | 185,455 | 504,227 | 576,420 | 627,199 | 622,784 | 742,571 | 808,361 | 807,738 | 818,777 | 1,369,334 | 7,248,320 |
| Cash Infusion | - | - | | | | | | | | | | | | - |
| **Total Collections:** | - | - | 185,455 | 185,455 | 504,227 | 576,420 | 627,199 | 622,784 | 742,571 | 808,361 | 807,738 | 818,777 | 1,369,334 | 7,248,320 |
| | | | | | | | | | | | | | | |
| Payroll | - | - | 510,000 | - | 550,000 | - | 510,000 | - | 550,000 | - | 510,000 | - | 550,000 | 3,180,000 |
| Settlements | 211,602 | 224,864 | 224,864 | 224,864 | 277,561 | 287,461 | 287,461 | 287,461 | 287,461 | 288,325 | 288,325 | 288,325 | 288,325 | 3,466,902 |
| Fuel/Trucking | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 975,000 |
| Leases/Rents | - | 247,000 | - | - | - | 247,000 | - | - | - | - | 247,000 | - | - | 741,000 |
| Supplies/Maintenance/Waste | 97,500 | 97,500 | 97,500 | 97,500 | 97,500 | 97,500 | 97,500 | 97,500 | 97,500 | 97,500 | 97,500 | 97,500 | 97,500 | 1,267,500 |
| Insurance | 39,000 | - | 180,000 | - | 166,000 | 39,000 | 180,000 | - | 166,000 | 39,000 | 180,000 | - | 166,000 | 1,155,000 |
| OPEX Supplies/Services | 15,250 | 15,250 | 15,250 | 15,250 | 15,250 | 15,250 | 15,250 | 15,250 | 15,250 | 15,250 | 15,250 | 15,250 | 15,250 | 198,250 |
| Office Supplies | 1,000 | 4,500 | 1,000 | 4,500 | 1,000 | 4,500 | 1,000 | 4,500 | 1,000 | 4,500 | 1,000 | 4,500 | 1,000 | 34,000 |
| Misc/Others | 22,500 | 22,500 | 22,500 | 22,500 | 22,500 | 22,500 | 22,500 | 22,500 | 22,500 | 22,500 | 22,500 | 22,500 | 22,500 | 292,500 |
| Other/Summit Equipment | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 36,190 | 10,000 | 10,000 | 10,000 | 36,190 | 10,000 | 10,000 | 10,000 | 182,381 |
| Professionals Fees | - | - | - | - | - | - | - | - | - | - | - | - | 200,000 | 200,000 |
| **Total Disbursements** | 471,852 | 696,614 | 1,136,114 | 449,614 | 1,214,811 | 824,402 | 1,198,711 | 512,211 | 1,224,711 | 578,266 | 1,446,575 | 513,075 | 1,425,575 | 11,692,533 |
| | | | | | | | | | | | | | | |
| **Total Billing** | 593,208 | 647,339 | 647,339 | 647,339 | 795,061 | 851,190 | 1,451,190 | 851,190 | 851,190 | 812,369 | 1,412,369 | 812,369 | 812,369 | 11,189,521 |
| Collections | - | - | 185,455 | 185,455 | 504,227 | 576,420 | 627,199 | 622,784 | 742,571 | 808,361 | 807,738 | 818,777 | 1,369,334 | 7,248,320 |

# EXHIBIT E

**23**

1  Michael B. Reynolds (CA Bar #174534)
   Christopher H. Bayley (AZ Bar #010764)[1]
2  Steven D. Jerome (AZ Bar #018420)[2]
   SNELL & WILMER L.L.P.
3  600 Anton Blvd, Suite 1400
   Costa Mesa, California 92626-7689
4  Telephone:  714.427.7000
   Facsimile:   714.427.7799
5  Email: mreynolds@swlaw.com
           cbayley@swlaw.com
6          sjerome@swlaw.com
   *Proposed Attorneys for Debtor*
7
   Nanette D. Sanders (CA Bar #120169)
8  RINGSTAD & SANDERS LLP
   4343 Von Karman Ave., Suite 300
9  Newport Beach, CA 92660
   Telephone:   (949) 851-7450
10 Email: Nanette@ringstadlaw.com
   *Proposed Special Counsel for Debtor*
11

LAW OFFICES
Snell & Wilmer
L.L.P.
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

12            **UNITED STATES BANKRUPTCY COURT**

13            **EASTERN DISTRICT OF CALIFORNIA**

14                **SACRAMENTO DIVISION**

| 15 In Re: | Proceedings Under Chapter 11 |
|---|---|
| 16 ECS REFINING, Inc., | Case No. _____ |
| 17            Debtor. | **FINAL ORDER (1) AUTHORIZING** |
| 18 | **DEBTOR TO OBTAIN POST-PETITION FINANCING PURSUANT** |
| 19 | **TO 11 U.S.C. § 364; (2) GRANTING LIENS AND SUPERPRIORITY** |
| 20 | **CLAIMS PURSUANT TO § 364; (3) AUTHORIZING THE USE OF POST-PETITION CASH COLLATERAL** |
| 21 | **PURSUANT TO 11 U.S.C. § 363; (4) GRANTING RELATED RELIEF** |

22

23

24        Upon the "Emergency *Ex Parte* Motion for Order (1) Authorizing Debtor to Obtain

25 Post-Petition Financing Pursuant to 11 U.S.C. § 364; (2) Granting Liens and Superpriority

26 Claims Pursuant to § 364; (3) Authorizing the Use of Post-Petition Cash Collateral

27 _____

28 [1] Application for admission *pro hac vice* is pending.
   [2] Application for admission *pro hac vice* is pending.

                                    FINAL ORDER RE FIRST DAY MOTIONS

Pursuant to 11 U.S.C. § 363; (4) Scheduling a Final Hearing; and (5) Granting Related Relief" dated April 24, 2018 (the "DIP Motion"), of ECS Refining Inc. (the "Debtor"), as debtor and debtor-in-possession, in the above-referenced case (the "Bankruptcy Case"), seeking entry of a final order (the "Final Order") pursuant to sections 105(a), 361, 362, 363, 364, 365, 507, and 552 of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001(c) and 4001(d) of the Local Rules of Bankruptcy Procedure for the Eastern District of California (the "Local Rules"), that, among other things:

1.     authorizes the Debtor to enter into a secured, super-priority, multiple draw term credit facility (such facility, the "DIP Facility") of up to $6,000,000 in the aggregate principal amount pursuant to the terms of (a) this Final Order, (b) the interim order approving the DIP Facility that was previously entered by this Court on _____ (the "Interim Order"); (c) that certain "Loan Agreement" in substantially the form attached to the Interim Order as Exhibit A (as the same may be amended, restated, supplemented or otherwise modified from time to time and subject to the restrictions set forth herein, the "DIP Loan Agreement")[3] among the Debtor and Butch & Sundance, LLC as the lender (the "Lender"), and (d) any and all other Loan Documents (as defined in the DIP Loan Agreement) (together with the DIP Loan Agreement, collectively, the "DIP Loan Documents"), which consists of $6,000,000.00 in new money funding (the "DIP Loan"), inclusive of any amounts previously funded in accordance with the Interim Order, subject to the terms and conditions of this Final Order and the DIP Loan Documents (any DIP Loan made to or for the benefit or account of the Debtor pursuant to the DIP Loan Documents, and all other obligations and liabilities of the Debtor arising under the DIP Loan Documents are collectively referred to as the "DIP Obligations");

2.     approves the terms of, and authorizes and directs the Debtor to execute and

---

[3] Unless otherwise specified, all capitalized terms used herein without definition shall have the respective meanings given such terms in the DIP Credit Agreement.

FINAL ORDER RE FIRST DAY MOTIONS

4850-8174-2177

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

1   deliver, and perform under, the DIP Loan Documents and to perform such other and

2   further acts as may be required in connection with the DIP Loan Documents;

3      3.     authorizes and directs the Debtor to grant the Lender (1) superpriority

4   administrative expense claims having recourse to any unencumbered pre-petition assets

5   and all post-petition assets of the Debtor (the "DIP Superpriority Claims"), (2) a valid,

6   binding, continuing, enforceable, fully perfected, and unavoidable first priority security

7   interest and lien granted to the Lender (the "Post-Petition DIP Lien", as more fully

8   defined herein) in and on any unencumbered pre-petition assets and all post-petition assets

9   of the Debtor, which shall be, and deemed to be, immediately secured (without any further

10   filings), (3) a valid, binding, continuing, enforceable, fully perfected, and unavoidable

11   security interest and lien granted to the Lender (the "Pre-Petition DIP Lien") in and on

12   any and pre-petition assets of the Debtor, subject only to any existing, as of the Petition

13   Date, valid, perfected and unavoidable liens, which shall be, and deemed to be,

14   immediately secured (without any further filings) (the Post-Petition DIP Lien and the Pre-

15   Petition DIP Lien are collectively referred to herein as the "DIP Lien"), (4) a valid,

16   binding, continuing, enforceable, fully perfected, and unavoidable first priority security

17   interest and lien to the Lender (the "DIP Chapter 5 Lien", as more fully defined herein) in

18   and on any and all claims arising under Chapter 5 of the Bankruptcy Code, any other

19   avoidance actions under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the

20   Uniform Fraudulent Conveyance Act, non-bankruptcy law, and the proceeds thereof,

21   whether real or personal, tangible or intangible, and wherever located, and whether now

22   existing or hereafter acquired, including proceeds, products, rents, and profits thereof;

23      4.     authorizes the Debtor to use post-petition "cash collateral," as such term is

24   defined in Section 363 of the Bankruptcy Code (the "Cash Collateral");

25      5.     vacates the automatic stay imposed by Section 362 of the Bankruptcy Code

26   to the extent necessary to implement and effectuate the terms and provisions of the DIP

27   Loan Documents and this Final Order;

28      6.     authorizes the Lender to exercise remedies upon the occurrence and

FINAL ORDER RE FIRST DAY MOTIONS

4850-8174-2177

continuance of an Event of Default (under and as defined in the DIP Loan Documents) after written notice and as further specified in this Final Order; and

7.        waives any applicable stay, including under Bankruptcy Rule 6004, and provides for immediate effectiveness of this Final Order.

Having considered the DIP Motion, the Omnibus Declaration of Jack Rockwood in Support of First Day Motions, the DIP Loan Documents, and the evidence submitted at the interim hearing held on _____ (the "Interim Hearing"); any objections filed regarding the DIP Motion; and in accordance with Bankruptcy Rules 2002, 4001, 6004, and 9014 and all applicable Local Rules, notice of the DIP Motion and the Final Hearing having been given; an Interim Hearing having been held and concluded on _____; and it appearing that approval of the final relief requested in the DIP Motion is fair and reasonable and in the best interests of the Debtor; its creditors, estate and all parties-in-interest, and is essential for the continued operation of the Debtor's business; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**IT IS FOUND AND DETERMINED** that:

A.        **Petition Date**.  On April 24, 2018 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Eastern District of California (the "Bankruptcy Court"). The Debtor has continued in the management and operation of its business and property as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No statutory committee of unsecured creditors (to the extent such committee is appointed, the "Committee"), trustee, or examiner has been appointed in the Bankruptcy Case.

B.        **Jurisdiction and Venue**.  The Bankruptcy Court has core jurisdiction over the Bankruptcy Case, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.   Venue for the Bankruptcy Case and proceedings on the DIP Motion is proper before the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The legal predicates for the relief sought herein are Sections

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

4

4850-8174-2177

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Rule 4001.

C.     **Interim Order**.  Based upon the DIP Motion and the DIP Loan Documents, and the evidence submitted at the Interim Hearing, the Court approved the Debtor's entry into and performance under the DIP Loan Documents and entered the Interim Order. Pursuant to the Interim Order, the Debtor was authorized, among other things, to incur secured borrowings pursuant to the terms of the DIP Loan Documents and the Interim Order pending the entry of a final order on the DIP Motion.

D.     **Authority**.  The Debtor has duly authorized entry into the DIP Loan Documents to which it is a party by all necessary corporate action and, upon execution, the DIP Loan Documents will constitute a legal, valid, and binding obligation of the Debtor in accordance with its terms.

E.     **Notice**.  The Final Hearing was held pursuant to the authorization of Bankruptcy Rule 4001.  Notice of the Final Hearing and the relief requested in the DIP Motion has been provided by the Debtor, whether by facsimile, electronic mail, overnight courier, hand delivery and/or telephone, on ＿＿＿＿＿＿＿＿, to certain parties-in-interest, including: (a) the Office of the United States Trustee for the Eastern District of California (the "U.S. Trustee"); (b) the Debtor's twenty largest unsecured creditors; (c) counsel to the Committee, if one is appointed and (d) all those who had then filed notices of appearance or requests for notice in the Bankruptcy Case.  Such notice of the DIP Motion, the relief requested therein, the Interim Hearing, and the Final Hearing is sufficient under the circumstances.

F.     **Findings Regarding the DIP Facilities**.

1.     Need for Post-petition Financing.  The Debtor has an immediate need to obtain the DIP Facility and use post-petition Cash Collateral, among other things, to permit the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers, and customers, to make payroll, to make capital

FINAL ORDER RE FIRST DAY MOTIONS

4850-8174-2177

expenditures, and to satisfy other working capital and operation needs. The Debtor's access to sufficient working capital and liquidity through the use of borrowing under the DIP Facility and through the use of post-petition Cash Collateral is vital to the preservation and maintenance of the going concern value of the Debtor and its successful reorganization.

2. <u>No Credit Available on More Favorable Terms.</u> The Debtor has been and continues to be unable to obtain financing on more favorable terms from sources other than the Lender under the DIP Loan Documents. The Debtor is unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense without incurring prohibitive litigation and/or execution expenses that would erode the value of the Debtor's estate and harm all parties-in-interest. The most favorable terms the Debtor is able to obtain credit on are those terms provided herein and in the DIP Loan Documents pursuant to Sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code, including, without limitation, the DIP Superpriority Claims, the DIP Lien, and the DIP Chapter 5 Lien, as defined herein (all of the foregoing, collectively, the "<u>DIP Protections</u>").

G. **<u>Business Judgment and Good Faith Pursuant to Section 364(e).</u>**

1. The Lender has indicated a willingness to provide post-petition secured financing via the DIP Facility to the Debtor in accordance with the DIP Loan Documents and this Final Order.

2. The terms and conditions of the DIP Facility pursuant to the DIP Loan Documents and this Final Order, and the fees, costs, expenses, and attorney fees paid and to be paid thereunder, are fair, reasonable, and the best available under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and is supported by reasonably equivalent value and consideration.

3. Based on the record presented to the Bankruptcy Court at the Interim Hearing and the Final Hearing, the DIP Facility and the DIP Loan Documents were negotiated in good faith and at arms' length among the Debtor, on the one hand, and the

FINAL ORDER RE FIRST DAY MOTIONS

4850-8174-2177

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

Lender, on the other hand, and all of the DIP Obligations shall be deemed to have been extended by the Lender for valid business purposes and uses and in good faith, as that term is used in Section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Protections shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event the Interim Order, this Final Order, or any other order or any provision hereof or thereof is vacated, reversed, amended, or modified, on appeal or otherwise.

H.      **Relief Essential; Best Interest**.  For the reasons stated above, the Debtor has requested immediate entry of this Final Order pursuant to Bankruptcy Rule 4001(b)(2) and 4001(c)(2).  Absent granting the relief set forth in this Final Order, the Debtor's estate and its ability to successfully reorganize will be immediately and irreparably harmed. Consummation of the DIP Facility in accordance with this Final Order and the DIP Loan Documents is therefore in the best interests of the Debtor's estate.

**NOW, THEREFORE**, based upon the DIP Motion and the record before the Bankruptcy Court with respect to the DIP Motion, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.      **Motion Granted**.  The DIP Motion is granted on a final basis in accordance with the terms and conditions set forth in this Final Order and the DIP Loan Documents. To the extent of any inconsistencies between the Final Order and the DIP Loan Documents, the provisions of this Final Order shall control.  Any objections to the DIP Motion with respect to the entry of this Final Order that have not been withdrawn, waived, or settled, are hereby denied and overruled.

2.      **DIP Loan Documents and DIP Protections**.

a.      Approval of DIP Loan Documents.  The Debtor is expressly and immediately authorized and directed to (to the extent such actions were not previously taken in accordance with the Interim Orders): (i) establish the DIP Facility, (ii) execute, deliver, and perform under the DIP Loan Documents and to incur the DIP Obligations in

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California  92626-7689

7

4850-8174-2177

accordance with, and subject to, the terms of this Final Order and the DIP Loan Documents, and (iii) execute, deliver, and perform under all other instruments, certificates, agreements, and documents which may be required or necessary for performance by the Debtor under the DIP Facility. The Debtor is hereby authorized to do and perform all acts, pay the principal, interest, fees, costs, expenses, attorneys' fees, and other amounts described in the DIP Loan Documents as such become due or have become due pursuant to the DIP Loan Documents, the Interim Order, and this Final Order. Upon their execution and delivery, the DIP Loan Documents shall represent valid and binding obligations of the Debtor enforceable against the Debtor in accordance with their terms.

　　　　　b.　　　Authorization to Incur DIP Obligations. To enable the Debtor to continue to operate its business, and subject to the terms and conditions of this Final Order the DIP Loan Documents, and the budget attached to the DIP Motion (the "Budget"), the Debtor is hereby authorized to borrow the DIP Loan under the DIP Facility in an aggregate outstanding principal amount not to exceed $6,000,000.00, inclusive of the Interim Advance made pursuant to the Interim Order (and as defined therein).

　　　　　c.　　　Application of DIP Facility Proceeds. The proceeds of the DIP Facility (net of any amounts used to pay fees, principal, interest, costs, and expenses of the DIP Facility pursuant to, and in accordance with, the DIP Loan Documents, the Interim Order, and this Final Order) shall be used in accordance with the terms and conditions of the DIP Loan Documents and this Final Order, for (i) working capital; (ii) other general corporate purposes of the Debtor; and (iii) the costs of administration of the Bankruptcy Case. Without limiting the foregoing, the Debtor shall not be permitted to make any payments on account of any pre-petition debt or obligation prior to the effective date of any confirmed Chapter 11 plan, except as otherwise ordered by the Bankruptcy Court or as otherwise provided in the DIP Loan Documents.

　　　　　d.　　　Conditions Precedent. The Lender shall have no obligation to make any DIP Loan or make any other extension of credit or financial accommodation in respect of the DIP Facility, or otherwise, unless and until all conditions precedent to the

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

8

4850-8174-2177

making of any such DIP Loan or other extension of credit or financial accommodation under the DIP Loan Documents, the Interim Order, and this Final Order have been satisfied in full or waived by the Lender in accordance with the DIP Loan Documents, the Interim Order, and this Final Order.

e.      <u>DIP Liens.</u> Effective immediately upon the entry of this Final Order, the Lender is hereby granted the following liens (which shall immediately, and without any further action by any person, be valid, binding, permanent, perfected, continuing, enforceable, and non-avoidable):

(1)      a lien, as provided for in the DIP Loan Documents, in and on any unencumbered pre-petition assets and all post-petition assets of the Debtor, now existing or hereafter acquired, including, without limitation, all such cash and cash equivalents, and any investment in such cash or cash equivalents, money, motor vehicles and rolling stock, inventory, goods, accounts receivable, other rights to payment, intercompany loans and other investments, investment property, contracts, contract rights, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, documents of title**,** letters of credit, letter of credit rights, supporting obligations, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, capital stock or equity interests of subsidiaries, tax refunds, insurance proceeds, commercial tort claims, membership interests and other equity ownership interests, and all rents, products, substitutions, accessions, profits, replacements, and cash and non-cash proceeds of all of the foregoing (the "<u>Post-Petition DIP Lien</u>");

(2)      a lien, as provided for in the DIP Loan Documents, in and on any encumbered pre-petition assets of the Debtor, including, without limitation, all such cash and cash equivalents, and any investment in such cash or cash equivalents, money, motor vehicles and rolling stock, inventory, goods, accounts receivable, other rights to payment, intercompany loans and other investments, investment property, contracts, contract rights, plants, equipment, machinery, general intangibles, payment intangibles,

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

FINAL ORDER RE FIRST DAY MOTIONS

4850-8174-2177

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

accounts, deposit accounts, documents, instruments, chattel paper, documents of title, letters of credit, letter of credit rights, supporting obligations, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, capital stock or equity interests of subsidiaries, tax refunds, insurance proceeds, commercial tort claims, membership interests and other equity ownership interests, and all rents, products, substitutions, accessions, profits, replacements, and cash and non-cash proceeds of all of the foregoing, subject only to any existing, as of the Petition Date, valid, perfected and unavoidable liens (the "Pre-Petition DIP Lien") (the Post-Petition DIP Lien and the Pre-Petition DIP Lien are collectively referred to herein as the "DIP Lien");

(3)　　a lien on any and all claims arising under Chapter 5 of the Bankruptcy Code, including without limitation Sections 502(d), 544, 547, 548, 549, and 550, any other avoidance action under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, non-bankruptcy law, and the proceeds thereof, whether real or personal, tangible or intangible, and wherever located, and whether now existing or hereafter acquired, including proceeds, products, rents, and profits thereof (the "DIP Chapter 5 Lien").

f.　　DIP Lien Priority.　Notwithstanding anything to the contrary contained in this Final Order, the Interim Order, or the DIP Loan Documents, and for the avoidance of doubt, the Post-Petition DIP Lien and the DIP Chapter 5 Lien granted to the Lender shall in each and every case be first priority senior liens.

g.　　Enforceable Obligations.　The DIP Loan Documents shall constitute and evidence the valid and binding DIP Obligations of the Debtor, which DIP Obligations shall be enforceable against the Debtor, its estate, and any successors thereto (including, without limitation, any trustee or other estate representative), and its creditors, in accordance with the terms of the DIP Loan Documents, the Interim Order, and this Final Order.　No obligation, payment, transfer, or grant of security under the DIP Loan Documents or this Final Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without

FINAL ORDER RE FIRST DAY MOTIONS

4850-8174-2177

limitation, under Sections 502(d), 544, 547, 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, re-characterization, subordination (whether equitable, contractual or otherwise) counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

h. <u>DIP Superpriority Claims.</u>  In addition to the DIP Lien and DIP Chapter 5 Lien granted herein, effective immediately upon entry of this Final Order, all of the DIP Obligations authorized to be incurred by the Debtor pursuant to the Interim Order and this Final Order shall constitute allowed superpriority administrative expense claims pursuant to Section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject only to the payment of the Carve-Out, as defined herein, over all administrative expenses of the kind specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, or 1114 of the Bankruptcy Code, or otherwise (the "DIP Superpriority Claims").  The DIP Superpriority Claims shall for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under Section 503(b) of the Bankruptcy Code and shall be payable from and have recourse to all post-petition property of the Debtor and all proceeds thereof and any pre-petition unencumbered assets of the Debtor and all proceeds thereof.  Other than as provided in the DIP Loan Documents, the Interim Order, and this Final Order with respect to the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Sections 328, 330, 331, and 363 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Lien, the DIP Chapter 5 Lien, or the DIP Superpriority Claims, or with any other claim of the Lender arising hereunder.

FINAL ORDER RE FIRST DAY MOTIONS

4850-8174-2177

3.     **Authorization to Use Proceeds of DIP Facility, Including Post-Petition Cash Collateral**.

Subject to the terms and conditions of this Final Order and the DIP Loan Documents, (a) the Debtor is authorized to use proceeds of the DIP Loan from and after the Effective Date (as defined in the DIP Loan Documents), and (b) the Debtor is authorized to use all post-petition Cash Collateral.  The Debtor's right to use proceeds of the DIP Loan and post-petition Cash Collateral shall terminate (i) automatically upon the occurrence of the Maturity Date (under and as defined in the DIP Credit Agreement) or (ii) immediately upon notice to such effect by the Lender to the Debtor after the occurrence and during the continuance of an Event of Default, as defined in the DIP Loan Documents (the applicable termination date specified in clause (i) or (ii) above, the "Termination Date").

4.     **Automatic Post-Petition Lien Perfection**.    This Final Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, and priority of the DIP Lien and the DIP Chapter 5 Lien without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction, (b) obtaining consents from any landlord, licensor, or other party-in-interest, (c) complying with any requirement, under the Uniform Commercial Code or otherwise, to specifically identify any commercial tort claim, or (d) taking any other action to validate or perfect the DIP Lien and the DIP Chapter 5 Lien or to entitle the DIP Lien and the DIP Chapter 5 Lien to the priorities granted herein.  Notwithstanding the foregoing, the Lender may, in its sole discretion, file financing statements, mortgages, security agreements, notices of liens, or other similar documents, and is hereby granted relief from the automatic stay of Section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been filed or recorded at the time of and on the Petition Date.  Any provision of any loan document, use agreement, proffer, covenant, license, contract,

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd. Suite 1400
Costa Mesa, California 92626-7689

FINAL ORDER RE FIRST DAY MOTIONS

organizational document, or other instrument or agreement that requires the payment of any fees or obligations to any governmental entity or non-governmental entity in order for the Debtor to pledge, grant, mortgage, sell, assign, or otherwise transfer any interest or the proceeds thereof or other collateral subject to the DIP Lien or DIP Chapter 5 Lien, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the liens on such interests or the proceeds of any assignment and/or sale thereof by the Debtor in favor of the Lender in accordance with the terms of the DIP Loan Documents and this Final Order.

5. **Carve Out**. The DIP Lien, DIP Chapter 5 Lien, and DIP Superpriority Claims shall be subject and subordinate to payment of the Carve-Out (as defined below) solely in the event of the delivery of a Carve-Out Trigger Notice (as defined below) after the occurrence and during the continuance of an Event of Default under, and as defined in, the DIP Loan Documents:

a. For purposes of this Final Order, "Carve-Out" means (i) all unpaid fees required to be paid in the Bankruptcy Case to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a)(6), in such amount agreed to by the Office of the United States Trustee or as determined by the Bankruptcy Court, whether arising prior to or after the delivery of the Carve-Out Trigger Notice; (ii) fees, disbursements, costs, and expenses which are incurred after the Petition Date and before the delivery of a Carve-Out Trigger Notice in an amount not to exceed the amount of $750,000.00, less any amount actually paid to each such Professional, retained by the Debtor and any Committee pursuant to Bankruptcy Code Sections 327, 330, 333, 363 and 1103 (collectively, the "Professionals"), to the extent allowed at any time by the Bankruptcy Court and owed pursuant to such Professionals' respective engagement letters; (iii) the fees, disbursements, costs, and expenses of Professionals in an aggregate amount not to exceed $250,000.00 that are incurred after the delivery of a Carve-Out Trigger Notice and which are ultimately allowed by the Bankruptcy Court (the "Carve-Out Cap"). The term "Carve-Out Trigger Notice" shall mean a written notice delivered

FINAL ORDER RE FIRST DAY MOTIONS

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

by the Lender to the Debtor's lead counsel, the U.S. Trustee, and lead counsel to any Committee appointed in the Bankruptcy Case, which notice may be delivered at any time following the occurrence and during the continuation of any Event of Default under the DIP Loan Documents, expressly stating that the Carve-Out (and the Carve-Out Cap) is invoked.

       b.     Following the delivery of the Carve-Out Trigger Notice after the occurrence and during the continuance of any Event of Default under the DIP Loan Documents, any payments actually made pursuant to Bankruptcy Code Sections 327, 328, 330, 331, 333 363, 503 or 1103 or otherwise, to Professionals shall (i) not be paid from the proceeds of any DIP Loan or post-petition Cash Collateral until such time as all retainers, if any, held by such Professionals have been reduced to zero, and (ii) in the case of any payments made on account of any fees and expenses described in clause (iii) of the definition of Carve-Out, reduce the Carve-Out Cap on a dollar-for-dollar basis.

       c.     Nothing herein shall be construed as consent to the allowance of any Professional fees or expenses of the Debtor, any Committee Bankruptcy Case, or of any other person or entity, or shall affect the right of the Lender to object to the allowance and payment of such fees and expenses.

6.    **Waiver of Section 506(c) Claims**.  As a further condition of the DIP Facility and any obligation of the Lender to make credit extensions pursuant to the DIP Loan Documents (and their consent to the payment of the Carve-Out to the extent provided herein), no costs or expenses of administration of the Bankruptcy Case shall be charged against or recovered from or against the Lender or any collateral subject to the DIP Lien or the DIP Chapter 5 Lien pursuant to Section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the Lender, and no such consent shall be implied from any action, inaction, or acquiescence of any or all of the Lender.

7.    **After-Acquired Property**.  Except as otherwise provided in this Final Order, pursuant to Section 552(a) of the Bankruptcy Code, all property acquired by the Debtor on or after the Petition Date is not, and shall not be, subject to any lien of any

FINAL ORDER RE FIRST DAY MOTIONS

person or entity resulting from any security agreement entered into by the Debtor prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtor that is subject to a valid, enforceable, perfected, and unavoidable lien as of the Petition Date which is not subject to subordination under the Bankruptcy Code or other provisions or principles of applicable law.

8.  **Proceeds of Subsequent Financing**.  If at any time prior to the indefeasible payment in full of all DIP Obligations (including subsequent to the confirmation of a Chapter 11 plan), the Debtor's estate, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to Sections 364(b), 364(c), 364(d) or any other provision of the Bankruptcy Code in violation of the DIP Loan Documents, then all of the cash proceeds derived from such credit or debt and all post-petition Cash Collateral shall immediately be turned over to the Lender, until indefeasible payment in full of the DIP Obligations in accordance with the DIP Loan Documents.

9.  **Disposition of Collateral Subject to the DIP Lien**.  The Debtor shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the collateral subject to the DIP Lien without the prior written consent of the Lender under the DIP Loan Documents (and no such consent shall be implied from any other action, inaction, or acquiescence by the Lender or any order of this Bankruptcy Court), except for sales of inventory in the ordinary course of business or except as otherwise permitted in the DIP Loan Documents and this Final Order and approved by the Bankruptcy Court to the extent required under applicable bankruptcy law.  Except to the extent otherwise expressly provided in the DIP Loan Documents, all proceeds from the sale, transfer, lease, encumbrance, or other disposition of any collateral subject to the DIP Lien outside the ordinary course of business shall be remitted to the Lender until payment in full of the DIP Obligations in accordance with the terms of the DIP Loan Documents.

10.  **Events of Default**.

a.  <u>Rights and Remedies Upon Event of Default.</u>  Any automatic stay

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

FINAL ORDER RE FIRST DAY MOTIONS

4850-8174-2177

Snell & Wilmer

L.L.P.

LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

1   otherwise applicable to the Lender is hereby modified, without requiring prior notice to or

2   authorization of the Bankruptcy Court, to the extent necessary to permit the Lender to

3   exercise (i) immediately upon the occurrence and during the continuance of an Event of

4   Default, all rights and remedies under this Final Order and the DIP Loan Documents, and

5   (ii) upon the occurrence and during the continuance of an Event of Default and the giving

6   of three business days' prior written notice (the "Enforcement Notice") to the Debtor

7   (with a copy to the United States Trustee, the lead counsel to any Committee), all rights

8   and remedies against the collateral provided for in the DIP Loan Documents or applicable

9   law including, without limitation, the right to enforce the DIP Lien through state law

10   foreclosure proceedings; provided, however, immediately following the giving of an

11   Enforcement Notice by the Lender any obligation otherwise imposed on the Lender to

12   provide any loan or other financial accommodation to the Debtor pursuant to the DIP

13   Facility (other than to permit the Debtor to use post-petition Cash Collateral in

14   accordance) shall immediately be suspended.  Following the giving of an Enforcement

15   Notice by the Lender, the Debtor and any Committee shall be entitled to an emergency

16   hearing before the Bankruptcy Court; provided, however, that any such emergency

17   hearing shall be limited to the issue of whether or not an Event of Default has occurred,

18   and the Debtor, the Committee and/or any other party in interest shall not have any right

19   to contest whether or not the automatic stay shall be lifted or modified as provided herein

20   or in the DIP Loan Documents. Upon entry of the Final Order, neither any Committee nor

21   the Debtor shall have any right to contest whether or not the automatic stay shall be lifted

22   or modified as provided herein or in the DIP Loan Documents.  Subject to any order of the

23   Bankruptcy Court that is entered during such three business-day period, the automatic

24   stay, as to the Lender, shall automatically terminate at the end of such notice period.

25           b.     Subject to the limitations in this Paragraph 10, the automatic stay

26   imposed under Bankruptcy Code Section 362(a) is hereby modified pursuant to the terms

27   of the DIP Credit Agreement as necessary to (i) permit the Debtor to incur all liabilities

28   and obligations to the Lender under the DIP Loan Documents, the DIP Facility, and this

Final Order, (ii) authorize the Lender to retain and apply payments hereunder, and (iii) otherwise to the extent necessary to implement and effectuate the provisions of this Final Order.

11. **Restriction on Use of Proceeds**. Notwithstanding anything herein to the contrary, no proceeds from the DIP Facility or any portion of the Carve-Out may be used by the Debtor, any Committee, or any trustee or other estate representative appointed in the Bankruptcy Case, or any other person, party, or entity to (or to pay any professional fees and disbursements incurred in connection therewith) (a) request authorization to obtain post-petition loans or other financial accommodations pursuant to Bankruptcy Code Section 364(c) or (d), or otherwise, other than (i) from the Lender or (ii) with the express written consent of the Lender; (b) investigate, assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, the Lender, and its respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any claims or defenses, any avoidance actions or other actions arising under Chapter 5 or Section 724(a) of the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority, and extent of the DIP Obligations, or the validity, extent, and priority of the DIP Obligations; (iv) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Protections; (v) any action seeking, or having the effect of, preventing, hindering, or otherwise delaying the Lender's assertion, enforcement, or realization on the collateral subject to the DIP Protections in accordance with the DIP Loan Documents or this Final Order; or (vi) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to the Lender hereunder or under the DIP Loan Documents.

17

FINAL ORDER RE FIRST DAY MOTIONS

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

12. **Proofs of Claim**. The Lender shall not be required to file proofs of claim evidencing the DIP Obligations or the DIP Protections in the Bankruptcy Case.

13. **Preservation of Rights Granted under the Order**.

a. No Non-Consensual Modification or Extension of Final Order. Unless all DIP Obligations shall have been indefeasibly been paid in Full, the Debtor shall not seek, and it shall constitute an Event of Default (resulting, among other things, in the termination of the Debtor's right to use post-petition Cash Collateral), if there is entered (i) an order amending, supplementing, extending, or otherwise modifying this Final Order or (ii) an order converting or dismissing the Bankruptcy Case, in each case, without the prior written consent of the Lender, and no such consent shall be implied by any other action, inaction, or acquiescence.

b. Dismissal. If any order dismissing the Bankruptcy Case (under Section 1112 of the Bankruptcy Code or otherwise) is at any time entered, (i) such order shall have no effect on the DIP Protections, and the DIP Protections shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations have been indefeasibly paid in full, and all DIP Protections, shall, notwithstanding such dismissal, remain binding on all parties-in-interest, and (ii) the Bankruptcy Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such DIP Protections.

c. Modification of Final Order. Based on the findings set forth in this Final Order and in accordance with Section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility, in the event any or all of the provisions of this Final Order are hereafter reversed, modified, vacated, or stayed by a subsequent order of the Bankruptcy Court or any other court, the Lender shall be entitled to the protections provided in Section 364(e) of the Bankruptcy Code, and no such reversal, modification, vacatur, or stay shall affect (i) the validity, priority, or enforceability of any DIP Protections granted or incurred prior to the actual receipt of written notice by the Lender of the effective date of such reversal, modification, vacatur, or stay or (ii) the validity or

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

18

FINAL ORDER RE FIRST DAY MOTIONS

1    enforceability of any lien or priority authorized or created hereby or pursuant to the DIP

2    Loan Documents.  Notwithstanding any such reversal, modification, vacatur, or stay, any

3    DIP Protections incurred or granted by the Debtor prior to the actual receipt of written

4    notice by the Lender of the effective date of such reversal, modification, vacatur, or stay

5    shall be governed in all respects by the original provisions of this Final Order, and the

6    Lender shall be entitled to all of the DIP Protections and all other rights, remedies, liens,

7    priorities, privileges, protections, and benefits granted in Section 364(e) of the Bankruptcy

8    Code, this Final Order, and pursuant to the DIP Loan Documents.

9              d.    <u>Survival of Final Order.</u>  The provisions of this Final Order and the

10   DIP Loan Documents, any actions taken pursuant hereto or thereto, all of the DIP

11   Protections, and all other rights, remedies, liens, priorities, privileges, protections, and

12   benefits granted to the Lender shall survive, and shall not be modified, impaired, or

13   discharged by, the entry of any order confirming any plan of reorganization in the

14   Bankruptcy Case, converting the Bankruptcy Case to a case under Chapter 7, dismissing

15   the Bankruptcy Case, providing for abstention from handling or retaining of jurisdiction

16   of the Bankruptcy Case in the Bankruptcy Court, or by any other act or omission.  The

17   terms and provisions of this Final Order, including all of the DIP Protections, and all other

18   rights, remedies, liens, priorities, privileges, protections, and benefits granted to the

19   Lender, shall continue in full force and effect notwithstanding the entry of any such order,

20   and such DIP Protections shall continue in the Bankruptcy Case, and shall maintain their

21   respective priorities as provided by this Final Order.  The DIP Obligations shall not be

22   discharged by the entry of an order confirming a Chapter 11 plan in the Bankruptcy Case,

23   the Debtor having waived such discharge pursuant to Section 1141(d)(4) of the

24   Bankruptcy Code.

25        14.   **Other Rights and Obligations**.

26              a.    <u>Binding Effect.</u>  The provisions of this Final Order, including all

27   findings herein, and the DIP Loan Documents shall be binding upon all parties-in-interest

28   in the Bankruptcy Case, including, without limitation, the Lender, any Committee, and the

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

19

FINAL ORDER RE FIRST DAY MOTIONS

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

1    Debtor and their respective successors and assigns (including any Chapter 7 or Chapter 11

2    trustee hereinafter appointed or elected for the Debtor's estate, an examiner appointed

3    pursuant to Section 1104 of the Bankruptcy Code or any other fiduciary or responsible

4    person appointed as a legal representative of the Debtor or with respect to the property of

5    the Debtor's estate), in the Bankruptcy Case or upon dismissal of the Bankruptcy Case.

6            b.    <u>No Waiver.</u>    Neither the failure of the Lender to seek relief or

7    otherwise exercise its rights and remedies under this Final Order, the DIP Loan

8    Documents, or otherwise (or any delay in seeking or exercising same), shall constitute a

9    waiver of the Lender's rights hereunder, thereunder, or otherwise.   Except as expressly

10   provided herein, nothing contained in this Final Order (including, without limitation, the

11   authorization of the use of any post-petition Cash Collateral) shall impair or modify any

12   rights, claims, or defenses available in law or equity to the Lender, including, without

13   limitation, rights to a swap agreement, securities contract, commodities contract, forward

14   contract or repurchase agreement with the Debtor to assert rights of setoff or other rights

15   with respect thereto as permitted by law (or the right of the Debtor to contest such

16   assertion).   Except as prohibited by this Final Order, the entry of this Final Order is

17   without prejudice to, and does not constitute a waiver of, expressly or implicitly, or

18   otherwise impair the Lender under the Bankruptcy Code or under non-bankruptcy law, to

19   (i) request conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy

20   Code, dismissal of the Bankruptcy Case, or the appointment of a trustee in the Bankruptcy

21   Case, (ii) propose, subject to the provisions of Section 1121 of the Bankruptcy Code, any

22   Chapter 11 plan with respect to the Debtor, or (iii) exercise any of the rights, claims, or

23   privileges (whether legal, equitable, or otherwise) of the Lender.

24           c.    <u>No Third Party Rights.</u>  Except as explicitly provided for herein, this

25   Final Order does not create any rights for the benefit of any third party, creditor, equity

26   holder, or any direct, indirect, or incidental beneficiary.  In determining to make any loan

27   or financial accommodation (whether under the DIP Loan Documents or otherwise) or to

28   permit the use of post-petition Cash Collateral or in exercising any rights or remedies as

FINAL ORDER RE FIRST DAY MOTIONS

1  and when permitted pursuant to this Final Order or the DIP Loan Documents, the Lender

2  shall not (i) be deemed to be in control of the operations of the Debtor, or (ii) owe any

3  fiduciary duty to the Debtor, its creditors, equity holders, or estate.

4           d.    <u>No Marshaling.</u>   The Lender shall not be subject to the equitable

5  doctrine of "marshaling" or any other similar doctrine with respect to any of the collateral

6  subject to the DIP Lien.

7           e.    <u>Amendments.</u>   The Debtor is authorized and empowered, without

8  further notice and hearing or approval of the Bankruptcy Court, to amend, modify,

9  supplement, or waive any provision of the DIP Loan Documents in accordance with the

10  provisions thereof, in each case unless such amendment, modification, supplement, or

11  waiver (i) increases the interest rate, (ii) increases the aggregate lending commitments of

12  the Lender in respect of the DIP Facility, (iii) changes the Maturity Date (under and as

13  defined in the DIP Loan Documents) or (iv) adds or amends any Event of Default. No

14  waiver, modification, or amendment of any of the provisions hereof shall be effective

15  unless set forth in writing, signed by or on behalf the Debtor, the Lender, and, except as

16  provided herein, approved by the Bankruptcy Court.

17           f.    <u>Inconsistency.</u>   In the event of any inconsistency between the terms

18  and conditions of the DIP Loan Documents and of this Final Order, the provisions of this

19  Final Order shall govern and control.

20           g.    <u>Enforceability.</u>   This Final Order shall constitute findings of fact and

21  conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be

22  fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

23  Notwithstanding Bankruptcy Rules 4001, 6004, 6006, 7062, or 9024, or any other

24  Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order

25  shall be immediately effective and enforceable upon its entry, and there shall be no stay of

26  execution or effectiveness of this Final Order.

27           h.    <u>Preservation of Claims and Causes of Actions.</u>   Nothing in this Final

28  Order shall constitute a release or waiver of any claims, causes of action, or rights against

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

FINAL ORDER RE FIRST DAY MOTIONS

4850-8174-2177

1   any party, individual, or entity, except for the waivers of the Lender contained herein or in

2   the DIP Loan Documents.

3               i.      Headings.  Paragraph headings used herein are for convenience only

4   and are not to affect the construction of or to be taken into consideration in interpreting

5   this Final Order.

6               j.      Retention of Jurisdiction.  The Bankruptcy Court has and will retain

7   jurisdiction to enforce this Final Order according to its terms.

8

9

10  DATED:_____                    _____

11                                                   Honorable ████████████████
                                                     United States Bankruptcy Judge

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

FINAL ORDER RE FIRST DAY MOTIONS

4850-8174-2177

**TO THE HONORABLE _____, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND ALL OTHER INTEREST PARTIES:**

Please take notice that on _____ at _____, in the Courtroom of the Honorable _____, United States Bankruptcy Judge, located at _____ _____, California, a hearing will be held to consider the _____ (the "_____") filed by _____ ("_____"). Pursuant to the _____, [client] seeks an order from the Court _____

_____

_____

_____

_____

**PLEASE TAKE NOTICE** that pursuant to LBR 9014-1(f)(1)(B), opposition, if any, to the granting of the Motion shall be in writing and shall be served and filed with the Court by the responding party at least fourteen (14) days preceding the date or continued date of the hearing. Opposition shall be accompanied by evidence establishing its factual allegations. Without good cause no party shall be heard in opposition to the Motion at oral argument if written opposition to the Motion has not been timely filed. Failure of the responding party to timely file written opposition may be deemed a waiver of any opposition to the granting of the Motion or may result in the imposition of sanctions.

DATED:

_____

Honorable _____
United States Bankruptcy Judge

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689

23

FINAL ORDER RE FIRST DAY MOTIONS

4850-8174-2177